# United States Court of Appeals
# For the First Circuit

No. 26-8037
In re: MCP 198
*(Caption Continued on Inside Cover)*

On Petitions for Review of a Final Order of the
Federal Communications Commission

## JOINT OPENING BRIEF OF PETITIONERS DIRECT ACTION FOR RIGHTS AND EQUALITY, CRIMINAL JUSTICE REFORM CLINIC, PENNSYLVANIA PRISON SOCIETY, AND UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.


Andrew Jay Schwartzman
525 Ninth Street, NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

Erik Stallman
SAMUELSON LAW, TECHNOLOGY & PUBLIC POLICY CLINIC
UC Berkeley School of Law
353 Law Building
Berkeley, CA 94720
Telephone: (510) 642-2485
estallman@clinical.law.berkeley.edu

*Counsel for United Church of Christ Media Justice Ministry, Inc.*

Arjun R. Ramamurti
Jessica Ring Amunson
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
aramamurti@jenner.com

*Counsel for Direct Action for Rights and Equality*

Stephen A. Raher
TABOR LAW
4110 SE Hawthorne Blvd., PMB #506
Portland, OR 97214
Telephone: (971) 867-2440
sraher@pdx-law.com

*Counsel for Criminal Justice Reform Clinic*

No. 26-1446

UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

---

No. 26-1447

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

---

No. 26-1448

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

---

No. 26-1449

NETWORK COMMUNICATIONS INTERNATIONAL CORPORATION,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

---

No. 26-1450

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

---

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, Public Interest Petitioners submit the following corporate disclosure statements:

**Direct Action for Rights and Equality** is a non-profit organization. Direct Action for Rights and Equality has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**Criminal Justice Reform Clinic** is a non-profit organization. Criminal Justice Reform Clinic has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**Pennsylvania Prison Society** is a non-profit organization. Pennsylvania Prison Society has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**United Church of Christ Media Justice Ministry** is a non-profit organization. United Church of Christ Media Justice Ministry has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........ i

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

STATUTES AND REGULATIONS ........ 5

ISSUES PRESENTED ........ 5

STATEMENT OF THE CASE ........ 6

A. The Failed Market for IPCS and Prior Regulatory Efforts ........ 6

B. The Martha Wright-Reed Act ........ 8

C. The 2024 Order ........ 9

D. The Commission's Retreat from the 2024 Order ........ 14

E. The 2025 Order ........ 16

F. Procedural History ........ 20

SUMMARY OF ARGUMENT ........ 20

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 23

I. THE COMMISSION'S INCLUSION OF ALL SAFETY AND SECURITY COSTS IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ........ 23

A. The Inclusion of All Safety and Security Costs Is Contrary to the MWRA's "Just and Reasonable" and "Necessary to Provide" Requirements. ........ 23

B. The Commission's Reversal on Safety and Security Costs Is Arbitrary and Capricious. ....................................................................32

II. THE COMMISSION'S FACILITY COST ADDITIVE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ...........39

A. The Additive Is an Unlawful Site Commission and Compensates Entities Outside the MWRA's Scope..................................................40

B. The Commission's Reversal on the Additive Is Arbitrary and Capricious...........................................................................................42

III. THE COMMISSION'S INFLATION FACTOR WAS ADOPTED WITHOUT ADEQUATE NOTICE AND IS UNLAWFUL AND UNREASONABLE. .........................................................................46

A. The Commission Introduced an Inflation Factor Without Adequate Notice. .........................................................................46

B. The Commission's Reversal on the Inflation Factor Is Contrary to Law and Arbitrary and Capricious. ................................................48

IV. THE COURT SHOULD VACATE THE 2025 ORDER'S RATE CAPS AND FACILITY COST ADDITIVE, RESTORING THE 2024 ORDER'S CAPS. ...........................................................................52

CONCLUSION ...........................................................................................53

## TABLE OF AUTHORITIES

**CASES**

*Allentown Mack Sales & Service, Inc. v. N.L.R.B*, 522 U.S. 359 (1998) ................32

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993)..........................................................................52

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) .................................51

*Bruno Project Rescue, Inc. v. CDC*, 182 F.4th 1 (1st Cir. 2026) ................ 22-23, 24

*Chamber of Commerce of United States v. EPA*, 2026 WL 2409748 (D.C. Cir. Aug. 18, 2026) .................................................................................46

*Chlorine Chemistry Council v. EPA*, 206 F.3d 1286 (D.C. Cir. 2000) ...................38

*DHS v. Regents of University of California*, 591 U.S. 1 (2020)........................34, 46

*District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) ...........................................................................................................43

*Environmental Integrity Project v. United States EPA*, 425 F.3d 992 (D.C. Cir. 2005) ......................................................................................................48

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................23, 33, 43, 49

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).............................5

*In re Financial Oversight and Management Board for Puerto Rico*, 110 F.4th 295 (1st Cir. 2024)...................................................................................5

*Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).....................................7, 8

*GTE Service Corp. v. FCC*, 205 F.3d 416 (D.C. Cir. 2000).............................26, 29

*Housatonic River Initiative v. United States EPA*, 75 F.4th 248 (1st Cir. 2023) ...........................................................................................................34

*Liquid Energy Pipeline Ass'n v. FERC*, 109 F.4th 543 (D.C. Cir. 2024) ...........................................................................................................48

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .................................23, 24

*In re MCP 191*, 158 F.4th 294 (1st Cir. 2025) (per curiam)....................................16

*In re MCP 191*, No. 24-8028 (1st Cir.)....................................................................14

*MISO Transmission Owners v. FERC*, 45 F.4th 248 (D.C. Cir. 2022) ...................37

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).........23, 34, 35, 50

*National Ass'n of Broadcasters v. FCC*, 147 F.4th 978 (D.C. Cir. 2025) ..............................................................................................................47

*National Lime Ass'n v. EPA*, 627 F.2d 416 (D.C. Cir. 1980).................................36

*NLRB v. Lily Transportation Corp.*, 853 F.3d 31 (1st Cir. 2017) ...........................49

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ..........................................................50

*Small Refiner Lead Phase-Down Task Force v. United States EPA*, 705 F.2d 506 (D.C. Cir. 1983).........................................................................48

*Sprint Corp. v. FCC*, 315 F.3d 369 (D.C. Cir. 2003) ..............................................48

*Tennessee Gas Pipeline Co. v. FERC*, 606 F.2d 1094 (D.C. Cir. 1979)................24

*Time Warner Entertainment Co., L.P. v. FCC*, 56 F.3d 151 (D.C. Cir. 1995) ..............................................................................................................26

*TransCanada Marketing Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015)..............28, 31

**STATUTES**

5 U.S.C. § 553 ........................................................................................................46

5 U.S.C. § 706(2) ....................................................................................................52

5 U.S.C. § 706(2)(A).................................................................................................22

5 U.S.C. § 706(2)(D).................................................................................................22

28 U.S.C. § 2342(1) ...................................................................................................4

28 U.S.C. § 2344 ...................................................................................................4, 5

47 U.S.C. § 201(b) .....................................................................................................7

47 U.S.C. § 276 .......... 7

47 U.S.C. § 276(b)(1)(A) .......... 3, 9, 16, 39, 41

47 U.S.C. § 276(b)(1)(A) (2022) .......... 7

47 U.S.C. § 402(a) .......... 4

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) .......... 1, 3, 9, 25, 26, 39, 42, 45


**LEGISLATIVE MATERIALS**

168 Cong. Rec. H10027-28 (daily ed. Dec. 22, 2022) (statement of Rep. Rush) .......... 8


**ADMINISTRATIVE RULINGS**

*AT&T Co. Phase II Order*, 64 F.C.C.2d 1 (1977), *modified by* 72 F.C.C.2d 1 (1979) .......... 25, 27

*Business Data Services in an Internet Protocol Environment et al.*, 32 FCC Rcd 3459 (2017), *review granted in part, vacated in part*, *Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018) .......... 51

*Investigation of Special Access Tariffs of Local Exchange Carriers*, FCC 86-52, 1986 WL 291617 (1986) .......... 24

*Price Cap Performance Review for Local Exchange Carriers; Treatment of Video Dialtone Services Under Price Cap Regulation*, 10 FCC Rcd 3141 (1995) .......... 51

*Sandwich Isles Communications, Inc.*, 34 FCC Rcd 577 (2019) .......... 24, 27


**OTHER AUTHORITIES**

47 C.F.R. § 1.1203 .......... 48

47 C.F.R. § 64.6030 .......... 41

90 Fed. Reg. 56,013 (Dec. 5, 2025) .......... 20

Application for Review of the Public Interest Parties, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 & 12-375 (FCC filed July 30, 2025) ....................................15

FCC Br., *In re: MCP 191*, No. 26-8037 (1st Cir. June 13, 2025) ...............14, 15, 26

Order, *In re MCP 191*, No. 24-8028 (1st Cir. Dec. 11, 2025)..................................16

## INTRODUCTION

This case seeks review of a 2025 order of the Federal Communications Commission (the "Commission" or "FCC") that unlawfully and unreasonably reversed course and increased the per-minute rate caps that providers can charge for incarcerated people's communications services ("IPCS").[1] Affordable IPCS is essential for incarcerated people to maintain vital connections with their family, loved ones, and broader support systems. Even a cent or two more in per-minute calling rates makes an extraordinary difference to incarcerated people's ability to stay in touch. Yet for decades, incarcerated people paid exorbitant prices because IPCS providers and carceral facilities took advantage of market failures to force incarcerated people to pay monopoly prices and the cost of "site commissions" that did not directly benefit them and were not prudently incurred in the provision of IPCS.

That all changed in 2024. Acting pursuant to expanded statutory authority that Congress conferred in the bipartisan Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWRA"), Pub. L. No. 117-338, 136 Stat. 6156 (2023), the Commission unanimously took decisive action to limit IPCS providers' ability to recover costs for expenditures that are not actually "used and useful" to

---

[1] *See generally Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 40 FCC Rcd 9365 (2025) ("2025 Order") (JA__).

IPCS consumers.[2] The 2024 Order dramatically reduced the rate caps across all tiers of prisons and jails, including reducing rate caps from $0.14 per minute to $0.06 per minute for prisons, and from $0.21 per minute to $0.07 for medium jails. 2024 Order ¶ 4 (JA__). In April 2025, the Commission fully defended its 2024 Order in its brief to this Court, including against challenges from IPCS providers, states, and sheriffs' organizations.

Six months later, however, the Commission abruptly changed course. In the 2025 Order, a divided Commission reverted to higher rate caps—in some instances setting them closer to the pre-MWRA rate caps than to those set in the 2024 Order. Thus, the 2025 Order raised the rate caps for prisons from $0.06 per minute to $0.11 per minute and for medium jails from $0.07 per minute to $0.12 per minute. 2025 Order ¶ 8 (JA__). The Commission did so despite purporting to rely on the same "used and useful" framework it adopted in the 2024 Order, the same underlying data from IPCS providers, and essentially the same record. According to the Commission, those drastic changes to the nationwide rate caps across every facility tier were necessary as "interim" measures to address isolated concerns from facilities about their ability to continue offering IPCS, and to account for newfound uncertainty about providers' self-reported costs. Based on those tenuous premises—

[2] *See generally Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 39 FCC Rcd 7647 (2024) ("2024 Order") (JA__).

which were in fact already addressed and accounted for in the 2024 Order—the 2025 Order raised the rate caps by resolving every ambiguity in providers' favor.

That approach conflicts with the MWRA, well-established ratesetting principles, the record before the Commission, and the Commission's own prior findings, all of which limit rate recovery to those costs that the Commission *affirmatively* finds to directly benefit IPCS consumers. As Commissioner Gomez put it in her dissent, the 2025 Order is "indefensible," "implements an egregious transfer of wealth from families in incredibly vulnerable situations to monopoly companies that seek to squeeze every penny out of them," and "give[s] the monopoly companies that have provided the supposedly insufficient data everything they ask for and more." *Id*. at 9455-56 (Statement of Commissioner Gomez) (JA__) ("Gomez Dissent").

In particular, the 2025 Order is contrary to law and arbitrary and capricious in three respects. *First*, after rejecting five categories of IPCS providers' self-reported safety and security costs in the 2024 Order, the Commission chose to include all seven categories of those costs in its new rate cap calculations. That decision, which adds hundreds of millions of dollars in costs to the rate-cap calculations, is contrary to the MWRA's requirements that rates be "just and reasonable" for IPCS consumers and that the Commission consider only those safety and security costs that are "necessary to provide" IPCS. 47 U.S.C. § 276(b)(1)(A); MWRA § 3(b)(2). It is

also an unreasoned departure from the Commission's approach on the same record a year earlier. *Second*, the Commission authorized an across-the-board "additive" to compensate carceral facilities by up to $0.02 per minute. The additive is an unlawful site commission in all but name, and it arbitrarily applies across every facility tier based on a flawed, decade-old survey only of jails that the Commission itself has repeatedly found unreliable. *Third*, without notice and at the behest of a provider's *ex parte* letter filed on the last permissible day, the Commission adopted an unprecedented 6.73% inflation factor that included no offset for productivity gains, silently reversing its 2024 finding that the record did not support any such adjustment.

In light of these serious errors, the Court should grant these petitions for review, vacate and remand the 2025 Order's interim rate caps and facility cost additive, and make clear that the 2024 Order's lower rate caps will be in effect pending further Commission action.

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). The Commission released the final 2025 Order on November 6, 2025, and it was published in the Federal Register on December 5, 2025. Public Interest Petitioners participated in the proceedings below and are "part[ies] aggrieved" under 28 U.S.C. § 2344. *See* Letter from Cheryl A. Leanza *et al.* to

Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Oct. 21, 2025) (JA__). Public Interest Petitioners work with or represent incarcerated individuals and depend on affordable IPCS to carry out their missions. Add. 5-7, 9, 10-11, 16, 18-19; *see also* Letter from Melonie Perez *et al.* to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) (JA__). The higher rates imposed by the 2025 Order have imposed costs on their organizations or their members by increasing the cost of calls or directly affecting and interfering with their core activities, and vacatur of the 2025 Order's rate caps would redress those injuries. *See* Add. 6-7, 9, 12-13, 16-17, 19-21; *see generally In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024); *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Public Interest Petitioners timely petitioned for review of the 2025 Order on December 10 and 11, 2025. *See* 28 U.S.C. § 2344.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum.

## ISSUES PRESENTED

1. Whether the Commission's decision to reverse course and include all seven categories of IPCS providers' self-reported safety and security costs in its rate cap calculations is contrary to law and arbitrary and capricious.

2. Whether the Commission's decision to authorize a facility cost additive of up to $0.02 per minute for every facility tier is contrary to law and arbitrary and capricious.

3. Whether the Commission's decision to include an inflation factor without notice and without accounting for offsetting productivity gains is without observance of procedures required by law, contrary to law, and arbitrary and capricious.

## STATEMENT OF THE CASE

### A. The Failed Market for IPCS and Prior Regulatory Efforts

Incarcerated people have long paid high rates to stay in touch with the outside world because they have been forced to bear various costs that do not benefit them. IPCS providers enter into monopoly contracts with carceral facilities to offer audio and sometimes video calling services, with incarcerated people "play[ing] no role in the process of selecting IPCS providers or the services they offer," and "hav[ing] no choice but to pay rates and charges imposed if they wish to call their family or other loved ones." 2024 Order ¶ 23 (JA__). This lack of competition means that there are "no competitive forces to constrain providers from imposing rates and charges that far exceed the costs required to provide services." *Id.* To win those lucrative monopoly contracts, IPCS providers often agreed to pay "site commissions" to carceral facilities, with the costs of those commissions, too, passed on to incarcerated

people and their families. *See, e.g.*, *Id.* ¶¶ 247-254 (JA__-__). As part of the rates they paid for IPCS, incarcerated people were further required to pay for various safety and security measures—such as for search warrant processing or monitoring, storing, and transcribing recorded communications—that primarily served law enforcement purposes and did not benefit them. *Id.* ¶¶ 341-346 (JA__-__). The resulting high rates meant that loved ones in some instances had to "choose between basic necessities, such as [] food, and communications." *Id.* ¶ 28 (JA __).

Prior to the MWRA, the Commission attempted to address high IPCS rates on several occasions based on its authority under Sections 276 and 201(b) of the Communications Act. 47 U.S.C. §§ 276, 201(b). At that time, Section 276(b)(1)(A) required IPCS providers to be "fairly compensated for each and every completed intrastate and interstate call using their payphone," 47 U.S.C. § 276(b)(1)(A) (2022), and Section 201(b) required that "[a]ll charges" for interstate communications services be "just and reasonable," *id.* § 201(b).

In 2015, the Commission set its first permanent rate caps for interstate and intrastate calling services and explicitly excluded the recovery of site commissions. *See Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763, ¶¶ 7, 106-116, 144-145 (2015) (JA__, __-__, __). But the D.C. Circuit vacated the Commission's 2015 reforms in large part. *See generally Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ("*GTL*"). In particular, the D.C. Circuit held that the Commission

exceeded its authority in capping intrastate call rates because Section 201(b) does not reach intrastate calls and Section 276 included no authorization to set "just and reasonable" rates. *Id.* at 408-12. The court further held that the Commission acted arbitrarily and capriciously by categorically refusing to consider site commissions as part of the cost to IPCS providers of providing the service. *Id.* at 412-14.

Following *GTL*, the Commission took several modest actions to address IPCS rates, but IPCS rates remained high. *See* 2024 Order ¶¶ 15-20 (JA __-__); *see generally Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, ¶¶ 3, 40 (2021) ("2021 Order") (JA__, __). But the Commission could not address intrastate audio rates or video rates, and site commission pass-throughs remained with a $0.02 per minute cap for facilities with ADP of 1,000 or more where the site commission payment was not mandated by law. 2021 Order ¶ 3 (JA__).

### B. The Martha Wright-Reed Act

In January 2023, "in the face of years of litigation frustrating the Commission's reform efforts in this area, Congress passed the [MWRA]." 2024 Order ¶ 1 (JA__); *see also* 2025 Order ¶ 3 n.4 (JA__) (similar). The Act was a direct response to *GTL* and sought to "en[d] the practice of phone companies charging families astronomically high rates to call incarcerated loved ones in prison," which were "unjust and unreasonable." 168 Cong. Rec. H10028 (daily ed. Dec. 22, 2022) (statement of Rep. Rush).

As relevant here, Congress expressly amended § 276(b)(1)(A) to provide that the Commission must ensure "just and reasonable" rates for IPCS. MWRA § 2(a). Congress also eliminated the prior requirement in § 276(b)(1)(A) that providers be fairly compensated on a "per call" basis for "each and every" call, *id.* § 2(a)(1), instead expressly authorizing the Commission to use "industry-wide average costs," *id.* § 3(b)(1). Other sections of the MWRA require the Commission to "consider costs associated with any safety and security measures *necessary to provide*" IPCS, MWRA § 3(b)(2) (emphasis added), while more broadly providing that "[n]othing in this Act shall be construed to … prohibit the implementation of any safety and security measures *related to* [IPCS] services at" carceral facilities. *Id.* § 4 (emphases added). And, recognizing the urgency of reform, Congress directed the Commission to promulgate new IPCS regulations implementing the MWRA "not later than 24 months after" the MWRA's enactment. *Id.* § 3(a).

### C. The 2024 Order

In July 2024, the Commission unanimously adopted the 2024 Order. The Commission first concluded that Congress' addition of a "just and reasonable" standard in § 276(b)(1)(A) required it to incorporate the "used and useful" framework that it had employed for decades under the same language in § 201(b). 2024 Order ¶ 41 (JA__). That framework "focuses on affording regulated entities an opportunity to recover their '*prudently incurred* investments and expenses that

are "used and useful" in the provision of the regulated service for which rates are being set.'" *Id.* ¶ 42 (JA__) (quoting 2021 Order ¶ 126). As applied to the IPCS context, the "used and useful" framework "allows [the Commission] to recognize all IPCS costs that *benefit IPCS users*, including any such costs incurred by correctional facilities, as costs that should be recovered through IPCS rates and charges." *Id.* ¶ 43 (JA__). This approach then produces a "zone of reasonableness" within which rates are considered just and reasonable. *Id.* ¶ 62 & n.211 (JA__) (quotation marks omitted). Consistent with the Commission's historical approach to ratesetting, "[t]he lower bounds of [the] zones of reasonableness reflect[ed] only those costs that the record *affirmatively establishes* as generally being used and useful in the provision of IPCS." *Id.* ¶ 178 (JA__).

To determine the rate caps themselves, the Commission relied on a mandatory data collection ("MDC") in which providers were required to self-report their costs for calendar year 2022. *See id.* ¶ 17 & n.60 (JA__). The MDC required providers to report their claimed safety and security costs across seven categories specified by the Commission: "CALEA Compliance Measures," "Law Enforcement Support Services," "Communication Security Services," "Communication Recording Services," "Communication Monitoring Services," "Voice Biometrics Services," and "Other Safety and Security Measures." *Id.* App'x I, ¶ 55 Tbl. 6 (JA__). The Commission concluded that the data gleaned from the MDC meant that it now had

a "sufficiently robust record to apply the used and useful framework for the first time to [] safety and security measures." *Id.* ¶ 372 (JA__). At the same time, the Commission recognized that these self-reported costs were likely "overstated" given that they exceeded IPCS providers' total revenues by $219 million. *Id.* ¶ 210 (JA__).

The Commission accounted for that fact in setting the rate caps. The Commission first set the upper bounds of the zones of reasonableness by including all of IPCS providers' reported costs. *Id.* ¶¶ 189-197 & App'x H (JA__, __). But to determine the lower bounds, the Commission deducted from the upper bounds all costs that it could not determine were "used and useful" to consumers in the provision of IPCS. As relevant here, applying the "used and useful" standard, the Commission excluded from the lower bounds costs associated with five of seven safety and security categories (all but "CALEA Compliance Measures" and "Communications Security Services"). Applying that framework, the Commission concluded that the costs included in the five excluded categories predominantly served law enforcement purposes, did not directly benefit IPCS consumers, and were not "necessary to provide" IPCS. *Id.* ¶¶ 381-386 (JA__-__). The Commission explained that "[a]llowing the costs of measures that are not used and useful in the provision of IPCS to be recovered through IPCS rates would be inconsistent with" the MWRA's "mandate[] that [it] ensure just and reasonable IPCS rates for incarcerated people and their loved ones," *id.* ¶ 374 (JA__), and that "correctional

facilities remain free to implement any safety and security measures of their choosing," *id.* ¶ 379 (JA__). The Commission also rejected the notion that curtailing cost recovery would cause facilities to stop providing IPCS, noting that access to IPCS improves the safety of facilities and that "denial or reduction of access to IPCS" would likely "elicit an intensely negative backlash." *Id.* ¶ 312 (JA__) (citation omitted).

The Commission further adopted a two-cent facility cost "additive" in the upper bounds of its zones of reasonableness, based largely on a 2015 submission from the National Sheriffs' Association ("NSA") that it conceded was outdated, unrepresentative, non-specific, and inflated. *Id.* ¶¶ 164-167 (JA__-__). But by accounting for facility costs only in the upper bounds rather than in the rate caps themselves, the Commission expressly "decline[d] requests that [it] instead account for [correctional facility] costs by adding a specific amount per-minute to our rate caps based on data from the [NSA] cost survey," recognizing that the flawed NSA submission could not support that result. *Id.* ¶ 169 (JA__). Nonetheless, the Commission also allowed IPCS providers to reimburse correctional facilities for any used-and-useful costs. *Id.* ¶ 181 (JA__).

The Commission also expressly rejected proposals to incorporate an inflation factor, finding no basis to conclude that inflation had outpaced productivity gains, and noting that telecommunications-industry inflation has historically run below

general measures of inflation. *See* 2024 Order ¶ 129 & n.431 (JA__). As the Commission explained, "Neither Securus nor any other party has shown that IPCS expenses have grown sufficiently fast since 2022, after accounting for industry productivity, to render 2022 expenses too low for the purpose of setting our rate caps," especially since "telecommunications industry inflation has been significantly lower than broader measures of inflation." *Id.* App. J, ¶ 8 (JA__).

Based on these and other determinations, the Commission determined the lower and upper bounds of the zones of reasonableness for each facility tier. The Commission then determined it would set the rate caps between the lower bound and the midpoint between the lower and upper bounds rather than at the lower bounds. *Id.* ¶¶ 209, 213 (JA__). That choice reflected a conservative approach to "minimize reliance on the imperfect data on which [the FCC] base[d] [its] rate caps" and to "account for the possibility that the adjustments [it] applied to providers' reported costs to obtain the lower bounds were too aggressive," as well as to "account for any inflation not offset by productivity growth." *Id.* ¶ 213 (JA__).

The result of applying the used-and-useful framework was a significant reduction in the rate caps, with the new per-minute audio rate caps for prisons and large jails, for example, cut to $0.06, down from $0.14 and $0.16, respectively. *Id.* ¶ 4 (JA__). To further ease the transition to lower rates, the 2024 Order set staggered compliance dates and allowing individual waivers for providers who could show

they were unable to recover their costs under the caps, *id.* ¶¶ 475-481, 587 (JA__-__, __). The 2024 Order also included a further notice of proposed rulemaking ("2024 FNPRM") that sought comment on specific issues pertaining to IPCS. *See id.* ¶¶ 608-625 (JA__-__).

### D. The Commission's Retreat from the 2024 Order

Petitions for review of the 2024 Order were consolidated in this Court. *See In re MCP 191*, No. 24-8028 (1st Cir.). Despite the change in presidential administration and agency leadership, the Commission filed a (never-withdrawn) brief defending the 2024 Order in full. The Commission correctly framed the problem as an effort "to address monopolistic power" held by IPCS providers, as well as facilities' incentive to "exploit their role in awarding monopoly contracts to providers" by "select[ing] providers based on the benefits providers offer to them" and then "pass[ing] [the cost] onto consumers." FCC Br., *In re: MCP 191*, No. 24-8028 (1st Cir. June 13, 2025) ("FCC 2024 Br."), at 1-2. The Commission's brief also specifically justified excluding most categories of safety and security costs, explaining that it "did not ignore warnings that correctional facilities might 'deny [access to] IPCS' if 'forced to choose between providing IPCS in an insecure manner or withholding it altogether,'" because the "Commission determined from the record" the "costs of measures that … were needed to provide IPCS safely" and "facilities remain free to purchase any other features they might wish to have." *Id.*

at 56-58 (citing 2024 Order ¶¶ 362 & n.1291). And it defended the 2024 Order's confinement to the upper bounds of the "self-reported" and "overstate[d]" NSA facility cost data, *id.* at 83, again rejecting contrary arguments that doing so would result in decreased access to IPCS, *see id.* at 83-85 (citing 2024 Order ¶¶ 26-30, 174, 266, 312).[3]

Just over two months later, the Commission abruptly shifted course. On June 30, 2025, the Wireline Competition Bureau took the highly unusual step of deciding unilaterally that the compliance deadlines for the new rate caps should be extended "until April 1, 2027, or any alternative date the Commission sets as part of further action in [this] proceeding" as the Commission considered whether to revisit the 2024 Order.[4] Thereafter, the Commission unsuccessfully sought to hold the case in abeyance. This Court then heard argument and issued an opinion holding that venue

---

[3] In their pending petitions for review of the 2024 Order, Public Interest Petitioners have challenged the Commission's reliance on the NSA data even as to the upper bounds.

[4] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 40 FCC Rcd 4309, ¶ 1 (WCB 2025) ("Waiver Order") (JA__). Several public interest organizations filed an application for review of the Waiver Order. *See* Application for Review of the Public Interest Parties, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 & 12-375 (FCC filed July 30, 2025); *see also* 2025 Order ¶ 89 n.245 (JA__) (purporting to "effectively provide[] the substance of the relief sought" in the Application).

was proper in the First Circuit. *See In re MCP 191*, 158 F.4th 294, 303 (1st Cir. 2025) (per curiam).[5]

**E. The 2025 Order**

On October 28, 2025, a divided Commission adopted the 2025 Order and set dramatically higher "interim" rate caps. The Commission claimed the 2025 Order addressed "unintended consequences" of the 2024 Order, *see, e.g.*, 2025 Order ¶¶ 1, 2, 5 (JA__), and acted pursuant to two sources: (1) the 2024 FNPRM accompanying the 2024 Order, and (2) a petition for reconsideration of the 2024 Order filed by Network Communications International Corporation ("NCIC"), an IPCS provider, *see id.* ¶ 6 (JA__).[6] Notably, in increasing the rate caps, the Commission did not revisit the 2024 Order's interpretive conclusions that the MWRA's addition of "just and reasonable" to Section 276(b)(1)(A) incorporates the used-and-useful framework and that the MWRA limits recoverable safety and security costs to those costs "necessary to provide" IPCS. The Commission also relied on no new data regarding safety and security costs.

---

[5] This Court also ordered supplemental briefing as to the extent to which the 2025 Order moots the petitions for review of the 2024 Order, which the parties have now fully briefed. *See* Order, *In re MCP 191*, No. 24-8028 (1st Cir. Dec. 11, 2025).

[6] *See generally* Petition for Reconsideration of Network Communications International Corp. d/b/a NCIC Correctional Services, WC Docket Nos. 23-62 & 12-375 (filed Oct. 21, 2024) ("NCIC Reconsideration Petition") (JA__).

As to safety and security costs, the 2025 Order "treat[ed] all reported safety and security costs as used and useful costs for determining the costs to be included in the lower bounds of the zones of reasonableness." *Id.* ¶ 29 (JA__). The Commission explained that "given the record which has developed since" the 2024 Order, the 2024 Order's rate caps "did not sufficiently recover providers' used and useful safety and security costs." *Id.* Notably, however, the "record" that had developed in the one year since the 2024 Order did not include any new cost data, and the only relevant developments were providers' and facilities' isolated and vague "concerns about jeopardizing access to IPCS." *Id.* The Commission identified only a single facility that had actually discontinued service. *Id.* ¶¶ 35-36 (JA__-__). The Commission also pointed to supposed confusion among providers about how to categorize costs under the MDC, *id.* ¶¶ 31-34 (JA__-__), even though the Commission had already accounted for that data uncertainty at length in the 2024 Order. *See, e.g.*, 2024 Order ¶ 387 (JA__). To justify its inclusion of 100% of self-reported safety and security costs, the Commission offered only a footnote that its new approach was "directionally aligned" with the used-and-useful framework because it was "*inherently* just and reasonable" to include all reported costs where their exclusion supposedly risked the continued provision of service. 2025 Order ¶ 57 n.179 (JA__).

As to facility costs, the Commission chose to adopt a "uniform rate additive of up to $0.02 per minute separate from and in addition to [its] rate caps to account for the costs correctional facilities incur in allowing access to IPCS." *Id.* ¶ 37 (JA__). It did so based on the concededly unreliable 2015 NSA survey and without acknowledging that it had squarely "decline[d]" to adopt that approach in the 2024 Order. 2024 Order ¶ 169 (JA__). The Commission also described the facility cost additive as "in lieu of the reimbursement framework adopted in the [2024 Order]." 2025 Order ¶ 42 (JA__).

Finally, the Commission introduced a further change in its methodology by adding, without notice, an "inflation factor" to the lower bounds of the zones of reasonableness. *Id.* ¶¶ 79-80 (JA__-__). That proposal appeared for the first time in an *ex parte* letter submitted by Securus one week before the Commission voted to adopt the 2025 Order, on the last day on which submissions to the Commission are permitted under the Commission's Sunshine rules. *See id.* ¶ 79 n.220 (JA__) (citing Letter from Michael H. Pryor, Counsel for Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 at 2-3 (filed Oct. 21, 2025) ("Securus *Ex Parte*") (JA__-__)). The 2025 Order adopted an inflation factor of 6.73% based on a measure of inflation for the overall economy. *Id.* ¶ 80 (JA__). It did so without adopting any productivity offset, stating that while such an offset is "typically include[d]," it "d[id] not attempt" to include one here "given the relative

lack of productivity data specific to the IPCS industry." *Id.* ¶ 80 n.225 (JA__). And it did so without acknowledging its prior rejection of an inflation factor because there was no factual basis to assume that inflation outpaced productivity in this context. *Cf.* 2024 Order ¶ 129 (JA__). The 2025 Order's inflation factor "result[ed] in an additional one to two cent per minute increase to the majority of the rate caps, depending on facility size." Gomez Dissent at 9458 (JA__).

The Commission went on to calculate new interim rate caps using this methodology, this time setting the rate caps at the lower bounds. *Id.* ¶¶ 70-72 (JA__-__). The new interim rate caps were dramatically higher than the rate caps set in the 2024 Order:

| | **Audio (Per minute)** | | | **Video (Per minute)** | | |
|---|---|---|---|---|---|---|
| **Tier (ADP)** | **2021** | **2024** | **2025**[7] | **2021** | **2024** | **2025** |
| **Prisons** (any ADP) | $0.14 | $0.06 | $0.11 | N/A | $0.16 | $0.25 |
| **Large Jails** (1,000+) | $0.16 | $0.06 | $0.10 | N/A | $0.11 | $0.19 |
| **Med. Jails** (350-999) | $0.21 | $0.07 | $0.12 | N/A | $0.12 | $0.19 |
| **Small Jails** (100-349) | $0.21 | $0.09 | $0.13 | N/A | $0.14 | $0.21 |
| **Very Small Jails** (50-99) | $0.21 | $0.12 | $0.15 | N/A | $0.25 | $0.25 |
| **Extr. Small Jails** (0-49) | $0.21 | $0.12 | $0.19 | N/A | $0.25 | $0.44 |

*See* 2024 Order ¶ 4 (JA__); 2025 Order ¶ 8 (JA__).

Unlike the 2024 Order, the 2025 Order was not unanimous. Commissioner Gomez dissented. She specifically objected to the Commission's "minimal basis"

[7] The total figures listed for all facilities as of the 2025 Order are effective rate caps, including the rate additive for facility costs. *See* 2025 Order ¶ 8 (JA__).

for revising the rate caps nationwide at every tier based on "a single facility in Arkansas that reported terminating access to IPCS" and on data concerns that are attributable to IPCS providers rather than IPCS consumers, *see* Gomez Dissent at 9455-57 (JA__); its new, across-the-board additive "based on old data on costs jails incur," *id.* at 9457-58 (JA__); and its adoption of an inflation factor "without giving notice to the public" based on a "single company letter filed in the eleventh hour," *id.* at 9458 (JA__). In Commissioner Gomez's view, the 2025 Order "implements an egregious transfer of wealth from families in incredibly vulnerable situations to monopoly companies that seek to squeeze every penny out of them." *Id.* at 9455 (JA__).

### F. Procedural History

The 2025 Order was published in the Federal Register on December 5, 2025. 90 Fed. Reg. 56,013 (Dec. 5, 2025). In December 2025 and January 2026, NCIC and Public Interest Petitioners filed petitions for review of the 2025 Order. Those petitions were eventually consolidated in the D.C. Circuit and transferred to this Court.

## SUMMARY OF ARGUMENT

I. The Commission's decision to include all safety and security costs in its rate cap calculations, despite having reached contrary conclusions one year prior based on identical data, is contrary to law and arbitrary and capricious. The

Commission's overinclusive approach expressly guarantees that costs that are *not* used and useful in the provision of IPCS will be included in the rate caps, thereby violating the MWRA's "just and reasonable" and "necessary to provide" requirements. The Commission also failed to offer a reasoned justification for reversing its 2024 findings on safety and security costs based on a virtually identical record. There is no rational connection between the Commission's finding that (at best) a handful of small facilities might discontinue IPCS service and its conclusion to impose a nationwide increase of rate caps across all rate tiers. Nor could purported data uncertainty or the "interim" label applied to the new rate caps justify resolving every ambiguity in providers' favor.

II. The Commission's authorization of a facility cost additive of up to $0.02 per minute, at every facility in every tier, is contrary to law and arbitrary and capricious. The additive is a site commission in all but name: a negotiated, per-minute payment from monopoly providers to facilities that is passed through to IPCS consumers with no verification that such costs are used-and-useful. The additive is also arbitrary and capricious because it rests on a decade-old, self-reported survey of jails that the Commission has repeatedly found unreliable and overstated, and because it applies that additive uniformly despite recognizing dramatic differences in per-minute costs based on facility tier.

III. Finally, the Commission's decision to include an inflation factor in its rate-cap calculations without accounting for productivity gains is procedurally improper, contrary to law, and arbitrary and capricious. The Commission's inflation factor is not a logical outgrowth of either the 2024 FNPRM or NCIC's Reconsideration Petition. Nor did the Commission even acknowledge, much less explain, its reversal of its 2024 finding that it was improper to apply an inflation factor at all given offsetting productivity gains.

IV. The proper remedy is vacatur of the 2025 Order's interim rate caps and the facility cost additive. The Order's errors affect the substance of the rates themselves. And vacatur would not be disruptive: most of the industry already operates at or below the 2024 Order's rate caps, and individual waivers remain available. Vacating the 2025 Order's interim rate caps and the facility cost additive would restore the 2024 Order's rate caps.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a petition for review of agency action should be granted where agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or made "without observance of procedure required by law," *id.* § 706(2)(D). A court "'must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority.'" *Bruno Project Rescue, Inc. v. CDC*, 182 F.4th

1, 8 (1st Cir. 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)).

To withstand arbitrary-and-capricious review, an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Agency action does not survive arbitrary and capricious review where the agency "entirely failed to consider an important aspect of the problem," "relied on factors which Congress has not intended it to consider," or "offered an explanation for its decision that runs counter to the evidence before [it]." *Id.* Further, when an agency changes positions, it must "display awareness that it *is* changing position" and that "there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## ARGUMENT

### I. THE COMMISSION'S INCLUSION OF ALL SAFETY AND SECURITY COSTS IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

#### A. The Inclusion of All Safety and Security Costs Is Contrary to the MWRA's "Just and Reasonable" and "Necessary to Provide" Requirements.

The Commission acted contrary to law in including all seven categories of providers' self-reported safety and security costs. In particular, the Commission

violated the MWRA's requirements both to ensure "just and reasonable" rates and to consider only safety and security costs that are "necessary to provide" IPCS. The Court should conclude that the best reading of those provisions is that IPCS rate caps may incorporate only those costs affirmatively shown to be used and useful in the provision of IPCS, and that safety and security costs may be included only if the underlying safety and security measures are "necessary to provide" IPCS. *See Loper Bright*, 603 U.S. at 394; *Bruno Project Rescue*, 182 F.4th at 8.

1. The Commission's inclusion of all seven categories of safety and security costs does not result in "just and reasonable" rates because it indisputably results in costs being passed on to IPCS consumers for safety and security measures that do not benefit them. The "just and reasonable" requirement incorporates a longstanding body of law in the ratesetting context that ratepayers are to "bear only legitimate costs of providing service to them." *Tenn. Gas Pipeline Co. v. FERC*, 606 F.2d 1094, 1109 (D.C. Cir. 1979). The Commission itself has long adopted this approach under Section 201(b) of the Communications Act, and the Commission previously concluded that Congress intended the phrase to have the same meaning in this context. 2024 Order ¶¶ 38-40, 276, 373 (JA__, __, __); *see also, e.g.*, *Sandwich Isles Communications, Inc.*, 34 FCC Rcd 577, 580 ¶ 7 (2019); *Investigation of Special Access Tariffs of Local Exchange Carriers*, FCC 86-52, 1986 WL 291617, ¶ 35 (1986).

The "just and reasonable" term of art brings with it the "used and useful" framework, under which the "determination of just and reasonable rates focuses on affording regulated entities an opportunity to recover their 'prudently incurred investments and expenses that are "used and useful" in the provision of the regulated service for which rates are being set.'" 2024 Order ¶ 42 (JA__) (citation omitted). And the Commission correctly concluded in the 2024 Order that this standard means that IPCS consumers '"may not fairly be forced to pay a return except on investment which can be shown directly to benefit them.'" *Id.* ¶ 380 (JA__) (quoting *AT&T Phase II Order*, 64 F.C.C.2d 1, 38, ¶¶ 111-112(1977), *modified by* 72 F.C.C.2d 1 (1979)). Thus, the question is whether the costs at issue "directly benefit the ratepayer," and the Commission is required to "exclude any imprudent, fraudulent, or extravagant outlays." *Id.* ¶ 42 (JA__) (citation omitted); *see also id.* ¶ 43 (JA__) (similar).

To avoid any doubt, Congress further enacted Sections 3(b)(2) and 4 of the MWRA to make double-sure that the Commission did not attempt to impose unnecessary or imprudent safety and security costs on IPCS consumers. Section 3(b)(2) provides that the Commission must "*consider* costs associated with any safety and security measures *necessary to provide*" IPCS when "determining just and reasonable rates." MWRA § 3(b)(2) (emphasis added). As the Commission correctly concluded, this language is best read to limit the costs that can be passed

on to those that are "necessary" for the provision of IPCS—and even as to those costs, the Commission need only "consider" them rather than include them. *See, e.g.*, 2024 Order ¶¶ 46, 56 (JA__, __).[8] And Section 4 confirms that reading by clarifying that the MWRA does not broadly "prohibit the implementation of any safety and security measures *related to* [IPCS] services" at correctional facilities. MWRA § 4; *see generally* 2024 Order ¶¶ 51, 54 (JA__) (adopting this reading); FCC 2024 Br. 14 (same).

2. The Commission's inclusion of all seven categories of safety and security costs in its calculation of the lower bounds of the zones of reasonableness cannot be squared with these statutory requirements.

*First*, both the "just and reasonable" standard and the obligation to "consider" necessary safety and security costs make clear that the Commission can only include costs that it *affirmatively finds* to be used and useful in the provision of IPCS. *See* 2024 Order ¶ 178 (JA__) (noting that the "lower bounds of [the] zones of reasonableness reflect[ed] only those costs that the record *affirmatively establishes* as generally being used and useful in the provision of IPCS" (emphasis added));

---

[8] As the Commission previously recognized, *see* 2024 Order ¶ 356 n.1269 (JA__), a "statutory reference to 'necessary' must be construed in a fashion that is consistent with the ordinary and fair meaning of the word, i.e., so as to limit 'necessary' to that which is required to achieve a desired goal." *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000). And "consider" does not mean "include." *See Time Warner Ent. Co., L.P. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995).

*Sandwich Isles*, 34 FCC Rcd at 598, ¶ 46; *AT&T Phase II Order*, 64 F.C.C.2d at 38, ¶ 111. In other words, under the governing used-and-useful framework, any ambiguities must be resolved in favor of the consumer: unless it is clear that a cost prudently incurred does benefit the IPCS consumer, it cannot be included in cost recovery. *Cf.* 2024 Order ¶ 384 n.1382 (JA__) (explaining that used-and-useful is an "equitable principle that prevents ratepayers from having to pay for costs that are primarily incurred for the benefit of the provider"). The Commission rightly recognized as much in the 2024 Order. There, Securus argued that the Commission "must include safety and security costs in IPCS rates *absent a finding* that those costs bear no relation to the provision of telephone or video services." 2024 Order ¶ 377 (JA__) (quotation marks omitted). The Commission explained that such an approach would invert the analysis demanded by the "just and reasonable" statutory standard, under which the rate cap calculations "should reflect, to the extent the record permits us to make such a determination, *only* those costs that we *affirmatively find* are used and useful in the provision of IPCS." *Id.* (emphasis added).

Here, the Commission abdicated its statutory responsibility to make an affirmative "used and useful" finding, instead simply assuming in the purported absence of reliable data that *all* claimed safety and security costs are used and useful. That inversion is plain on the face of the 2025 Order. The most the Commission

could say is that because it "*cannot* conclude that the categories of safety and security costs formerly excluded from the lower bounds are *not* in fact used and useful," those costs should be included. 2025 Order ¶ 57 (JA__) (emphasis added). But that double-negative does not satisfy the statute. The MWRA allows facilities to deploy safety and security features of their choice, but it is neither just nor reasonable to require IPCS consumers to bear the cost of all claimed safety and security measures in the face of supposed uncertainty.

*Second*, by including all seven categories of safety and security costs, the Commission abdicated its statutory obligation to limit recovery to *prudently incurred* costs. As the D.C. Circuit has recognized, "[i]t is indisputable that, under established ratemaking principles, rates that permit excessive profits are not just and reasonable." *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015). Here, including *all* reported costs cannot possibly comply with the "just and reasonable" statutory requirement. As the Commission previously noted, the providers' self-reported costs exceeded their revenues by *$219 million*, making clear that the data submitted is "overstated." 2024 Order ¶ 210 (JA__). It is not consistent with the "just and reasonable" standard to pass on imprudent and excessive costs.[9]

[9] For related reasons, though the 2025 Order nowhere argues that including all categories of costs is necessary to "fairly compensate" IPCS providers, any such statutory argument would fail because "fair compensation does not require … rate

*Third*, six of the categories do not "directly benefit" IPCS consumers but instead serve law-enforcement purposes, and their inclusion therefore violates the MWRA. The Commission broadly agreed in the 2024 Order, where it declined to include five of those categories for precisely that reason.[10] Each of the five newly incorporated categories of safety and security costs includes expenses that are not "required to achieve" the provision of IPCS services, *GTE*, 205 F.3d at 423, because—as the Commission previously found in great detail, 2024 Order ¶¶ 390-407 (JA__-__)—they predominantly benefit law enforcement rather than IPCS consumers. For example:

- The Law Enforcement Support Services Category includes expenses for "search warrant processing" and "FOIA request processing." 2024 Order ¶ 394 (JA__); *see* Gomez Dissent at 9457 (JA__).
- The Communications Recording Services Category includes expenses for "storing recorded communications, transcribing such recordings, and converting recordings into digital formats to support investigation and litigation activities." 2024 Order ¶ 398 (JA__); *see* Gomez Dissent at 9457 (JA__).
- The Communications Monitoring Services Category includes expenses to "aid investigations related to detention facilities," "aid corrections agencies and law enforcement in investigation and litigation activities," and "provide for skilled investigators." 2024 Order ¶ 403 (JA__); *see* Gomez Dissent at 9457 (JA__).

---

caps which allow for the recovery of inefficiently incurred costs." 2024 Order ¶ 219 n.778 (JA__).

[10] Public Interest Petitioners continue to challenge the inclusion of Communications Security Services costs, as they did with respect to the 2024 Order.

- The Voice Biometrics Services Category includes "general law enforcement purposes, including generating targeted investigative leads [and] helping investigators find correlations among calls." 2024 Order ¶ 405 (JA__).
- The Other Safety and Security Measures Category includes expenses like "flag[ging] calls in which incarcerated people discussed contacting media about cover-ups of COVID-19 outbreaks." 2024 Order ¶ 407 (JA__) (quotation marks omitted).

In deciding to include these categories of costs in the revised rate caps—a complete reversal of the 2024 Order's extensive analysis without any real change in the record—the Commission offered no reassessment of any individual category suggesting that it did satisfy the statutory standard of direct benefit to IPCS consumers. Because these five categories include costs that do not directly benefit IPCS consumers, the Commission was not authorized to consider them in its "just and reasonable" rate cap analysis.

3. The 2025 Order's only justification with respect to the statute is a footnote arguing that inclusion of all categories of safety and security costs suffices for now because the failure to incorporate all reported costs could risk the provision of IPCS. As the Commission put it, "the decision to exclude certain of those expenses would frustrate the industry's ability to provide the service at all," and thus "the inclusion of those same expenses in order to enable service is *inherently* just and reasonable, unless and until additional data allows the Commission the ability to review and analyze such expenses on a more granular basis to determine whether such expenses

are used and useful in the provision of IPCS." 2025 Order ¶ 57 n.179 (JA__) (emphasis added). But that approach violates the core tenets of the "just and reasonable" standard and the used-and-useful framework by using ambiguity to substitute for affirmative findings. The Commission acknowledged that its approach could be seen as "a departure from the ordinary application of the used and useful framework," but concluded that ensuring the continued provision of service "is directionally aligned with the ordinary operation of the framework." *Id.*

Whatever "directionally aligned" is supposed to mean, it does not overcome decades of established judicial and administrative precedent requiring the opposite of what the Commission has done here. As explained above, the "just and reasonable" standard does not allow the Commission simply to assume in the absence of clear evidence that all claimed costs should be included. Rather, the default rule is non-inclusion. Indeed, this case is worse than *TransCanada*, where FERC merely failed to gather the evidence necessary to determine whether rates *might* result in excessive profits. *See* 811 F.3d at 12. Here, by including 100% of "overstated" costs, the Commission *guaranteed* excessive profits. And the Commission eschewed its own established precedent requiring an affirmative finding that rates will in fact be just and reasonable.

In any case, it is beyond dispute that what is "directionally aligned" with the MWRA in the face of supposed uncertainty is lowering IPCS rates, not increasing

them. The MWRA was enacted directly in response to the D.C. Circuit's decision in *GTL*, which made it difficult for the Commission to bring down rates precisely because the Commission previously lacked a "just and reasonable" mandate. 2025 Order ¶ 3 & n.4 (JA__). The Commission thus acted contrary to Congress's intent when it erred on the side of higher rates where the data are inconclusive.[11]

### B. The Commission's Reversal on Safety and Security Costs Is Arbitrary and Capricious.

The Commission's reversal on safety and security costs is also arbitrary and capricious for several reasons. The Commission previously concluded that including all safety and security costs in the lower bounds "would run counter to the purposes and language of the [MWRA] and would fail to yield just and reasonable rates." 2024 Order ¶ 200 (JA__). Yet that is precisely what the Commission did with minimal explanation in the 2025 Order.

As an initial matter, because the 2025 Order "rests upon factual findings that contradict those which underlay its prior policy," the Commission must provide a "more detailed justification than what would suffice for a new policy created on a

---

[11] At minimum, it was arbitrary and capricious for the Commission to pay lip service to the "used and useful" framework without actually applying it. Even if the statute did not require a full application of that framework, the Commission committed itself to the standard by announcing it. *See* 2025 Order ¶ 36 (JA__). The Commission was not then free to instead apply a different standard—blanket inclusion. *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (arbitrary to "apply[] a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced").

blank slate." *Fox Television*, 556 U.S. at 515-16. The 2025 Order cannot meet that standard. As noted, in the 2024 Order, the Commission found—category by category—that five categories of reported safety and security costs were not used and useful in providing IPCS, and that providers' cost submissions were "overstated." 2024 Order ¶¶ 210, 394-407 (JA__, __-__). It further found that the 2024 Order's rate caps would not decrease access to IPCS. *See* 2024 Order ¶¶ 26-30, 174, 266, 312 (JA__-__, __, __, __). Just over a year later, on the same record, the Commission adopted the opposite conclusion: every reported cost is now treated as used and useful. The Commission gathered no new data and did not identify any actual error in the prior order's category-by-category analysis. That about-face is arbitrary and capricious.

To the extent the Commission offers any justification for its change in position, those justifications are also inadequate. The Commission's three rationales for including all seven categories of safety and security costs are that (1) it feared anything short of full inclusion could cause facilities to discontinue IPCS; (2) it lacked adequate data to assess what costs were necessary; and (3) it is merely setting "interim" rate caps. But none of those rationales withstands scrutiny.

1. The Commission's primary explanation is that full incorporation of safety and security costs is required to ensure continued provision of IPCS. *See* 2025 Order ¶¶ 31-35 (JA__-__). But to act reasonably, an agency "must examine the relevant

data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). No such connection can be discerned here.

*First*, taking the facts found by the agency for all they are worth, at best the Commission found that *one* of the country's thousands of carceral facilities stopped providing IPCS, and a few more had expressed doubts about continuing service. 2025 Order ¶¶ 35-36 (JA__). There is no "rational connection" between finding potential issues at a small number of facilities and a wholesale revision of the nationwide rate caps across every tier of prisons and jails. *State Farm*, 463 U.S. at 43.

That problem is further compounded by the fact that the Commission already had an existing mechanism—individual waivers—to address isolated problems of that sort. Where, as here, an agency reverses a prior policy, "its reasoned analysis must consider the 'alternative[s] that are within the ambit of the existing policy.'" *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020); *see also Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 270 (1st Cir. 2023). Yet here, the Commission failed to consider an alternative based on the individual waiver process. *See* 2024 Order ¶¶ 475-481 (JA__–__); Gomez Dissent at 9456 (JA __) (faulting the 2025 Order for failing to "consider[] granting an individual waiver of the 2024 rate caps to facilities that made a showing that reduced revenues resulted in the unavailability

of IPCS services”). Ironically, the 2025 Order itself invites providers with “exceptionally high costs” to “use the Commission’s waiver process” if their costs exceed the new caps, 2025 Order ¶ 75 n.214 (JA__)—raising the obvious question why the same safety valve could not adequately address any individual provider’s inability to recover its costs under the 2024 caps. And that oversight is all the more striking in view of evidence in the reconsideration record that 76% of prison systems across the country already comply with the 2024 rate caps, making it unlikely that widespread cessation of service would or could occur. *See* Letter from Bianca Tylek, Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (filed Sept. 15, 2025) (JA__); Gomez Dissent at 9455 (JA__).

*Second*, the facts do not support any such concern about facilities declining to provide IPCS. *State Farm*, 463 U.S. at 43 (holding agency action is arbitrary and capricious if the agency “offered an explanation for its decision that runs counter to the evidence before [it]”). The scant two paragraphs the Commission spent on this central justification relied on scant evidence. *See* 2025 Order ¶¶ 35-36 (JA__-__); Gomez Dissent at 9456 (JA__) (noting the “minimal basis for the significant nationwide increases”). The only record evidence even arguably suggesting that concerns over safety and security costs could lead to cessation of IPCS was a single county jail in Arkansas, accompanied by providers’ descriptions of seven unspecified small facilities and two sheriffs’ predictions of budget strain. *Id.* ¶ 36

(JA__). That is a wafer-thin reed on which to increase rate caps for the thousands of facilities in the United States. *See, e.g.*, *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 451-55 (D.C. Cir. 1980) (setting aside agency rule with industrywide application based on testing of a small handful of facilities).

2. The Commission next pointed to data uncertainty to justify its reversal, *see* 2025 Order ¶¶ 31-34 (JA__-__), but such ambiguities cannot justify adopting a completely one-sided order that places all burdens of uncertainty on ratepayers and none on IPCS providers.

*First*, as noted, any ambiguities stemming from the Commission's choice of categories or the providers' reporting errors must be resolved against the providers in this statutory context. *See* Section I.A *supra*. In any case, any such flaws are nothing new: The 2024 Order *already* acknowledged that "the categories of safety and security costs in the 2023 Mandatory Data Collection are imprecise." 2024 Order ¶ 385 (JA__); *see also id.* ¶ 372 (JA__). And the 2024 Order *already* accounted for that fact several times over. Thus, the 2024 Order "evaluat[ed] categories based on the nature of the preponderance of tasks or functions within each category," excluding categories only "[i]f the predominant use of tasks and functions within a category are not used and useful." *Id.* ¶ 385 (JA__–__).[12] The 2024 Order

[12] Though the Commission described its prior "preponderance" approach, 2025 Order ¶ 28 (JA__), nowhere did the Commission point to any specific flaws with that approach. That alone is arbitrary and capricious under *Fox Television* and its

also included all reported safety and security costs—including the five excluded categories—remained in the upper bounds of the zones of reasonableness. 2024 Order ¶¶ 190-197 (JA__). And the Commission deliberately selected rate caps above the lower bounds—between the lower bound and the midpoint of each zone—precisely to "account for the possibility that the adjustments [it] applied to providers' reported costs to obtain the lower bounds were too aggressive." *Id.* ¶¶ 209, 213 (JA__). The 2025 Order does not adequately explain why all of these built-in corrections in the 2024 Order were insufficient.

Instead, the Commission unreasonably took the opposite approach to the same data. While the Commission acknowledged that it had "attempted to reconcile the intermingled nature of [safety and security] costs in the *2024 IPCS Order*," it decided to err on the side of overinclusion merely because the excluded categories "included services or functions that are used and useful." 2025 Order ¶ 36 (JA__). This approach—allowing any hint of used-and-useful costs to infect the entire category in which they are found—is unreasonable. The Commission did not even attempt to make a finding that any particular category of costs was in fact necessary to provide IPCS service at all, much less identify the specific costs within those categories that were prudently incurred and benefit IPCS consumers. Mechanically

progeny. *See MISO Transmission Owners v. FERC*, 45 F.4th 248, 264 (D.C. Cir. 2022).

including any and all costs that happen to be grouped with a cost that was prudently incurred is not reasoned decisionmaking.

*Second*, even if the Commission's MDC categories did paint with too broad a brush, and providers misallocated their costs within those categories, that is still not a reasoned basis on which to adopt a one-sided solution that burdens only IPCS consumers. Any problems caused by misallocation are the fault of those IPCS providers—or at best, the Commission itself—not the consumers who would be burdened with higher rates. Even the 2025 Order recognized that "[d]espite the detailed instructions and description of the safety and security cost categories the Commission included in the Mandatory Data Collection, providers did not report their safety and security data in a uniform fashion." 2025 Order ¶ 33 (JA__). As Commissioner Gomez put it in her dissent, "IPCS providers have the missing puzzle pieces to solve this problem. IPCS providers have these data, but fail to submit them, and then claim that the FCC lacked the data necessary when the decision the agency makes is not in their favor." *Id.* Gomez Dissent at 9457 (JA__). By allowing that ploy to succeed, the "Commission rewards bad behavior." *Id.*

3. Finally, the Commission repeatedly invokes the "interim" nature of its 2025 rate caps. But agencies may not explain away analytical gaps simply by characterizing their actions as "interim," *see, e.g.*, *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1291 (D.C. Cir. 2000), and there is no loophole or exception

in the MWRA for interim rates. To the contrary, it provides that "*all* rates and charges" must be "just and reasonable," and Congress underscored that point by requiring implementing regulations within 24 months. 47 U.S.C. § 276(b)(1)(A); MWRA § 3(a). Nor is this a scenario in which the agency needed to act quickly pending further study. The Commission *already* had in place a permanent framework that it developed over two years and that most providers were already following. There is no reasoned basis for charging incarcerated people and their loved ones unlawful rates while the Commission searches for the data that could support that result.

## II. THE COMMISSION'S FACILITY COST ADDITIVE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

The 2025 Order impermissibly authorizes IPCS providers to charge consumers "up to $0.02 per minute," at every facility in every tier, "separate from and in addition to" the rate caps, to fund payments to carceral facilities for the "costs [they] incur in allowing access to IPCS." 2025 Order ¶ 37 (JA__). But the additive does not reflect any verified used-and-useful costs; rather, it is described as a "reasonable outer bound for providers' negotiations with facilities" over facility compensation. *Id.* ¶ 51 (JA__). In effect, the Commission thus set a cap for per-minute payments from monopoly providers to the facilities that award their contracts, and authorized providers to pass those unverified payments on to incarcerated people and their loved ones. That is an unlawful site commission. In

addition, setting that additive at $0.02 across all rate tiers—an approach the 2024 Order expressly rejected based on the same record, *see* 2024 Order ¶ 169 (JA__)—is arbitrary and capricious.

### A. The Additive Is an Unlawful Site Commission and Compensates Entities Outside the MWRA's Scope.

1. The additive is an illegal site commission. Site commissions are "location rents that are negotiable by contract with the facility owners and represent an apportionment of profits." 2024 Order ¶ 10 & n.30 (JA__). The additive is a payment from an IPCS provider to a carceral facility, negotiated as part of the contract, subject to an "outer bound" limit, 2025 Order ¶ 51 (JA__), and funded by a per-minute consumer pass-through, *id.* ¶ 48 (JA__). The 2024 Order banned site commissions after finding they are not used and useful in the provision of IPCS and their recovery "would fail to yield just and reasonable rates." 2024 Order ¶¶ 200, 270-288 (JA__, __-__). Yet the 2025 Order leaves in place (for now) the 2024 Order's site commission ban while unlawfully recreating the same payment stream under a different label.

The Commission offers two primary responses, neither of which is persuasive. The Commission primarily asserts that the additive is "limited to used and useful IPCS costs incurred by facilities." 2025 Order ¶ 50 (JA__). But as shown below, the Order in fact eliminates the only mechanism that could conceivably test that limitation. Otherwise, the Commission argues that the additive is "capped." But the

2021 Order, too, had a $0.02 cap on site commissions, 2021 Order ¶ 3 (JA__), and the 2024 Order nonetheless banned site commissions as unjust and unreasonable. The Commission cannot circumvent the statute simply by calling a two-cent payment stream an "additive" rather than a "site commission."

2. The additive is also not "just and unreasonable" because it eliminates the requirement of an affirmative used-and-useful showing. Under the 2024 Order, facilities recovered their genuine IPCS costs through provider reimbursements, which required a facility to "persuade the provider that the costs for which they seek reimbursement are used and useful." 2025 Order ¶ 46 (JA__). Yet the 2025 Order adopts the additive precisely because the Commission was dissatisfied with that aspect of the 2024 Order—allowing facilities to recover up to $0.02 per minute in costs without bearing the burden of demonstrating to anyone that their costs are used and useful. *Id.* ¶¶ 42-43, 46 (JA__-__, __). The regulations adopted by the 2025 Order require no findings or verification by any entity to validate that fact. 47 C.F.R. § 64.6030(d) (JA__).

3. Finally, the additive is unlawful because it compensates an entity that the statute's "fair compensation" mandate does not name. Section 276(b)(1)(A) directs the Commission to provide a "compensation plan" that ensures that "all payphone service providers are fairly compensated, and all rates and charges are just and reasonable." 47 U.S.C. § 276(b)(1)(A). Jails and prisons are not entities regulated

by the Commission. The rate caps regulate what an *IPCS provider* may charge, and nowhere does the statute require, or even permit, the Commission to ensure facilities are compensated. Nor can the Commission claim that the additive is a form of cost recovery for providers, when the 2025 Order now draws a sharp line between the revised rate caps—which are "based exclusively on provider costs"—and the facility cost additive, which is a distinct "facility-related" component that is "designed for the recovery of the used and useful costs facilities incur." 2025 Order ¶¶ 44, 53 (JA__, __); *see also id.* ¶ 38 (JA__) ("Establishing *separate* provider-related and facility-related rate components helps ensure our rate structure accounts for both providers' and correctional facilities' used and useful costs." (emphasis added)). The MWRA confirms that this kind of facility-specific additive exceeds the Commission's authority, as it makes clear that facilities may adopt whatever security measures they choose "related to" the provision of IPCS but are entitled to consumer-funded reimbursement only for "necessary" measures. MWRA § 4.

### B. The Commission's Reversal on the Additive Is Arbitrary and Capricious.

Even if some facility costs could lawfully be recovered through consumer rates, the Commission's adoption of this additive on this record was arbitrary and capricious in numerous respects.

*First*, the 2024 Order expressly found that the NSA survey did *not* support a uniform additive, and the 2025 Order offered no reasoned explanation for reversing

that finding, much less the "detailed justification" that *Fox Television* requires. *See* 556 U.S. at 515-16. The 2024 Order "decline[d] requests" to account for facility costs "by adding a specific amount per-minute to [the] rate caps based on data from the [NSA] cost survey." 2024 Order ¶ 169 (JA__); *see also id.* (explaining that commenters had shown no connection between the NSA survey and "their proposed [rate] additives" or "any alternative additive"). The 2025 Order did not justify its reversal nor explain how the NSA survey suddenly *did* support a uniform additive of any particular amount when it did not in 2024. That was arbitrary and capricious.

*Second*, the additive rests on data that the Commission has repeatedly found to be unreliable. An agency cannot rely on data that it recognizes measures the wrong thing and is therefore inaccurate. *See, e.g.*, *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015). The primary facility-cost evidence is the 2015 NSA survey, and the Commission's findings about that survey have been consistently negative: the survey is ten years old; reflects operations, staffing, and technology as they existed in 2014; and covers only 152 jails and not a single prison. *See, e.g.*, 2024 Order ¶¶ 168-169 (JA__-__); 2021 Order ¶¶ 143-148 (JA__) (noting issues with this study). And it relies on unaudited, self-reported estimates from facility representatives with every incentive to overstate their costs. *See generally* Comments of the Nat'l Sheriffs' Ass'n, Docket No. 12-375 at 1 & Ex. A (filed Jan. 12, 2015) (JA__, __). The 2024 Order therefore correctly concluded that the survey

data “do not allow [the Commission] to quantify what [facility] costs are with any level of exactitude,” 2024 Order ¶ 165 (JA__); that the survey “very likely … overstated correctional facility costs at the time of the survey,” *id.* ¶ 167 (JA__). And after repeatedly asking for updated facility cost data in 2020, 2021, and 2023—and not receiving it—the Commission drew an “adverse inference that actual information would not support the case for recovery.” *Id.* ¶ 166 (JA__). Yet here that data is used to increase the rate caps by two cents per minute.

The Commission otherwise points to its prior analysis of “site commission data submitted by prisons and jails” in the context of the 2021 Order to justify the $0.02 estimate. 2025 Order ¶ 39 n.114 (JA__). But the Commission failed to draw any rational connection between the universal $0.02 per minute additive and its calculations supporting the more limited 2021 additive. *See id.* ¶ 47 (JA__). The Commission tellingly did not say what numbers those calculations produced: By comparing the differences between per-minute costs at facilities that did or did not receive site commissions, the Commission estimated average per-minute facility costs of $0.008 for prisons, $0.004 for all jails, and *zero* for larger jails specifically. *See* 2021 Order, App’x H ¶ 3 (JA__). The 2021 Order then decided to *disregard* those calculations and impose an additive of $0.02 per minute anyway, based on the 2015 NSA Survey. *See id.* ¶ 144 (JA__). The 2025 Order did not explain how these figures supported an additive of $0.02 per minute for facilities of all sizes. Nor did

the Commission explain why those calculations, which were done to support an additive solely for "recovery of contractually prescribed site commission payments to prisons and larger jails," *id.* ¶ 140 (JA__), supported an additive to recover *all* facility costs at *all* facilities, regardless of any contractual obligation on the provider's part to pay the facility. In relying on the 2021 Order, the Commission only confirms that the additive is a site commission under a different name.

*Third*, the Commission's adoption of a *uniform* additive is arbitrary and capricious. A uniform additive that applies a $0.02 additive to prisons makes little sense when the data on which the additive is premised studied *zero* prisons. And a uniform additive is internally inconsistent with the rest of the 2025 Order, which created an entirely new rate tier for extremely small jails because it recognized that per-minute costs vary dramatically based on facility size. 2025 Order ¶¶ 19-27 (JA__-__); *cf.* MWRA § 3(b)(2) (authorizing different rate caps for different tiers in light of this known phenomenon). Yet the additive is identical across the board.

Nor is it any answer to justify the uniform additive as an "interim" measure. 2025 Order ¶ 51 (JA__). In so doing, the Commission failed to consider obvious alternatives. As Commissioner Gomez noted, the Commission could have considered a jail-only additive matching the NSA study; or an opt-in structure conditioning the charge on a facility-specific showing. Gomez Dissent at 9458

(JA__-__). These proposals were aired before the agency but were not addressed or adopted. *Cf. Regents*, 591 U.S. at 30.

## III. THE COMMISSION'S INFLATION FACTOR WAS ADOPTED WITHOUT ADEQUATE NOTICE AND IS UNLAWFUL AND UNREASONABLE.

Finally, the Commission's decision to adjust the rate caps by an inflation factor of 6.73%—thereby increasing the rate caps by up to 25% of the base rate cap for audio calls—lacked proper notice and was contrary to law and unreasonable.

### A. The Commission Introduced an Inflation Factor Without Adequate Notice.

The APA requires the Commission to provide notice and an opportunity for comment before changing its rules. *See* 5 U.S.C. § 553. Notice '"ensure[s] that agency regulations are tested via exposure to diverse public comment,' promotes fairness to impacted parties, and gives them 'an opportunity to develop evidence in the record to support their objections.'" *Chamber of Com. of U.S. v. EPA*, 2026 WL 2409748, at *10 (D.C. Cir. Aug. 18, 2026) (citation omitted). This notice requirement "extends to 'critical information' on which the rule is based." *Id.* (citation omitted). And the "test for whether an agency has met the APA's notice requirement is whether 'affected parties should have anticipated the final rule in light of the notice,'" such that the "final rule is a 'logical outgrowth' of the proposal." *Id.* (citations omitted).

The Commission did not provide adequate notice that it was considering adopting an inflation factor that would increase many of the rate caps by 1-2 cents. The 2025 Order is entirely premised on the 2024 FNPRM and NCIC's Reconsideration Petition. 2025 Order ¶ 6 (JA__). Neither even mentions the word "inflation." *See* 2024 Order ¶¶ 608-625 (JA__); NCIC Reconsideration Petition (JA__-__). Nor did the inflation adjustment even appear in the draft 2025 Order that the Commission released three weeks before the ultimate vote to adopt it, on October 7, 2025. *See generally Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, FCC-CIRC2510-08 (rel. Oct. 7, 2025) (JA__-__). To the contrary, the draft order included its own FNPRM that asked for future comment as to whether the Commission should "*attempt to collect data* that would allow [it] to measure the effects future inflation and productivity increases will have on the average cost per minute of providing audio and video IPCS and rate caps"—thereby providing affirmative notice that inflation was *not* at issue. *Id.* ¶ 94 (JA__) (emphasis added). The Commission cannot suggest that an issue will be taken up in a future proceeding and then resolve that issue without notice now. *Cf. Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978, 992 (D.C. Cir. 2025) (agency "surprise switcheroo[s]" fail the

logical-outgrowth requirement); *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (same).[13]

Rather, the inflation factor was proposed for the first time in the Securus *Ex Parte* submitted one week before the Commission's final vote, at the "eleventh hour before Sunshine" when all further ex parte communications are forbidden. Gomez Dissent at 9458 (JA__); *see also* 47 C.F.R. § 1.1203 ("Sunshine Period Prohibition"). Even if notice by others could substitute for the agency's failure to provide notice, *but see Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983), any such notice here would be woefully inadequate given other interested parties lacked any opportunity to comment following the Securus *Ex Parte*.[14]

### B. The Commission's Reversal on the Inflation Factor Is Contrary to Law and Arbitrary and Capricious.

The Commission's inflation factor decision also violates the MWRA's "just and reasonable" requirement and is arbitrary and capricious. Just as with the other

[13] Nor can the Commission claim that the 2025 Order's inflation factor is a logical outgrowth of the 2024 Order, broadly construed. To the contrary, the 2024 Order squarely rejected proposals to "incorporate an inflation factor into [its] methodology for setting rate caps." 2024 Order ¶ 129 (JA__).

[14] Importantly, the reconsideration posture of the Order under review does not relieve the Commission of its notice-and-comment obligations. *See Liquid Energy Pipeline Ass'n v. FERC*, 109 F.4th 543, 548 (D.C. Cir. 2024); *Sprint Corp. v. FCC*, 315 F.3d 369, 372, 376 (D.C. Cir. 2003).

challenged aspects of the 2025 Order, the Commission did not make an affirmative finding that inclusion of inflation without an offset for productivity gains would in fact result in just and reasonable rates. The words "just and reasonable" or "used and useful" do not even appear in the scant two paragraphs the Commission devoted to the inflation factor. 2025 Order ¶¶ 79-80 (JA__-__).

In addition, the Commission's decision on inflation was also arbitrary and capricious in at least two respects:

1. The Commission entirely failed to satisfy its basic obligations under *Fox Television* to "display awareness that it *is* changing position," and to "provide a more detailed justification" where its change in position rests on a changed understanding of the underlying facts. 556 U.S. at 515; *see also NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) (Souter, J.) ("[A]n about-face on a rule owing to facts changed from those underlying the prior view requires that the new facts be addressed explicitly by reasoned explanation for the change of direction."). The Commission nowhere acknowledged that it had rejected an inflation factor in the 2024 Order for reasons diametrically opposed to the reasoning in the 2025 Order.

In particular, the 2024 Order declined to "incorporate an inflation factor" because "commenters generally fail to acknowledge the role that productivity increases play in offsetting inflation," and "fail[ed] to establish that productivity increases did not offset the inflation that has [occurred] since 2022, much less that

inflation will outpace productivity gains in the future." 2024 Order ¶ 129 (JA__). And the 2024 Order implicitly recognized that any such inflation, even if it were to be accounted for, would need to be offset by productivity gains. *Id.* ¶ 213 (JA__) (explaining that the 2024 rate caps were set above the lower bounds in part to "account for any inflation not offset by productivity growth"). The Commission also found that inflation in the telecommunications industry "has been lower, on average, than general measures of inflation." *Id.* ¶ 129 n.431 (JA__); *see also id.* ¶ 129 n.432 (JA__) (similar). Yet in the 2025 Order, the Commission reversed course without explanation to incorporate an inflation factor based on economy-wide inflation with no productivity offset at all.

The Commission cannot defend this reversal on the theory that the 2025 Order's express inflation factor merely substitutes for the 2024 Order's decision to select rate caps above the lower bounds. The 2025 Order nowhere offers that rationale, and agency action cannot be sustained on a basis the agency itself did not give. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). The substitution theory would fail on its own terms in any event: the 2024 cushion accounted only for inflation "not offset by productivity growth," 2024 Order ¶ 213 (JA__), whereas the 2025 factor applies economy-wide inflation with no productivity offset whatsoever.

2. The Commission's decision to apply a 6.73% inflation factor is also arbitrary and capricious taken on its own terms. *Cf. State Farm*, 463 U.S. at 43; *see*

*also* Gomez Dissent at 9458 (JA__) (faulting the Commission for its "insufficient explanation" regarding inflation). On the productivity side, the Commission justified its decision not to include any productivity offset because of the "relative lack of productivity data specific to the IPCS industry." 2025 Order ¶ 80 n.225 (JA__). But citing lack of data as a rationale for applying a productivity offset of *zero* makes no sense where the Commission expressly recognized that such offsets are "typically include[d]," *id.* ¶ 80 n.225 (JA__),[15] and where the productivity offset is likely of similar scale to the inflation adjustment, *see, e.g.*, 2024 Order ¶¶ 129, 213 (JA__, __); *id.* App. J ¶ 8 & nn.21-23 (JA__). Indeed, the Commission offered not a single prior example where it had proceeded in this manner.

Moreover, the Commission's approach to productivity is internally inconsistent and therefore unreasonable. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018). The Commission gave providers the benefit of uncertainty on the metric that increases the rate caps (inflation). In doing so, it decided to assume that inflation in the relevant market tracked inflation in the economy as a whole, *see* 2025 Order ¶¶ 79-80 (JA__-__), ignoring the

---

[15] *See, e.g.*, *Business Data Services in an Internet Protocol Environment*, 32 FCC Rcd 3459, 3544-57, ¶¶ 200-236 (2017), *review granted in part, vacated in part*, *Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018); *Price Cap Performance Review for Local Exchange Carriers; Treatment of Video Dialtone Services Under Price Cap Regulation*, 10 FCC Rcd 3141, 3150 ¶ 14 (1995).

Commission's own prior data to the contrary, *see* 2024 Order ¶ 129 n.432 (JA__). Yet on the other side of the ledger, the Commission construed the lack of data as a reason not even to "attempt" to account for productivity, *see* 2025 Order ¶ 80 n.225 (JA__), despite previously finding it to be of equivalent magnitude to inflation, *see* 2024 Order ¶ 129 (JA__). Thus, in a now-familiar pattern, the 2025 Order used purported data uncertainty in one-sided fashion to "squeeze every penny possible from families that want to stay in touch with loved ones." Gomez Dissent at 9458 (JA__).

## IV. THE COURT SHOULD VACATE THE 2025 ORDER'S RATE CAPS AND FACILITY COST ADDITIVE, RESTORING THE 2024 ORDER'S CAPS.

This Court should vacate the 2025 Order's interim rate caps, which will result in the 2024 Order's rate caps springing back into effect. Vacatur is the APA's ordinary remedy. 5 U.S.C. § 706(2). There is no plausible case for remand without vacatur here. *Cf. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). The 2025 Order's "deficiencies" are "serious[]," *id.* at 150, and they implicate the 2025 Order's "interrelated and interdependent" methodological changes that resulted in the new substantive rate caps, 2025 Order ¶ 6 (JA__). Nor would there be "disruptive consequences" of vacatur, *Allied-Signal*, 988 F.2d at 150: 76% of prison systems were already in compliance with the 2024 Order's rate caps, *see, e.g.*, Gomez Dissent at 9455 (JA__); the 2024 Order found

that the 2024 rate caps allowed for adequate cost recovery for providers representing 96% of ADP nationwide, 2024 Order ¶ 216 (JA__); and individual waivers remain for any outliers, *id.* ¶¶ 475-481 (JA__-__).

The consequence of vacatur is restoration of the 2024 Order's rate caps. The intervening Waiver Order poses no obstacle because that order extended the 2024 compliance deadlines only "until April 1, 2027, or any alternative date the Commission sets as part of further action in [this] proceeding." Waiver Order ¶ 1 (JA__). The 2025 Order then expressly stated that its compliance date of April 6, 2026 "represents the 'alternative date' … anticipated in the [Waiver Order] and therefore supersedes the April 1, 2027 compliance deadline previously established in that order." 2025 Order ¶ 89 (JA__). Vacatur of the 2025 Order's revised rate caps does not revive the superseded Waiver Order's compliance regime. And because the 2024 Order's original compliance deadlines have also run, the Court should conclude that the 2024 Order's rate caps are immediately binding upon vacatur of the 2025 Order's revised rate caps.[16]

**CONCLUSION**

The Court should grant Public Interest Petitioners' petitions for review, vacate the 2025 Order's interim rate caps and facility cost additive, and remand to the

[16] This requested relief is consistent with Public Interest Petitioners' requested disposition in *In re: MCP 191*, where Public Interest Petitioners have sought remand without vacatur of the 2024 Order's rate caps.

Commission with instructions that the 2024 Order's rate caps govern pending further agency action.

Dated: September 9, 2026

Respectfully submitted,


/s/Andrew Jay Schwartzman
Andrew Jay Schwartzman
525 Ninth Street, NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

/s/Arjun R. Ramamurti

Arjun R. Ramamurti
Jessica Ring Amunson
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
aramamurti@jenner.com

*Counsel for Direct Action for Rights and Equality*

/s/Erik Stallman
Erik Stallman
SAMUELSON LAW, TECHNOLOGY & PUBLIC POLICY CLINIC
UC Berkeley School of Law
353 Law Building
Berkeley, CA 94720
Telephone: (510) 642-2485
estallman@clinical.law.berkeley.edu

*Counsel for United Church of Christ Media Justice Ministry, Inc.*

/s/Stephen A. Raher
Stephen A. Raher
TABOR LAW
4110 SE Hawthorne Blvd., PMB #506
Portland, OR 97214
Telephone: (971) 867-2440
sraher@pdx-law.com

*Counsel for Criminal Justice Reform Clinic*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit requirements of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and this Court's order of August 18, 2026, because it is 12,945 words in length, as counted by Microsoft Office Word 365, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

Dated: September 9, 2026

*_/s/ Arjun R. Ramamurti_*
Arjun R. Ramamurti

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Arjun R. Ramamurti*
Arjun R. Ramamurti

# ADDENDUM

## TABLE OF CONTENTS

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ........ Add. 1

47 U.S.C. § 201(b) ........ Add. 3

47 U.S.C. § 276(b)(1)(A) ........ Add. 4

Declaration of Reverend Amanda Hendler Voss (UCC) ........ Add. 5

Declaration of Eric Brooks (UCC) ........ Add. 8

Declaration of Aliza Kaplan (CJRC) ........ Add. 10

Declaration of Melonie Perez (DARE) ........ Add. 15

Declaration of Claire Shubik-Richards (PPS) ........ Add. 18

Public Law 117–338
117th Congress

## An Act

Jan. 5, 2023
[S. 1541]

To amend the Communications Act of 1934 to require the Federal Communications Commission to ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Martha Wright-Reed Just and Reasonable Communications Act of 2022.
47 USC 609 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Martha Wright-Reed Just and Reasonable Communications Act of 2022".

**SEC. 2. TECHNICAL AMENDMENTS.**

(a) IN GENERAL.—Section 276 of the Communications Act of 1934 (47 U.S.C. 276) is amended—

(1) in subsection (b)(1)(A)—

(A) by striking "per call";

(B) by inserting ", and all rates and charges are just and reasonable," after "fairly compensated";

(C) by striking "each and every";

(D) by striking "call using" and inserting "communications using"; and

(E) by inserting "or other calling device" after "payphone"; and

(2) in subsection (d), by inserting "and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 3(1)" after "inmate telephone service".

(b) DEFINITION OF ADVANCED COMMUNICATIONS SERVICES.—Section 3(1) of the Communications Act of 1934 (47 U.S.C. 153(1)) is amended—

(1) in subparagraph (C), by striking "and" at the end;

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.".

(c) APPLICATION OF THE ACT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by inserting "section 276," after "sections 223 through 227, inclusive,".

47 USC 152 note.

**SEC. 3. IMPLEMENTATION.**

Deadlines.

(a) RULEMAKING.—Not earlier than 18 months and not later than 24 months after the date of enactment of this Act, the Federal

Communications Commission shall promulgate any regulations necessary to implement this Act and the amendments made by this Act.

(b) USE OF DATA.—In implementing this Act and the amendments made by this Act, including by promulgating regulations under subsection (a) and determining just and reasonable rates, the Federal Communications Commission—

(1) may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider; and

(2) shall consider costs associated with any safety and security measures necessary to provide a service described in paragraph (1) and differences in the costs described in paragraph (1) by small, medium, or large facilities or other characteristics.

**SEC. 4. EFFECT ON OTHER LAWS.** 47 USC 152 note.

Nothing in this Act shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities.

Approved January 5, 2023.

LEGISLATIVE HISTORY—S. 1541:

CONGRESSIONAL RECORD, Vol. 168 (2022):
Dec. 21, considered and passed Senate.
Dec. 22, considered and passed House.

**47 U.S.C. § 201(b)**

**Service and Charges.**

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

**47 U.S.C. § 276(b)(1)(A)**

**Provision of Payphone Service.**

**(b) Regulations**

(1) Contents of regulations

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that—

(A) establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation.

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

| In Re: MCP 198<br>UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.<br>*Petitioner*,<br>v.<br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br>*Respondents*. | No. 26-8037<br><br>No. 26-1446 |
| --- | --- |

**DECLARATION OF REVEREND AMANDA HENDLER VOSS**

1. I, Reverend Amanda Hendler Voss, am the Senior Minister at First Congregational United Church of Christ located in Washington, DC.

2. I am over the age of 18 and am competent to make this declaration.

3. This Declaration has been prepared in support of United Church of Christ (UCC) Media Justice Ministry in *In re MCP: 198*.

4. The United Church of Christ Media Justice Ministry participated in the rulemaking process culminating in the Order on review in this litigation. It has participated in previous rulemakings related to Incarcerated People's Communication Services (IPCS), and related litigation.

5. I earned my Masters of Divinity at the Candler School of Theology at Emory University with certificates in Black Church Studies and Church and Community programs. I was ordained in the western North Carolina Association of the UCC in 2006 while serving as a Minister of Faith Formation. I have been a leading minister across three congregations over the past twenty years.

6. In Matthew 25:35-40, Jesus explains that we show our love of God by the way we treat "the least of these" among us, including those in prison. I consider supporting and advocating for incarcerated people to be central to my ordination vows and to my ministry at UCC.

7. In accordance with this message, the United Church of Christ General Synod, which is the representative body of the United Church of Christ, has established guidance for local churches that reflects a faithful and prophetic engagement with our faith calling to address injustice in our criminal justice system. The 1997 General Synod Resolution in particular calls on UCC members to assist people reentering society after prison, to welcome families and incarcerated people into their membership and fellowship, and to celebrate and share stories of local congregations that are involved in prison ministries already. The 2015 General Synod Resolution echoes this call, recognizing the institutionalized racism and economic injustice of mass incarceration in the United States. It calls on local congregations and the United Church of Christ Media Justice Ministry to provide opportunities for education, public witness, and public advocacy for incarcerated people.

8. As part of my work as a minister, I have counseled incarcerated UCC congregants through IPCS, email correspondence, and in-person visitation. As part of my counseling, I provide financial support to incarcerated congregants so that I may continue to provide them with counseling services as part of my ministry.

9. I understand the per-minute rate caps set by the Federal Communications Commission's 2025 Incarcerated People's Communications Services Order (2025 Order), which increases the cap by as much as 83% (from $0.06 to $0.11 for phone and audio calling rates in prisons) for phone and video calling, depending on the size and type of prison and jail facility, will harm my ability to provide counseling services.

10. Due to the increased per-minute rate caps, I will have to communicate less frequently with incarcerated congregants because they must preserve their funds to pay for commissary services, or I will have to provide additional financial support to congregants so that I may continue to communicate with incarcerated congregants at the same frequency.

11. For example, I have provided counseling services using IPCS to Robert Brewington, a congregant of the Land of the Sky UCC, who is awaiting a capital sentence. I began providing counseling services to Robert almost

seventeen years ago when I was Minister of Faith Formation at First Congregational UCC of Asheville, NC, extended through my ministry as a co-founding minister at Land of the Sky UCC and until today. I have provided financial support to Robert so that we can continue to communicate. He recently informed me that he is not able to speak with his loved ones or with me as often because of the existing costs of IPCS. I will have to provide additional financial support for Robert so that I may continue to provide counseling services.

12. Accessible and affordable IPCS services contribute to safer communities and stronger families by making it easier for incarcerated people to maintain ties with their families and loved ones, and to succeed when they rejoin their communities. Our denomination is stronger when families and loved ones remain connected regardless of whether someone is incarcerated. The Federal Communications Commission's revised rate caps in the 2025 Order undermines the safety and security of our communities, including our denomination, congregations, congregants and their families.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: __9/2/26________ *_/s/ Amanda Hendler Voss_________*

Rev. Amanda Hendler Voss

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

| In Re: MCP 198 | |
|---|---|
| UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.<br><br>*Petitioner*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>*Respondents*. | No. 26-8037<br><br>No. 26-1446 |

**DECLARATION OF ERIC BROOKS**

1. I, Eric Brooks, am a congregant of the Cathedral of Hope in Oklahoma City, Oklahoma, and a member of the United Church of Christ.

2. I am over the age of 18 and am competent to make this declaration.

3. This Declaration has been prepared in support of United Church of Christ Media Justice Ministry in *United Church of Christ Media Justice Ministry, Inc. v. Federal Communications Commission, et al.*

4. The United Church of Christ Media Justice Ministry participated in the rulemaking process culminating in the Order on review in this litigation. It has participated in previous rulemakings related to Incarcerated People's Communication Services (IPCS), and related litigation.

5. I have been a member of the congregation at the Cathedral of Hope since 2006.

6. In Matthew 25:35-40, Jesus explains that we show our love of God by the way we treat "the least of these" among us, including those in prison. I consider supporting and advocating for incarcerated people to be central to my faith and an exercise of that faith as a member of the United Church of

Christ (UCC).

7. I have been using IPCS to communicate with an incarcerated congregant of our church since 2015.

8. The incarcerated person who I speak with most frequently has been moved to different carceral facilities in Oklahoma, usually at great distances from my home in Oklahoma City. These distances make frequent in-person visitations impractical. I therefore rely on IPCS to remain in touch with this congregant. We speak at least once per week.

9. With support from other UCC members and myself, this incarcerated person has been able to earn his bachelor's degree while incarcerated. He relied on IPCS to provide updates on his progress towards his degree and continues to rely on IPCS to provide updates on his wellbeing. Through this communication, members of the UCC understand his goals and are motivated to support him financially and emotionally.

10. Members of our congregation have also come to know and learn about the lives of other incarcerated people in Oklahoma through IPCS.

11. I use a mobile phone application to manage my payments for IPCS services and prepay for service in $50 installments.

12. I noticed a significant drop in the rates for IPCS service in 2024, with rates dropping to around 6 cents per minute.

13. I subsequently noticed rates increasing substantially in 2026, with rates now hovering around 14 cents per minute.

14. As a result of these increases, I must pay more or communicate less with my friend and fellow congregant.

15. The FCC's order and accompanying rate increases cost me more money have been a hardship for me, for other UCC congregants, and for the incarcerated people we speak with.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 14, 2026 /s/ Eric Brooks

Eric Brooks

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

| In re MCP 198 | Case No. 26-8037 (lead case) |
| --- | --- |
| Criminal Justice Reform Clinic,<br>Petitioner,<br>v.<br>Federal Communications Commission, and the United States of America,<br>Respondents. | Case No. 26-1450 |

## DECLARATION OF ALIZA KAPLAN

I, Aliza Kaplan, declare as follows:

1. I am a Professor of Law at Lewis & Clark Law School (the **"Law School"**), and the director of its Criminal Justice Reform Clinic (the **"Clinic"**). I am admitted to practice law in the states of Oregon and Massachusetts. I am over the age of 18 and if called to testify I can and would state as follows based on my personal knowledge and experience and based on my review of the Clinic's records and files that are maintained in the ordinary course of business.

2. The Clinic's mission is to advance criminal justice reform by working with clients on matters such as clemency, parole, and access to courts for incarcerated youth. The Clinic does this by providing direct services to clients

through law students supervised by clinical faculty. In a typical semester, approximately seven law students work at the Clinic evaluating the claims of potential clients and working with Clinic clients on preparing court filings, clemency requests, and other documents for filing in administrative or judicial proceedings.

3. Because the Clinic focuses on post-conviction representation in the State of Oregon, nearly all of our clients and potential clients are housed in the prison system operated by the Oregon Department of Corrections (**"Oregon DOC"**). The Oregon DOC maintains twelve prisons located throughout the state's 95,963 square miles. The wide geographic distribution of Oregon DOC facilities means that, as a practical matter, the Clinic relies on incarcerated people's communications services (**"IPCS"**) to speak with incarcerated clients (and potential clients) regarding clemency and parole matters and other projects related to the Clinic's mission. Sometimes IPCS calls with Clinic clients and potential clients are paid for by the Law School, other times the incarcerated caller covers the cost.

4. The Oregon DOC has selected ICS Corrections, Inc., doing business as ICSolutions (**"ICS"**) as its exclusive provider of voice- and video-IPCS. ICS currently charges 9¢ per minute for domestic voice calling. Video calls must be paid

for in 28-minute sessions, which cost $5.88. More detail about ICS's pricing for Oregon DOC IPCS is available online at https://www.icscorrections.com/facilities/odoc.html#services.

5. Recent actions by the Federal Communications Commission (the **"Commission"**) with respect to IPCS rate regulation have injured the Clinic and have directly affected and interfered with the Clinic's core activities, as described below.

6. The Commission's report and order issued on July 22, 2024 in the proceedings *Incarcerated People's Communications Services*, WC Docket 23-62 and *Rates for Interstate Inmate Calling Services*, WC Docket 12-375 (collectively, the **"IPCS Rulemaking"**) capped voice calls from Oregon DOC facilities at 6¢ per minute. In 2025, the Commission suspended the previous report and order, and promulgated new rate caps, allowing IPCS providers at prisons like Oregon DOC facilities to charge up to 11¢ per minute. Because ICS currently charges more than would have been allowed under the Commission's 2024 rate caps, a voice call between a Clinic student and a client in the Oregon DOC is more expensive than it would have been had the Commission not suspended its 2024 report and order. The current rates cause the Law School to spend more on IPCS than it would be paying had the 2024 report and order remained in place, thus diverting financial

resources from other educational activities. It is my understanding that this concrete economic injury and diversion of resources qualifies to establish injury-in-fact and organizational standing in federal court.

7. IPCS video calling is a useful communications tool for the Clinic, because it provides an opportunity for visual communication, where Clinic students and clients can be attuned to non-verbal body language. ICS currently charges $5.88 for a 28-minute video-calling session, which equals a calculated rate of 21¢ per minute. Under the Commission's 2024 report and order, video calls from Oregon DOC facilities would have been capped at 16¢ per minute. The Commission's current rules allow IPCS providers at prisons to charge up to 25¢ per minute for video calls. Thus, as with voice calling, each IPCS video call is now more expensive than it would have been had the Commission not abandoned its 2024 price caps.

8. Apart from the direct economic injury suffered by the Clinic, as described above, I believe the Commission's 2025 report and order has also impaired the Clinic operations and mission even in situations where incarcerated clients or potential clients pay for IPCS calls to the Clinic. To my knowledge, if people incarcerated in the Oregon DOC receive paid work assignments, they typically earn significantly less than $1 per hour. Accordingly, incarcerated clients

who pay for some or all of their IPCS usage must either work a substantial amount to afford a brief call, or they must receive money from friends or family outside or prison. In either scenario, this has a chilling effect on the services we provide: if incarcerated clients are unable to call us due to the cost of IPCS, or if they limit their communications to stay within their personal budgets, then Clinic students must spend additional time to ensure that they are fully informed about their clients' needs. Advocating for clients requires clear and frequent communications. High IPCS rates act as a barrier to those communications, thereby infringing on the Clinic's mission and disadvantaging our clients.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 8th day of September 2026.

/s/ Aliza Kaplan
Aliza Kaplan

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

| | |
|---|---|
| IN RE: MCP 198 | No. 26-8037 |
| DIRECT ACTION FOR RIGHTS AND EQUALITY,<br>*Petitioner*,<br>v.<br>FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,<br>*Respondents*,<br>SECURUS TECHNOLOGIES, LLC; NATIONAL SHERIFFS' ASSOCIATION; GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES,<br>*Intervenors*. | No. 26-1447 |

I, Melonie Perez, declare as follows:

1. My name is Melonie Perez. I am over 18 years of age, of sound mind, and capable of making this declaration. I have personal knowledge of the matters set forth in this affidavit.

2. I am the Lead Organizer for the Behind the Walls Committee at Direct Action for Rights and Equality ("DARE"). I have served in that role since 2022. In my current role, I organize the community to work on criminal and prison reform.

3. DARE is a 501(c)(3) organization based in Rhode Island. DARE's core mission is to organize low-income families living in communities of color for social, economic, and political justice. DARE uses four interconnected strategies to build power, win campaigns, and fuel a lasting movement for social change. These include (a) base building, in which members work

together to seek and organize for solutions to community-wide programs; (b) direct action organizing, in which DARE builds campaigns from the ground up and seeks out allies in policy and advocacy organizations to find solutions; (c) leadership development, in which DARE offers members an opportunity to participate in its Leadership Institute to understand the root causes of problems that communities of colors face, and to develop their own skills as organizers, facilitators, and leaders; and (d) movement building, in which DARE works to build a network locally and globally with other base-building organizations who share DARE's values.

4. DARE is a membership-based organization. DARE has more than 200 members. Many of these members are formerly incarcerated or have family members who are or have been incarcerated.

5. For over ten years, DARE's Behind the Walls Committee has focused on improving the lives of incarcerated and formerly incarcerated people. The Committee conducts policy and reform campaigns spearheaded by people who have been impacted by incarceration, and focuses on several substantive issues, including securing voting rights for formerly incarcerated people, increasing access to public housing for people with criminal legal involvement, and making it illegal for employers to require applicants to disclose their criminal legal histories. The Committee also cares for and supports incarcerated and formerly incarcerated people by celebrating personal milestones and connecting people to employment, housing, and mentorship opportunities.

6. By necessity, DARE speaks with incarcerated people to involve them in the committee's campaigns and ensure their interests are centered in its work. In recent months, I have heard that some DARE members have had to pay more due to increased calling rates. For example, Jazzlyn Jaxzyn has family members incarcerated out-of-state in Florida, and has faced higher rates. Lela Greene has a family member incarcerated out-of-state in Kansas, and has faced

higher rates. And Jennifer Perdomo has family members incarcerated out-of-state in South Carolina, and has also faced higher rates.

7. In addition, DARE has opened and currently maintains a Securus account through which it pays for its phone calls with incarcerated people. DARE has participated in scores of telephone calls with incarcerated people. And incarcerated people also continue to regularly call DARE for work related to the Behind the Walls Campaign. Affordable calling rates help make it possible for loved ones to stay in regular contact with incarcerated people and are therefore essential to advancing DARE's mission of organizing communities of color for social, economic, and political justice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: September 4, 2026

Providence, Rhode Island

*/s/ Melonie Perez*
MELONIE PEREZ

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

| | |
|---|---|
| In re MCP 198 | No. 26-8037 (lead case) |
| Pennsylvania Prison Society,<br><br>Petitioner,<br><br>v.<br><br>Federal Communications Commission, and the United States of America,<br><br>Respondents. | No. 26-1448 |

I, Claire Shubik-Richards, declare as follows:

1. I am Executive Director of the Pennsylvania Prison Society (PPS).

2. PPS was founded in May 1787 in Philadelphia, just weeks before the start of the Constitutional Convention. It is the oldest prison reform organization in the United States. PPS was instrumental in developing the modern penitentiary system. In its early years, the group successfully advocated for the elimination of jailer fees, pushed for individual treatment of the incarcerated, and helped abolish the use of capital punishment for crimes other than murder.

3. PPS' core mission is to promote the health, safety, and dignity of people incarcerated in jails and prisons across the Commonwealth and their families. Today, PPS operates a wide range of programs to support incarcerated individuals and their loved ones. It monitors conditions in all 82 prisons and jails in Pennsylvania. PPS also facilitates community connection by hosting virtual family support groups and operating transportation programs that bring families to state prisons for visits.

4. PPS has had statutory recognition giving it access to Pennsylvania prisons and jails since 1829. The currently operative provisions governing the Society are 61 Pa.C.S. § 3512 and § 3513. Under Section 3512, "authorized members of the Pennsylvania Prison Society" are explicitly defined as "Official Visitors," putting them in the same statutory category as the Governor, Commonwealth lawmakers, judges, and the Attorney General. Section 3513 provides these Official Visitors with unrestricted visitation rights in Commonwealth and county carceral institutions and the right to conduct private interviews.

5. As the only independent monitoring body with statutory access to Pennsylvania's prisons and jails, PPS works directly inside all of Pennsylvania's state and county correctional facilities to monitor conditions, raise concerns about problems it witnesses, and surface issues before they become a problem.

6. Central to PPS's work is helping incarcerated people resolve issues related to their health, safety, and dignity. In 2025 PPS assisted approximately 2,000 people in custody with issues related to health, safety, and dignity. PPS relies on telephone conversations in day-to-day operation of its programs. It responds to individual requests for assistance from incarcerated people and their families, and works to resolve issues on a case-by-case basis. To provide effective oversight of individual institutions and the correctional system at-large, PPS tracks key issues and identifies trends through data collection, walkthroughs, and in-depth regular communication with people living and working in prison.

7. Increased rates for phone calls from jails and prisons have directly affected PPS's ability to conduct its activities and required it to divert resources from other activities and projects.

8. PPS is aware that least one, and possibly more, Pennsylvania county jails have recently increased their rates in reliance on the decisions of the Federal Communications Commission allowing such increases. In particular, it received reports that rates increased in Dauphin County days

after the Federal Communications Commission authorized higher rates. PPS staff received reports from incarcerated individuals about the burden this increase in rates placed on them.

9. The increased cost of IPCS phone calls burdens PPS' ability to carry out its mission and requires it to divert resources from its core activities to address those harms.

10. For example, increased costs impair PPS' monitoring activities, which are reliant on receiving reports from incarcerated individuals. Increased costs reduce the number and length of calls that families, loved ones and incarcerated persons can afford, meaning PPS is less likely to receive reports by telephone after rates go up. This in turn impedes PPS's ability to provide services and requires it to devote greater time and resources that must necessarily be diverted from other activities. When phone service is restricted by cost, PPS and the people it serves must resort to mail, which is slow and inefficient, often taking weeks, and materially impairs PPS' ability to provide quick and effective monitoring in line with its mission. Such communications are more resource intensive for PPS than the phone calls they replace. PPS is therefore considering changing the staffing model to account for the increased rates.

11. Moreover, the cost of postage has itself increased significantly, such that a stamp for a one-ounce letter that cost 55 cents as of January, 2021, now costs 82 cents, an increase of 49.1 percent. This makes the need for affordable telephone communications even more important.

12. Much of PPS's interaction is through friends and family, who can more easily call PPS to advise staff of information they obtain via phone conversations. Thus, in addition to the difficulty and lost time in communicating directly with incarcerated persons, these indirect communications are more difficult, and thus requires yet an additional diversion of PPS's resources.

13. Furthermore, a major component of PPS's work is facilitating societal

reentry after release. This involves communicating with family and friends, as well as the soon-to-be-released person. With fewer and shorter calls, there is less information available to PPS's reentry staff, and they are forced to play "catch up" to assess needs and secure resources

I declare under penalty of perjury that the foregoing is true and correct.

Executed: September 4, 2026

/s/ Claire Shubik-Richards _____
Claire Shubik-Richards