**ORAL ARGUMENT NOT YET SCHEDULED**

Case Nos. 26-8037, No. 26-1449

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

No. 26-8037

In re: MCP No. 198

---

**NETWORK COMMUNICATIONS INTERNATIONAL CORP.**
**D/B/A NCIC CORRECTIONAL SERVICES,**

*Petitioner*,

v.

**FEDERAL COMMUNICATIONS COMMISSION**
**and UNITED STATES OF AMERICA,**

*Respondents*,

**DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA PRISON SOCIETY; UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.; GLOBAL TEL*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES; SECURUS TECHNOLOGIES, LLC**; *Intervenors*.

---

On Petitions for Review of an Order of the
Federal Communications Commission

---

# OPENING BRIEF FOR NETWORK COMMUNICATIONS INTERNATIONAL CORP. D/B/A NCIC CORRECTIONAL SERVICES

---


Glenn S. Richards
Phillip J. DeRosier
Lee G. Petro
**DICKINSON WRIGHT PLLC**
1825 Eye Street, N.W., Suite 900
Washington, D.C. 20006
(202) 466-5961
GRichards@DWLaw.com
PDeRosier@DWLaw.com
LPetro@DWLaw.com

*Counsel for Petitioner Network Communications International Corp. d/b/a NCIC Correctional Services*


September 9, 2026

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to First Circuit Local Rule 28.0 and Federal Rules of Appellate Procedure 26.1 and 28, counsel for Petitioner certifies as follows:

(A) *Parties and Amici.* Petitioner is Network Communications International Corp. d/b/a NCIC Correctional Services ("NCIC"). Respondents are the Federal Communications Commission ("FCC" or "Commission") and the United States of America. Intervenors are the National Sheriffs' Association ("NSA"), Direct Action For Rights And Equality, Inc. ("DARE"), Pennsylvania Prison Society ("PPS"), United Church Of Christ Media Justice Ministry, Inc. ("UCC"), Global Tel*Link Corporation d/b/a ViaPath Technologies ("ViaPath"), and Securus Technologies, LLC ("Securus").

(B) *Rulings Under Review.* The ruling under review is *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Order on Reconsideration and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375, FCC 25-75 (rel. Nov. 6, 2025), published at 90 Fed. Reg. 56,013 (Dec. 5, 2025) ("2025 Order" or "Order").

(C) *Related Cases*. This case was originally filed in the United States Court of Appeals for the Fifth Circuit on December 12, 2025 (No. 25-60695) and transferred to the United States Court of Appeals for the District of Columbia

Circuit on January 6, 2026 (No. 26-1003). On motion by DARE, which NCIC opposed, the D.C. Circuit ordered NCIC's case transferred to this Court on April 16, 2026.

This Court accepted transfer on April 27, 2026, and on July 10, 2026, consolidated NCIC's case (now No. 26-1449) with four other petitions for review of the 2025 Order under the lead caption In re: MCP No. 198, No. 26-8037. Order, In re: MCP No. 198, No. 26-8037 (1st Cir. July 10, 2026). The consolidated cases are Nos. 26-1446 (UCC), 26-1447 (DARE), 26-1448 (PPS), 26-1449 (NCIC), and 26-1450 Criminal Justice Reform Clinic ("CJRC").

Petitions for review of the underlying 2024 Order, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375, FCC 24-75, 39 FCC Rcd 7647 (2024) ("2024 Order"), were consolidated in this Court in In re: MCP No. 191 (lead case Securus Techs., LLC v. FCC, No. 24-8028) and remain pending. Counsel is not aware of any other related cases within the meaning of First Circuit Local Rule 28.0(f).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner Network Communications International Corp. d/b/a NCIC Correctional Services states that it is a privately held corporation that provides incarcerated people's communications services and related services to correctional facilities throughout the United States. NCIC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i
CORPORATE DISCLOSURE STATEMENT .................................................... iii
TABLE OF CONTENTS.......................................................................... iv
TABLE OF AUTHORITIES ...................................................................... vi
REASONS WHY ORAL ARGUMENT SHOULD BE HEARD............................x
GLOSSARY.............................................................................................. xi
STATEMENT OF JURISDICTION........................................................1
STATEMENT OF THE ISSUES...............................................................3
PERTINENT STATUTES AND REGULATIONS ....................................5
INTRODUCTION .......................................................................................6
STATEMENT OF THE CASE......................................................................9
A. NCIC And The IPCS Industry ..........................................................9
B. Statutory And Regulatory Background ............................................10
C. NCIC's Petition For Reconsideration................................................12
D. Intervening Developments...............................................................14
E. The 2025 Order...............................................................................15
F. Procedural History .........................................................................17
SUMMARY OF ARGUMENT ...............................................................21
STANDARD OF REVIEW ......................................................................27
ARGUMENT ..........................................................................................29
I. THE INTERIM RATE CAPS VIOLATE THE MWR ACT AND SECTION 276 BECAUSE THEY DENY FAIR COMPENSATION TO IPCS PROVIDERS. ...........................................................................29
A. Section 276 Requires That Each Provider Be Fairly Compensated, But The Commission Set Every Cap At The Lowest Bound Of Its Own Cost Ranges. ...........................................................................29
B. The Waiver Process Does Not Cure The Statutory Violation. ...............36
C. The Commission Failed To Consider The Costs Of All IPCS Providers. 41

D. The Commission's Unexplained Shift From Simple To Minute-Weighted Averages Compounds The Lower-Bound Error And Requires Reasoned Explanation. ....... 45

II. THE COMMISSION'S REFUSAL TO REINSTATE SEPARATE ANCILLARY SERVICE FEES WAS ARBITRARY AND UNLAWFUL. ....... 47

III. THE COMMISSION'S RETENTION OF THE SITE COMMISSION PROHIBITION - WITHOUT ADDRESSING NCIC'S CHALLENGE - WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW. ....... 49

A. The Commission Failed To Address NCIC's Petition ....... 49

B. The Prohibition Departs From Decades Of Precedent Without Reasoned Explanation And Exceeds The Commission's Authority. ....... 50

C. The Prohibition Is Irreconcilable With The Order's Facility Rate Additive. ....... 54

IV. THE UNIFORM $0.02-PER-MINUTE FACILITY RATE ADDITIVE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO THE MWR ACT. ....... 55

V. THE COMMISSION'S REFUSAL TO ADOPT ENFORCEMENT AND DATA-COLLECTION PROCEDURES TO ADDRESS NONCOMPLIANT IPCS PROVIDERS WAS ARBITRARY AND CAPRICIOUS. ....... 58

CONCLUSION ....... 60

CERTIFICATE OF COMPLIANCE ....... 61

CERTIFICATE OF SERVICE ....... 62

APPENDIX A

STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 621 (5th Cir. 2000) .......................38

*ALLTEL Corp. v. FCC*, 838 F.2d 551, 561-62 (D.C. Cir. 1988)...................... 38, 41

*ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018) ........... 27, 48, 55

*Arsberry v. Illinois*, 244 F.3d 558, 561 (7th Cir. 2001)................................... 13, 51

*Brooks-Scanlon Co. v. Railroad Comm'n of La.*, 251 U.S. 396, 399 (1920)..........34

*Duncan v. Walker*, 533 U.S. 167, 174 (2001).........................................................30

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) ................ passim

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)............... passim

*Global Tel*Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017)........................ passim

*Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ...................................................51

*Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 565-66 (D.C. Cir. 1997) . 10, 29

*Implementation of the Pay Telephone Reclassification and Compensation Provisions*, Order on Reconsideration, 11 FCC Rcd 21233, ¶ 52 (1996) .... 13, 51

*In re MCP No. 191*, 158 F.4th 294 (1st Cir. 2025).................................................18

*In re: MCP No. 198*, Order, No. 26-8037 (1st Cir. July 10, 2026) .....................2, 18

*In re: MCP No. 198*, Order, No. 26-8037 (1st Cir. July 23, 2026) .........................18

*Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order on Reconsideration and Further Notice of Proposed Rulemaking, FCC 25-75 (rel. 2025), 90 Fed. Reg. 56,013 (Dec. 5, 2025) . passim

*Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75, 39 FCC Rcd 7647 (2024) ........................................................................................ passim

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) .......................................................... 27, 36, 48, 50

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ......................... passim

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370, 373 (1986).................53

*Maine Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 471 (D.C. Cir. 2008)............32

*Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251 (1951) .......... 31

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) .......... passim

*Mozilla Corp. v. FCC*, 940 F.3d 1, 76 (D.C. Cir. 2019) .......... 53

*Network Commc'ns Int'l Corp. v. FCC*, Order, No. 26-1003 (D.C. Cir. Apr. 16, 2026) (per curiam) .......... 2, 18

*NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008) .......... 37

*Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 850-51 (D.C. Cir. 1993) .......... 37

*Rates for Inmate Calling Services*, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, ¶ 118 (2015) .......... 10

*Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519 (2021) .......... xi, 11, 41, 45

*Russello v. United States*, 464 U.S. 16, 23 (1983) .......... 50

*Sandwich Isles Communications, Inc.*, Order, 34 FCC Rcd 577, 580 (2019) . 22, 43, 44

*Verizon Communications Inc. v. FCC*, 535 U.S. 467, 484-85 (2002) .. 22, 30, 42, 43

*West Virginia v. EPA*, 597 U.S. 697 (2022) .......... 24, 52

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 485 (2001) .......... 41

**Statutes**

28 U.S.C. § 2112(a)(3) .......... 18

28 U.S.C. § 2342(1) .......... 1, 2

28 U.S.C. § 2343 .......... 2

28 U.S.C. § 2344 .......... 1, 2

47 U.S.C. § 201 .......... 50

47 U.S.C. § 276 .......... passim

47 U.S.C. § 402(a) .......... 1, 2

5 U.S.C. § 706(2)(A) .......... 27

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 .......... passim

**Other Authorities**

*American Tel. & Tel. Co.*, Phase II Final Decision and Order, 64 F.C.C.2d 1, ¶ 111 (1977) ....................44

Br. for Respondents at pg. 48, *In re: MCP No. 191*, No. 24-8028 (1st Cir.) .. passim

Comments of Global Tel*Link Corp. d/b/a ViaPath Technologies, WC Docket Nos. 23-62, 12-375, at 4 (filed Aug. 7, 2026)....................40

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375 (filed Feb. 3, 2026).................... 24, 57

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375 (filed July 24, 2026). ....................38

CPUC Decision 26-04-004 (rel. Apr. 13, 2026) ....................19

*Disposition Rejecting Network Communications International Corporation (NCIC) Advice Letter 49 Requesting Increases to Incarcerated Persons Calling Services (IPCS) Rates Above the Rate Caps Adopted in Decision 26-04-004*, dated July 16, 2026 ....................20

Email Correspondence from Benjamin Rhodeside, Office of Senator Duckworth, dated March 17, 2022....................55

*Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, DA 25-565, WC Docket Nos. 23-62, 12-375 (WCB June 30, 2025) .................... 15, 16

Letter from Bradley Craigmyle, Deputy Gen. Counsel, FCC, to Clerk of Court, *In re: MCP No. 191*, No. 24-8028 (1st Cir. Nov. 6, 2025) ....................17

Letter from Chief Travis Koltiska, President, Wyoming Association of Sheriffs and Chiefs of Police, to the FCC, WC Docket Nos. 12-375, 23-62 (June 29, 2026).39

Letter from Sheriff Darren Eichinger, Labette County, Kan., Sheriff's Office (June 29, 2026) ....................39

Letter from Sheriff Jared Buchanan, Sanpete County, Utah, Sheriff's Office (August 4, 2026)....................39

Letter from Sheriff Randy Starkey, Niobrara County, Wyo., Sheriff's Office (June 18, 2026) ....................39

Letter from Thomas Kerss, Executive Director, Sheriffs' Association of Texas, to the FCC, WC Docket No. 23-62 (July 28, 2026) ....................39

NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375 (filed Jan. 9, 2025).1, 7, 33, 34

NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 3 (filed Mar. 6, 2025)....................33

NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 3 (filed Oct. 21, 2025)....................56

NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 5 (filed Mar. 6, 2025)....................43

NCIC Petition for Reconsideration, WC Docket Nos. 23-62, 12-375 (filed October 21, 2024) .................... passim

NCIC Petition for Waiver, WC Docket Nos. 23-62, 12-375 (filed June 16, 2026) 19

NCIC Reply to Oppositions, WC Docket Nos. 23-62, 12-375, at pg. 8 (filed Dec. 5, 2024)....................13

Opposition of the Wright Petitioners et al., WC Docket Nos. 23-62, 12-375, at 6-7 (filed Aug. 7, 2026)....................40

*Rates for Interstate Inmate Calling Services; Pay Tel Communications, Inc.'s Petition for Waiver of Interim Interstate ICS Rates*, Order, 29 FCC Rcd 1302 (WCB 2014) ....................37

Reply Br. of Provider Petitioners at 27, *In re: MCP No. 191* (1st Cir.)........... 33, 53

Reply Comments of the Wright Petitioners et al., WC Docket Nos. 23-62, 12-375, at 1-2 (filed Aug. 24, 2026)....................40

Securus Ex Parte Comments, WC Docket Nos. 23-62, 12-375, at 1-3 (Oct. 21, 2025).................... passim

Securus Ex Parte Comments, WC Docket Nos. 23-62, 12-375, at 2-4 (Sept. 29, 2025).................... 14, 17, 46

Securus Reply Comments at 2-3, WC Docket Nos. 23-62, 12-375 at 2-3 (filed Aug. 20, 2026) ....................40

Securus Techs., LLC, Reply Comments in Support of Petitions for Reconsideration, WC Docket Nos. 23-62, 12-375 (Nov. 25, 2024)....................14

**Rules**

47 C.F.R. § 1.429 ....................50

47 C.F.R. § 64.6015 ....................16

7 C.F.R. § 64.6030 ....................16

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The FCC has attempted to adopt rate caps and other regulations regarding IPCS since at least 2013. In its latest iteration, the FCC repeated the errors it had made in connection with the 2024 Report and Order, and ignored several issues raised by Petitioner in its Petition for Reconsideration of the 2024 Report and Order.

Further, the 2025 Report and Order attempts to resolve issues that are pending before this court in a related case – *In re: MCP 191* – which has gone through two rounds of briefing and oral arguments in which Petitioner was not eligible to participate because of its pending Petition for Rulemaking. Further, this court has not had the opportunity to consider the FCC's treatment of waiver requests of the rate caps, a safety valve the FCC relied on in its briefing in connection with the 2024 Report and Order. Finally, Petitioner raised issues in connection with the 2024 Report and Order not addressed by other parties in *In re: MCP 191*. Therefore, pursuant to FRAP 34(a)(1) and 1st Cir. R. 34.0(a), Petitioner requests oral argument.

## GLOSSARY

| | |
|---|---|
| 2021 ICS Order | *Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519 (2021) |
| 2024 Order | *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75, 39 FCC Rcd 7647 (2024) |
| 2025 Order or Order | *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order on Reconsideration and Further Notice of Proposed Rulemaking, FCC 25-75 (rel. 2025), 90 Fed. Reg. 56,013 (Dec. 5, 2025) |
| ADP | Average Daily Population |
| FCC or Commission | Federal Communications Commission |
| FCC MCP 191 Br. | Brief for Respondents Federal Communications Commission and United States, *In re: MCP No. 191*, No. 24-8028 (1st Cir. filed 2025) |
| FNPRM | Further Notice of Proposed Rulemaking |
| IPCS | Incarcerated People's Communications Services |
| JA | Joint Appendix |
| MWR Act | Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 |
| NCIC | Network Communications International Corp. d/b/a NCIC Correctional Services |
| NCIC Recon Petition | NCIC Petition for Reconsideration, WC Docket Nos. 23-62, 12-375 (filed October 21, 2024) |
| NSA | National Sheriffs' Association |
| PPI | Producer Price Index |
| WACC | Weighted Average Cost of Capital |

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1) to review final orders of the Federal Communications Commission. The Commission released the 2025 Order on November 6, 2025, and a summary was published in the Federal Register on December 5, 2025.

NCIC is a "party aggrieved" by the Order within the meaning of 28 U.S.C. § 2344. NCIC participated throughout the underlying rulemaking proceedings, filed the Petition for Reconsideration of the 2024 Order that the 2025 Order purports to resolve, and is directly and adversely affected by the Order, which imposes interim rate caps that fall below NCIC's costs at more than half of the facilities it serves, retains the prohibition on payments to correctional facilities under NCIC's existing contracts, and accelerates the deadline for compliance. *See* NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375 (filed Jan. 9, 2025) (JA___).

NCIC timely filed its petition for review on December 12, 2025, within 60 days of Federal Register publication of the Order. 28 U.S.C. § 2344. The petition was originally filed in the United States Court of Appeals for the Fifth Circuit (No. 25-60695), transferred to the United States Court of Appeals for the District of Columbia Circuit on January 6, 2026, as the result of the Consolidation Order, dated December 30, 2025, by the Judicial Panel on Multidistrict Litigation that randomly selected the United States Court of Appeals for the District of Columbia

Circuit. Subsequently, on DARE's motion, which NCIC opposed, the consolidated case was transferred to this Court on April 16, 2026, pursuant to 28 U.S.C. § 2112(a)(3) and (5). See *Network Commc'ns Int'l Corp. v. FCC*, Order, No. 26-1003 (D.C. Cir. Apr. 16, 2026) (per curiam).

This Court has jurisdiction and venue is proper under 28 U.S.C. § 2342(1), 28 U.S.C. § 2343, 28 U.S.C. § 2344, and 47 U.S.C. § 402(a). NCIC's case (now No. 26-1449) has been consolidated with four other petitions for review of the 2025 Order under the lead caption In re: MCP No. 198, No. 26-8037. *In re: MCP No. 198*, Order, No. 26-8037 (1st Cir. July 10, 2026).

## STATEMENT OF THE ISSUES

1. Whether the Commission's rate-setting methodology - which set interim rate caps at the lowest bounds of the Commission's own calculated cost ranges - is arbitrary, capricious, or otherwise contrary to the Martha Wright-Reed Act and 47 U.S.C. § 276 because it prevents IPCS providers from being fairly compensated for each completed intrastate and interstate communication.

2. Whether the Commission acted arbitrarily, capriciously, or otherwise contrary to law by failing to consider the costs incurred by all IPCS providers in establishing the interim rate caps.

3. Whether the Commission's refusal to reinstate a limited number of ancillary service fees - while including those costs in calculating the established rate caps – and its deferral of that issue to a further rulemaking, was arbitrary, capricious, or otherwise contrary to law.

4. Whether the Commission's decision to retain its prohibition on IPCS providers entering into agreements with correctional institutions that include sharing of revenue derived from IPCS, and the Commission's failure to address NCIC's petition for reconsideration of that prohibition, was arbitrary, capricious, or otherwise contrary to law.

5. Whether the Commission's adoption of a uniform $0.02-per-minute facility rate additive is arbitrary, capricious, or otherwise contrary to law because it

fails to account for all costs incurred by correctional facilities in facilitating IPCS.

6. Whether the Commission acted arbitrarily, capriciously, or otherwise contrary to law by not requiring all IPCS providers, including those that have never registered with the Commission, to participate in the Commission's mandatory data collections which provide the framework for the development of the interim IPCS rates.

7. Whether the Commission acted arbitrarily, capriciously, or otherwise contrary to law by failing to investigate ongoing violations of its IPCS rules, and broadly eliminating all ancillary fees, rather than strategically targeting the abusive fees imposed by the majority of IPCS providers, including the imposition of duplicative ancillary service charges and excessive single-call fees.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## INTRODUCTION

NCIC has provided communications services to incarcerated people and their families since 1995. It is the longest-serving large IPCS provider in the United States, and the largest independently owned IPCS provider, serving more than 765 correctional facilities nationwide. NCIC was also the only IPCS provider to support enactment of the MWR Act. NCIC does not oppose rate regulation. It comes before this Court because the Commission has implemented the MWR Act in a manner that Congress did not authorize and that the record cannot sustain.

In its 2024 Order, the Commission slashed IPCS rate caps using a methodology that excluded from cost recovery five of the seven categories of safety and security measures that providers must deploy as a condition of serving correctional facilities, representing approximately $346 million of the $569.9 million in reported safety-and-security costs. Further, the FCC modified its rate setting methodology by using providers' total minutes of service, including minutes for which providers are never paid. NCIC petitioned for reconsideration on four discrete grounds: (1) the exclusion of necessary safety-and-security costs; (2) the inclusion of unbilled minutes in establishing IPCS rate caps; (3) the prohibition on site commission payments to correctional facilities; and (4) the Commission's refusal to adopt meaningful enforcement and data-integrity procedures. NCIC Recon Petition 4-5

The 2025 Order proved NCIC was right about the numbers. The Commission granted reconsideration on the first two grounds, restoring hundreds of millions of dollars in excluded costs and removing unbilled minutes from the divisor which corrected the FCC's calculation of facility-size cost averages by as much as 63.7 percent. Order ¶¶ 30-58 (JA___). Those concessions confirmed that the 2024 caps were set below cost and unlawful.

Yet having conceded that its cost model understated providers' costs by hundreds of millions of dollars, the Commission repeated the same fundamental error in the 2025 Order: it again set the interim rate caps at the *lowest bounds* of its recalculated cost ranges, the result of which left NCIC providing service below its actual costs at more than half of the facilities it serves. NCIC Jan. 9, 2025 Ex Parte at 2 (JA___). The Commission compounded that error by adopting a uniform $0.02-per-minute facility rate additive, ignoring record evidence demonstrating material cost differences across facility sizes and service types.

The Commission simply ignored the other issues raised in NCIC's petition. The Order characterizes NCIC's petition as raising only two issues, Order ¶ 4 (JA___), and its ordering clause disposes of the petition as "granted in part . . . as described herein," Order ¶ 131 (JA___) without acknowledging or addressing NCIC's challenges to the site commission prohibition or its request for enforcement and data-collection procedures. And the Commission "deferred"

NCIC's request to reinstate separate ancillary service fees to a future rulemaking, Order ¶¶ 108-117 (JA___), while accelerating the compliance deadline for the rules NCIC asked it to reconsider, Order ¶¶ 87-89 (JA___).

The result is an order that is contrary to the MWR Act and 47 U.S.C. § 276 of the Communications Act and is arbitrary and capricious. The Court should vacate the unlawful portions of the Order and remand for further proceedings.

## STATEMENT OF THE CASE

### A. NCIC And The IPCS Industry

IPCS providers provide audio and video communications services to incarcerated people pursuant to contracts with the correctional authorities that control access to each facility. Unlike ordinary telephone service, IPCS must be delivered with an extensive suite of safety and security capabilities, including call recording and monitoring, voice biometrics, call transcription with keyword alerts, facial detection (not recognition) to ensure appropriate behavior during visits, fraud detection, law enforcement support, and related personnel, which correctional authorities require as a condition of doing business with IPCS providers. *See Global Tel*Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017) (recognizing that costs incurred as a "condition of doing business" at correctional facilities are legitimate costs of IPCS).

NCIC serves more than 765 correctional facilities, most of them small and medium-sized county jails. Jails differ fundamentally from prisons: they are smaller, their populations turn over constantly, and the costs of service are substantially higher. Correctional facilities also incur costs to facilitate IPCS - escorting inmates, administering devices, monitoring communications, and responding to law-enforcement requests - costs that facilities have historically

recovered through negotiated payments with IPCS providers commonly called site commissions.

In 2015, the FCC understood that if it did not need to eliminate site commissions to ensure that IPCS providers charged "fair, just, and reasonable" rates. *Rates for Inmate Calling Services*, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, ¶ 118 (2015). In response, several large IPCS providers followed through on their threat of litigation if the FCC did not adopt per-minute cap. *Global Tel*Link v. FCC,* 866 F.3d 397 (D.C. Cir. 2017). The 2025 Order adopted the cap originally supported by the *GTL v. FCC* petitioners and rejected NCIC's alternative cap that was based on facility population on the ground that the record was "insufficient." Order, at ¶46.

### B. Statutory And Regulatory Background

Section 276 of the Communications Act directs the Commission to prescribe regulations that "establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable," for completed intrastate and interstate communications. 47 U.S.C. § 276(b)(1)(A). The D.C. Circuit has previously held that § 276 requires the Commission to not take steps that prevents IPCS providers from being fairly compensated. *Global Tel*Link*, 866 F.3d at 408, 412; *Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 565-66 (D.C. Cir. 1997)

In the MWR Act, Congress expanded § 276 to reach all IPCS providers, including intrastate and video communications and added the requirement that "all rates and charges" be "just and reasonable." Congress simultaneously imposed two directives on the Commission's implementation: (i) the Commission "may use industry-wide average costs . . . and the average costs of service of a communications service provider," and (ii) it "shall consider costs associated with any safety and security measures necessary to provide" IPCS "and differences in the costs" of service "by small, medium, or large facilities or other characteristics." MWR Act § 3(b)(2) (emphasis added).

In its 2021 ICS Order, the Commission calculated per-minute costs using only *paid* minutes as the divisor, expressly recognizing that dividing by unpaid minutes would understate providers' recoverable costs. 2021 ICS Order, App. E ¶ 38.

In the 2024 Order, the Commission : (1) excluded five of the seven categories of reported safety-and-security costs from the cost basis used to set rate caps, 2024 Order ¶¶ 267-69 (JA___); (2) reversed the 2021 methodology by dividing providers' costs by total minutes, including unbilled minutes, without acknowledging the change; (3) abolished separate ancillary service fees on the theory that ancillary costs were incorporated into the new rate caps, 2024 Order ¶ 408 (JA___); (4) prohibited IPCS providers from paying site commissions to

correctional facilities, and preempted contrary state and local laws, 2024 Order ¶ 3 (JA___), while acknowledging in a footnote that facilities may still be reimbursed for the reasonable costs they actually incur in facilitating IPCS, *id.* ¶¶ 181-82 & n.648 (JA___); and (5) declined to enforce existing IPCS rules or adopt new IPCS-specific enforcement procedures beyond modifying the Commission's informal complaint form, *id.* ¶ 597 (JA___).

**C. NCIC's Petition For Reconsideration**

On October 21, 2024, NCIC petitioned for reconsideration of the 2024 Order, raising four grounds. NCIC Recon Petition (JA___).

*First*, NCIC demonstrated that the Commission misapplied its own "used and useful" framework in excluding approximately $346 million - 60 to 66 percent - of reported safety-and-security costs, notwithstanding the MWR Act's directive that the Commission "shall consider" such costs and the Commission's prior assurances that providers would have flexibility in documenting them. *Id.* at pg. 9 (JA___).

*Second*, NCIC showed that the Commission's use of unbilled minutes in the rate divisor reversed the 2021 ICS Order without explanation, substantially reducing  per-minute cost figures. *Id.* at pg. 11 (JA___).

*Third*, NCIC challenged the prohibition on site commissions, explaining that it contradicted more than two decades of Commission precedent recognizing that

location owners may lawfully be compensated, *Implementation of the Pay Telephone Reclassification and Compensation Provisions*, Order on Reconsideration, 11 FCC Rcd 21233, ¶ 52 (1996); *accord Arsberry v. Illinois*, 244 F.3d 558, 561 (7th Cir. 2001). NCIC also argued that the prohibition and its accompanying preemption of state and local law exceeded the Commission's statutory authority, and that the 2024 Order's own "safety valve" permitting reimbursement of facilities' reasonable costs, 2024 Order ¶¶ 181-82 & n.648 (JA___), was irreconcilable with the prohibition. NCIC Recon Petition at pg. 14 (JA___).

*Fourth*, NCIC restated its proposal for the FCC to adopt eleven concrete enforcement and data-integrity measures, supported by record evidence of ongoing industry practices that inflate consumer costs, including excessive single-call fees, duplicative credit-card processing charges, excessive per-minute video service rates, pass-through of federal universal service charges on exempt IPCS revenues, and the failure of the Commission to require numerous video-only IPCS providers to register with the Commission or file mandatory data collections. NCIC showed adoption of these measures could reduce ancillary charges by as much as 90 percent. NCIC Recon Petition at 18 (JA___); NCIC Reply to Oppositions, WC Docket Nos. 23-62, 12-375, at pg. 8 (filed Dec. 5, 2024) (JA___).

Other IPCS providers supported NCIC's petition regarding safety-and-security costs and the inclusion of unbilled-minutes. See Securus Techs., LLC, Reply Comments in Support of Petitions for Reconsideration, WC Docket Nos. 23-62, 12-375 (Nov. 25, 2024). Other industry filings amplified the objections to the Commission's rate setting methodology, including (i) the misapplication of the used-and-useful screen, (ii) the shift from simple to minute-weighted averages, (iii) the absence of an industry-specific inflation adjustment, and (iv) the downward WACC adjustment - none of which the 2025 Order addresses. Securus Ex Parte Comments, WC Docket Nos. 23-62, 12-375, at 2-4 (Sept. 29, 2025); Securus Ex Parte Comments, WC Docket Nos. 23-62, 12-375, at 1-3 (Oct. 21, 2025).

### D. Intervening Developments

While NCIC's Petition was pending, two developments framed the Commission's eventual action. *First*, petitions for review of the 2024 Order filed by IPCS providers, consumer advocates, and a coalition of State Attorneys General were consolidated in the United States Court of Appeals for the First Circuit, *In re: MCP No. 191* (lead case *Securus Techs., LLC v. FCC*, No. 24-8028), and argued on October 7, 2025.

*Second*, on June 30, 2025, the Wireline Competition Bureau waived the 2024 Order's compliance deadlines for the rate caps, the site commission prohibition, and the per-minute pricing requirement until April 1, 2027, finding

that additional time was necessary to ensure sufficient funding for safety and security measures. *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, DA 25-565, WC Docket Nos. 23-62, 12-375 (WCB June 30, 2025) ("Suspension Order").

### E. The 2025 Order

The 2025 Order granted NCIC's Petition in part. First, the Commission included all reported safety-and-security costs, adding approximately $346 million to the cost basis, Order ¶¶ 28-36 (JA___), and it removed unbilled minutes from the rate divisor, comprising 7.8 percent of total minutes industry-wide, and 27.5 percent of video minutes. Order ¶ 18 (JA___). The Order also created a new "extremely small" jail tier (average daily population 0-49) covering 956 jails and adopted a uniform interim facility rate additive of $0.02 per minute for all facility sizes and for both audio and video services. Order ¶¶ 19-27, 37-51 (JA___). The Commission rejected NCIC's proposal to vary the additive by facility size, asserting the record was insufficient. Order ¶ 47 (JA___). The Order stated that the additive "does not constitute a site commission." Order ¶ 49 (JA___).

The resulting interim caps, which includes the $0.02 additive and a 6.73 percent inflation adjustment, are set at the *lower bounds* of the Commission's recalculated cost ranges, rounded to the whole cent: $0.09 (audio) and $0.23 (video) per minute for prisons; $0.08/$0.17 for large jails; $0.10/$0.17 for medium

jails; $0.11/$0.19 for small jails; $0.13/$0.23 for very small jails; and $0.17/$0.42 for extremely small jails. Order, Table 1 (JA___); 47 C.F.R. § 64.6030.

The Order deferred NCIC's request to reinstate separate ancillary service fees to the concurrently-adopted Further Notice of Proposed Rulemaking, which proposes to retain the prohibition while seeking comment on NCIC's alternative proposals - a $3.00 cap on automated payment fees, $5.95 for live-agent transactions, a $0.25 single-call fee, reasonable deposit limits, and elimination of duplicative credit-card pass-through charges. Order ¶¶ 108-117 & n.300 (JA___). The Order did not cite NCIC's enforcement proposals; its introductory paragraph describes NCIC's petition as raising only the safety-and-security and unbilled-minutes issues, Order ¶ 4 (JA___), and its ordering clause states that NCIC's petition is "GRANTED IN PART as described herein," Order ¶ 131 (JA___).

Finally, the Order became effective upon Federal Register publication and required compliance within 120 days of publication, which had the effect of superseding the April 1, 2027, compliance deadline established just four months earlier. Order ¶¶ 87-89 (JA___); Suspension Order at 1-3, paras. 1-8. The 120-day deadline applies to the interim rate caps, the facility rate additive, and the site commission prohibition (47 C.F.R. § 64.6015). The Order contemplates a mandatory data collection and the establishment of permanent rate caps by the end of the first quarter of 2027. Order ¶ 81 (JA___).

Although the Order corrects the safety-and-security exclusion and the unbilled-minutes divisor, it did not address other industry objections including retention of the used-and-useful screen as the framework for excluding categories of costs from the lower bound, and the minute-weighted (rather than simple) averaging methodology first adopted in the 2024 Order. Further, the Order applies a 6.73 percent inflation adjustment rather than the 11.6 percent increase in the telecommunications Producer Price Index between August 2022 and August 2025 and retains the downward WACC adjustment. Finally, the Order rounds *down* from the lower bound for four of the six facility tiers, producing caps that fall below the Commission's own "more accurate reference" for used-and-useful costs. See Securus Sept. 29, 2025 Ex Parte at 2-4; Securus Oct. 21, 2025 Ex Parte at 1-3.

### F. Procedural History

By letters to the First Circuit dated October 7 and November 6, 2025, the Commission advised that the 2025 Order superseded the 2024 Order's rate caps and mooted the portions of the Commission's brief defending the 2024 Order's safety-and-security cost exclusions, its facility-cost treatment, and its use of unbilled minutes. Letter from Bradley Craigmyle, Deputy Gen. Counsel, FCC, to Clerk of Court, *In re: MCP No. 191*, No. 24-8028 (1st Cir. Nov. 6, 2025).

A summary of the Order was published in the Federal Register on December 5, 2025. 90 Fed. Reg. 56,013. NCIC timely petitioned for review in the United

States Court of Appeals for the Fifth Circuit, No. 25-60695, on December 12, 2025. The Judicial Panel on Multidistrict Litigation transferred the pending petitions for review of the 2025 Order to the United States Court of Appeals for the District of Columbia Circuit under 28 U.S.C. § 2112(a)(3), where NCIC's case was docketed as No. 26-1003. DARE subsequently moved to transfer the 2025 Order petitions to this Court under 28 U.S.C. § 2112(a)(5) for consolidation with the earlier-filed petitions for review of the 2024 Order pending in In re: MCP No. 191, on the ground that the 2025 Order arose out of and modified the same rulemaking.

Despite NCIC's opposition, the D.C. Circuit granted DARE's motion on April 16, 2026. *Network Commc'ns Int'l Corp. v. FCC*, Order, No. 26-1003 (D.C. Cir. Apr. 16, 2026) (per curiam) (citing 28 U.S.C. § 2112(a) and *In re MCP No. 191*, 158 F.4th 294 (1st Cir. 2025)). This Court accepted transfer on April 27, 2026, and on July 10, 2026 consolidated NCIC's case (docketed as No. 26-1449) with four other petitions for review of the 2025 Order under the lead caption In re: MCP No. 198, No. 26-8037. *In re: MCP No. 198*, Order, No. 26-8037 (1st Cir. July 10, 2026). On July 23, 2026, the Court adopted the parties' joint proposed briefing schedule. *In re: MCP No. 198*, Order, No. 26-8037 (1st Cir. July 23, 2026).

On June 16, 2026, NCIC filed with the FCC a petition for waiver of the interim rate caps under 47 C.F.R. § 64.6120, covering 456 facilities in 39 states,

the District of Columbia, and Puerto Rico. NCIC Petition for Waiver, WC Docket Nos. 23-62, 12-375 (filed June 16, 2026). The Commission has received comments and reply comments in response to the NCIC waiver petition, including letters of support for NCIC's request from 42 correctional facilities, multiple state sheriff's and jails associations, and the National Sheriffs' Association. The coalition of public-interest organizations in the instant proceeding filed an opposition, urging that the petition be dismissed or denied. The Commission has not issued a decision on the petition to date.

NCIC has raised similar concerns about non-cost-based rates in California. The 2024 Order assured providers contending that a lower state rate cap denies them fair compensation that they could "seek appropriate relief in the relevant state or locality" or petition the Commission. 2024 Order ¶ 238 (JA___). NCIC did both. On April 9, 2026, the California Public Utilities Commission adopted caps on intrastate audio rates at $0.025 per minute for every facility regardless of size, CPUC Decision 26-04-004 (rel. Apr. 13, 2026). On May 13, 2026, NCIC timely filed an application for rehearing of the CPUC decision. Because the CPUC failed to act in a timely manner, NCIC and Securus filed a Petition for Writ of Review with the Court of Appeal of the State of California on August 12, 2026, seeking review of the CPUC decision.

Separately, NCIC sought relief under the state's waiver procedures, by filing a Tier 2 Advice Letter on May 22, 2026, asking the Commission to approve a rate adjustment for NCIC-served facilities in California. The CPUC staff rejected NCIC's request on July 16, 2026. *Disposition Rejecting Network Communications International Corporation (NCIC) Advice Letter 49 Requesting Increases to Incarcerated Persons Calling Services (IPCS) Rates Above the Rate Caps Adopted in Decision 26-04-004*, dated July 16, 2026. NCIC filed a request for review of the staff decision on July 24, 2026, which remains pending.

## SUMMARY OF ARGUMENT

I. The interim rate caps violate the MWR Act and § 276 of the Communications Act. Section 276(b)(1)(A) requires the Commission to "ensure that *all* payphone service providers are fairly compensated, and all rates and charges are just and reasonable." In this context, the Commission has treated IPCS providers as payphone service providers when applying Section 276. Past precedent clearly establishes that the statute protects each provider individually, not the industry in the aggregate. Yet the Commission set interim rate cap at the *lowest bound* of its calculated cost ranges, ensuring that providers whose costs exceed the lower bound will not be fairly compensated. The Commission likewise failed to fully discharge the MWR Act's command that it "shall consider" the costs of all providers and the differences in costs across facility sizes and service types.

That is not a hypothetical concern. The interim caps require that NCIC provide IPCS at rates below its costs at more than half of the facilities it serves. A statute that requires fair compensation for all providers cannot be implemented by a methodology that inherently results in below-cost compensation. Just-and-reasonable ratemaking occupies a zone of reasonableness, but nothing in the MWR Act compels the Commission to select the bottom of every zone. Nor can a discretionary, individually adjudicated waiver process cure that structural defect. As noted, NCIC filed a petition for waiver, and the oppositions filed in response

urged denial because facility-level under-recovery is the "predictable and foreseeable" result of the Commission's methodology rather than an occasion for relief.

The Order compounds the lowest-bound error with four  methodological defects that the industry identified but the Commission mishandled. First, the Commission misapplies the used-and-useful doctrine - historically a rate-base constraint under rate-of-return regulation, *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 484-85 (2002); *Sandwich Isles Communications, Inc.*, Order, 34 FCC Rcd 577, 580 (2019) - to strip operating expenses, WACC inputs, and facility costs from the cost basis. Second, the Commission without explanation shifted from using simple averages in 2021 to minute-weighted averages in 2024, systematically biasing the resulting distributions toward large-facility economics and away from the small-jail costs the MWR Act commands the agency to consider. Third, the Commission's 6.73 percent inflation adjustment falls well short of the 11.6 percent measured increase in the telecommunications Producer Price Index between August 2022 and August 2025. Fourth, for four of the six facility tiers, the caps are rounded *down* from the lower bound, producing caps that fall below the Commission's own "more accurate reference" for used-and-useful costs. Each defect, standing alone, is arbitrary and capricious; together they confirm that the Order cannot ensure the "fair compensation" § 276 commands.

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

II. The Commission's treatment of ancillary service fees was arbitrary and unlawful. The 2024 Order abolished separate ancillary fees on the express premise that ancillary costs would be recovered through the rate caps. NCIC's reconsideration petition demonstrated that premise was false. Rather than confront that showing, the 2025 Order "deferred" the ancillary service fee issue to a further rulemaking while establishing rate caps that exclude meaningful ancillary cost recovery. An agency may not decline to decide a properly presented reconsideration ground while enforcing the very rule under challenge.

III. The Commission's continued prohibition of site commissions cannot stand. NCIC's reconsideration petition challenged the prohibition and the preemption of state and local law. The 2025 Order never responds. The failure to address a properly presented reconsideration ground is itself arbitrary and capricious. The site commission prohibition regulates a business *practice* although Congress confined § 276 to the regulation of "rates and charges" and, unlike in § 201(b) of the Communications Act, does not mention "practices." By prohibiting site commissions, the Commission departs from more than two decades of Commission precedent without adequate explanation, exceeds the authority

Congress conferred in the MWR Act, preempts state law that § 152(b) places beyond the Commission's reach, and intrudes on the States' management of their correctional systems in violation of the major questions and federalism principles that govern statutory interpretation after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) and *West Virginia v. EPA*, 597 U.S. 697 (2022). These concerns were also expressed by the seventeen (17) state Attorney General offices who are petitioners in the still-pending *In re: MCP 191* proceeding. Finally, the prohibition of site commissions is internally inconsistent with both the 2024 Order's cost-reimbursement "safety valve" and the 2025 Order's facility rate additive, which implicitly compensate facilities for the same functions while insisting it "does not constitute a site commission." The deficiency of the $0.02 additive was further explored by the National Sheriff's Association 2025 Cost Study, which examined the IPCS-related costs of 314 correctional facilities, and concluded that the per-minute additive should be based on the size of the facility, and range from $0.06 for large jails (1000+ADP) to $0.43 for extremely small jails (0-49) ADP. Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375 (filed Feb. 3, 2026).

IV. The Commission's adoption of a uniform $0.02-per-minute facility rate additive is arbitrary and capricious. The MWR Act directs the Commission to consider cost differences across facility sizes; the record, including the

Commission's own creation of a new "extremely small" facility tier recognizing those with  distinctly higher costs, confirms  that facility costs vary substantially by size and by  services.

Indeed, the record quantified those differences: per-person facility costs rise more than fourfold for audio, and more than eightfold for video, from the largest prisons to the smallest jails, and even the 2015 survey from which the Commission drew its uniform figure reported a difference in facility-size costs. *Order*, at ¶47. The Commission nonetheless adopted a single flat additive erroneously derived from the National Sheriffs' Association's 2015 survey, rejected NCIC's alternative based on facility population on the ground that the record was "insufficient," and gave no weight to the only contemporary facility cost survey in the record. An agency may not demand a record it declines to recognize, adopt a result based on thinner evidence than the alternatives it rejects, and disregard statutory considerations.

V. The Commission's refusal to adopt enforcement and data-collection procedures was arbitrary. NCIC documented ongoing, industry-wide violations of the Commission's IPCS rules and identified approximately eight video providers that have never properly registered with the FCC or filed data required of IPCS providers. The 2025 Order does not address these concerns. Because the Commission failed to consider an important aspect of the problem before it, i.e.,

the integrity of the data collections underlying its rates, this aspect of the Order must be set aside as well.

## STANDARD OF REVIEW

Questions of statutory interpretation are for the Court, which must exercise independent judgment in determining the meaning of the MWR Act and § 276 without deferring to the agency's reading. *Loper Bright*, 603 U.S. at 391-92, 412-13 (2024).

Under the Administrative Procedure Act, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 (1983). The Commission must articulate a "rational connection between the facts found and the choice made," and must justify any adverse treatment of similarly situated parties. *Id.* Finally, the Commission must respond to "relevant" and "significant" public comments, *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014).

Further, when an agency changes course, it must "display awareness that it *is* changing position," provide "a reasoned explanation . . . for disregarding facts

and circumstances that underlay or were engendered by the prior policy," and account for "serious reliance interests" its prior policy engendered. *Fox Television*, 556 U.S. at 515-16 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

## ARGUMENT

### I. THE INTERIM RATE CAPS VIOLATE THE MWR ACT AND SECTION 276 BECAUSE THEY DENY FAIR COMPENSATION TO IPCS PROVIDERS.

#### A. Section 276 Requires That Each Provider Be Fairly Compensated, But The Commission Set Every Cap At The Lowest Bound Of Its Own Cost Ranges.

Section 276(b)(1)(A) commands the Commission to "ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications." 47 U.S.C. § 276(b)(1)(A). Past decisions affecting the IPCS industry have construed the fair-compensation mandate to protect providers individually: the Commission must ensure fair compensation for "all" providers, not merely for a hypothetical average provider or for the industry in the aggregate. *Global Tel*Link v. FCC*, 866 F.3d 397, 408, 412 (D.C. Cir. 2017); *Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 565-66 (D.C. Cir. 1997).

The MWR Act strengthened this obligation by adding the independent requirement that "all rates and charges" be "just and reasonable," and extending both protections across all IPCS. While Congress permitted the Commission to "use industry-wide average costs" as a data source, MWR Act § 3(b)(2)(1), doing so did not eliminate the statutory obligation to ensure fair compensation for all providers.

The structure of § 276(b)(1)(A) confirms that reading. The Commission's approach taken in both the 2024 Order and the 2025 Order, wherein the Commission determines that fair compensation means no more than an opportunity to recover industry-average, "used and useful" costs on a company-wide basis, collapses the fair-compensation clause into the just-and-reasonable clause.

The "used and useful" inquiry is the conventional method of just-and-reasonable ratemaking. *See Verizon*, 535 U.S. at 483-86 (describing the "used and useful" qualification to the prudent-investment rule as a fixture of traditional cost-of-service regulation). But if satisfying that inquiry in the aggregate was all that Section 276 required, the separate command that "all payphone service providers are fairly compensated" would do no work at all. Yet statutes must be construed "so that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). The Commission's reading disregards the relevance of "all" from the statute and writes in "the average" - precisely the move the surplusage canon forbids.

The MWR Act's amendments further undermine the Commission's position. Congress provided that the Commission "may use industry-wide average costs . . . and the average costs of service of a communications service provider." MWR Act § 3(b)(2)(1). That is a permissive authorization addressed to the *inputs* of ratemaking, i.e., the data the Commission may consult, but did not grant a license

to produce *outputs* that leave certain IPCS providers undercompensated. While Congress deleted Section 276's prior reference to compensation for "each and every completed" call, it left the phrase "all payphone service providers" untouched. Had Congress intended to demote the guarantee from *every* provider to the *average* provider, it would not have retained the word "all."

The Commission's methodology is engineered to fail that standard. Despite adding back approximately $346 million in wrongly excluded safety-and-security costs and removing unbilled minutes from the divisor, as recommended by NCIC, the Commission then set each interim cap at the *lower bound* of the resulting range, rounded to the whole cent. Order ¶¶ 70-74 & Table 1 (JA___). By construction, a cap set at the bottom of a cost distribution denies cost recovery to every provider whose costs are higher than the lowest observed bound. The Commission's adjustments raised the cost averages by as much as 63.7 percent, Order ¶¶ 18, 36 (JA___), but setting caps at the floor of the corrected ranges simply relocates the same unlawful design one step higher.

The Commission cannot answer that its caps fall within a zone of reasonableness. The Supreme Court has held that "statutory reasonableness is an abstract quality represented by an area rather than a pinpoint," *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251 (1951), and "there is not a single 'just and reasonable rate' but rather a zone of rates that are just and

reasonable," *Maine Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 471 (D.C. Cir. 2008). However, the Commission computed such a zone for every facility tier and then selected the bottom of each. No precedent or statutory provision required that choice and the decision to follow this approach violates the MWR Act. A higher cap within the Commission's zones would have remained just and reasonable for consumers while fairly compensating the providers, a result the statute contemplates. The MWR Act's two commands of fair compensation and just and reasonable rates were never in tension, but the Commission simply refused to reconcile them.

Nor can the Commission rely on the 2024 Order's rationale that conservative cap placement buffered "imperfect" and potentially inflated cost data. The 2025 Order concedes the opposite: the data errors ran *against* providers. The Commission added back approximately $346 million in wrongly excluded safety-and-security costs and removed unbilled minutes that had deflated its per-minute figures, corrections that raised the cost averages by as much as 63.7 percent. Order ¶¶ 18, 36, 68 (JA___). Having conceded that its model materially understated costs, the Commission cannot invoke residual data imprecision to justify placing every cap at the floor of the corrected ranges. On this record, the error the Commission must guard against is under-compensation, which the statute forbids.

The consequences are concrete. NCIC has demonstrated that the caps "will result in NCIC providing service below its actual costs at more than half" of its facilities. NCIC Jan. 9, 2025 Ex Parte, at 2 (JA___). A rate structure that compels an efficient provider to serve most of its customer base below cost does not "ensure" that "all" providers are "fairly compensated." Where the statutory question is what § 276 requires, this Court owes the Commission's contrary reading no deference. *Loper Bright*, 603 U.S. at 412-13.

The Commission attempted to defend the rate design in the First Circuit litigation regarding the 2024 Order. There, the Commission acknowledged that its caps left four of the twelve reporting providers unable to recover their reported costs but dismissed the shortfall on the ground that those providers account for roughly four percent of industry minutes. Br. for Respondents at pg. 48, *In re: MCP No. 191*, No. 24-8028 (1st Cir.).

The record here is worse: the interim caps fall below cost for more than one-third of reporting providers, NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 3 (filed Mar. 6, 2025) (JA___), and record analyses showed the caps will require IPCS providers to offer services below cost at roughly 38 percent of all jails and prisons, with every provider serving a substantial set of facilities at a loss. Consol. Reply Br. of Provider Petitioners at 27, *In re: MCP No. 191* (1st Cir.).

Bedrock ratemaking principle reinforces the textual command. A regulator may not compel a company "to carry on even a branch of business at a loss, much less the whole business." *Brooks-Scanlon Co. v. Railroad Comm'n of La.*, 251 U.S. 396, 399 (1920). Caps set at the lowest bound of every cost range compel providers whose facilities sit above the floor of the distribution to operate at a loss or to subsidize regulated service from other operations. The consequences are not speculative, as demonstrated in California after the CPUC imposed rate reductions below providers' costs, which resulted in multiple IPCS providers exiting the state. NCIC Jan. 9, 2025 Ex Parte at 1 (JA___). A "compensation plan" that drives providers from the market does not "ensure" that "all" providers are fairly compensated.

The lowest-bound flaw is compounded by a rounding methodology that, for four of the six facility tiers, sets the caps *below* the Commission's own lower bounds. An ex parte submission by Securus demonstrated that the Order rounds the lower bounds *down* to the nearest whole cent when computing the caps for large jails, medium jails, small jails, and very small jails. Securus Oct. 21, 2025 Ex Parte at 3-4 & Table. The resulting caps are confiscatory by the Commission's own logic. In particular, the Order defends the use of the lower bound as a "conservative" estimate of used-and-useful costs, Order ¶¶ 70, 74 (JA___), but then adopts caps that fall below that reference for two-thirds of the tiers. Using the

Commission's own methodology, the caps for the four smaller tiers produce up to a 3.23 percent under-recovery at very small jails and an aggregate industry shortfall on the order of $5 million per year. Securus Oct. 21, 2025 Ex Parte at 3. The Commission never explained why rate caps that sit below its own "conservative" estimate of used-and-useful costs nonetheless satisfy the "fairly compensated" and "just and reasonable" prongs of § 276(b)(1)(A). Instead, it dismissed the resulting shortfall as "de minimis." Order ¶ 74 (JA___). That silence is dispositive. *State Farm*, 463 U.S. at 43.

The 6.73 percent inflation adjustment the Order applies is likewise inadequate. Order ¶¶ 79-80 & Table 1 (JA___). The Commission acknowledged Securus's 11.6 percent Telecom PPI-based proposal but rejected it in favor of a lower, general-economy GDP price index, without engaging Securus's industry-specific recommendation. Order ¶¶ 79-80 (JA___). The Commission's cost data reflects calendar year 2022, but the Order's rate caps are prospective. The Bureau of Labor Statistics telecommunications Producer Price Index rose from 104.25 in August 2022 to 116.32 in August 2025 - an 11.6 percent increase - and industry submissions provided the Commission with detailed table-based adjustments showing the actual measured increase. Securus Oct. 21, 2025 Ex Parte at 1-2 & Tables 1-2 (FTI adjustments). By applying an inflation adjustment demonstrably below the industry-specific index, the Commission engineered another downward

bias into the caps and offered no reasoned response to record placed before it. *Lilliputian*, 741 F.3d at 1312; *State Farm*, 463 U.S. at 43.

The Commission's downward adjustment to providers' reported weighted average cost of capital suffers from the same defect. The record contained industry-specific evidence of providers' actual cost of debt, and industry submissions specifically identified the cost-of-debt inputs the Commission's adjusted WACC failed to reflect. Securus Oct. 21, 2025 Ex Parte at 3. The Commission neither addressed that evidence nor explained why the industry data before it was insufficient. Because the WACC is a load-bearing input to the lower bound that the Commission adopts as its cap, an unexplained downward adjustment to that input further exacerbates the impact of below-cost rate caps. *State Farm*, 463 U.S. at 43.

### B. The Waiver Process Does Not Cure The Statutory Violation.

The Commission suggested that providers who could not be adequately compensated by the rate caps could  seek individual waivers under 47 C.F.R. § 64.6120. Order ¶ 74 n.214 (JA___). That response fails for two reasons. First, Section 276 places the obligation to "ensure" fair compensation on the Commission's compensation plan, not on the willingness of injured providers to litigate case-by-case exceptions. A rule that is unlawful as designed cannot be saved by the possibility of *ad hoc* dispensation from it. Second, the Commission's

waiver relief is based on the premise that it is extraordinary and disfavored, i.e., the requesting party must "articulate the nature of the special circumstances" warranting departure from the rule, and the Commission must "explain why deviation better serves the public interest." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008); *accord Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 850-51 (D.C. Cir. 1993) (upholding denial of agency-rule waiver where applicant failed to demonstrate special circumstances). Systematic under-compensation affecting more than half of a major provider's facilities is not a "special circumstance," it is the predictable output of the chosen methodology. Congress did not enact a fair-compensation guarantee that providers should be required to win back one facility at a time.

The Commission's own account of the waiver process confirms its inadequacy. Defending the 2024 Order, the Commission described Section 64.6120 relief as available in "exceptional" circumstances, and the lone example it offered was a temporary waiver granted to Pay Tel in 2014. FCC MCP 191 Br. at 48 (citing *Rates for Interstate Inmate Calling Services; Pay Tel Communications, Inc.'s Petition for Waiver of Interim Interstate ICS Rates*, Order, 29 FCC Rcd 1302 (WCB 2014)). An extraordinary, individualized, and historically temporary dispensation is not a "compensation plan" that "ensure[s]" fair compensation. It is well established that "[t]he FCC cannot save an irrational rule by tacking on a

waiver procedure," because "[i]f the Commission's argument were accepted, no rule, no matter how irrational, could be struck down, provided only that a waiver provision was attached." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561-62 (D.C. Cir. 1988); *accord Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 621 (5th Cir. 2000) (waiver is a mechanism for addressing an "anomaly"). Under-compensation across whole segments of IPCS industry is not an anomaly; it is the rule operating as designed.

Experience has confirmed the point. On June 16, 2026, NCIC filed a waiver petition covering 456 facilities in 39 states, the District of Columbia, and Puerto Rico, supported by facility-level cost showings prepared on the Commission's own data template, using the Commission's cost-data methodology. The petition drew overwhelming support from the facilities where NCIC's services are provided. NSA warns that when rates are set below the cost of providing IPCS, the predictable result is "a reduction in (and in some cases the elimination of) service by the provider, beginning at the facilities that are most expensive to serve." Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375 (filed July 24, 2026). The Sanpete County, Utah, Sheriff's Office describes the difficulty rural facilities face "finding . . . reliable service providers willing and able to serve our facility"; the Niobrara County, Wyoming, Sheriff reports that "it has been challenging to find reliable communications providers willing to serve

our area;" and the Labette County, Kansas, Sheriff's Office explains that larger facilities enjoy "greater economies of scale and more competitive options" that smaller jails lack. Letter from Sheriff Jared Buchanan, Sanpete County, Utah, Sheriff's Office (August 4, 2026); Letter from Sheriff Randy Starkey, Niobrara County, Wyo., Sheriff's Office (June 18, 2026); Letter from Sheriff Darren Eichinger, Labette County, Kan., Sheriff's Office (June 29, 2026) (all filed in WC Docket Nos. 23-62, 12-375). The Wyoming Association of Sheriffs and Chiefs of Police attests that cost recovery is "critically important" to Wyoming's "rural and frontier" agencies, and the Sheriffs' Association of Texas (representing all 254 Texas sheriffs) "strongly supports the granting of a waiver," noting that many counties "rely heavily on providers such as NCIC." Letter from Chief Travis Koltiska, President, Wyoming Association of Sheriffs and Chiefs of Police, to the FCC, WC Docket Nos. 12-375, 23-62 (June 29, 2026); Letter from Thomas Kerss, Executive Director, Sheriffs' Association of Texas, to the FCC, WC Docket No. 23-62 (July 28, 2026).

The record on NCIC's waiver petition confirms the structural defect from opposing directions. A coalition of public-interest organizations opposes relief on the ground that, because the caps rest on industry averages, "some facility costs will be higher and others will be lower than the rate caps," so that under-recovery at some of NCIC's facilities "is a predictable and foreseeable result of the MWRA,

not a basis for a waiver," and warns that granting waivers on that showing would "open the flood gates" and "eviscerate the 'exceptional' standard the Commission intended for the waiver process." Opposition of the Wright Petitioners et al., WC Docket Nos. 23-62, 12-375, at 6-7 (filed Aug. 7, 2026); *accord* Reply Comments of the Wright Petitioners et al., WC Docket Nos. 23-62, 12-375, at 1-2 (filed Aug. 24, 2026). A competing provider objects that NCIC's request is "overly broad in both scope and time" precisely because it "would apply to nearly every facility currently served by NCIC." Comments of Global Tel*Link Corp. d/b/a ViaPath Technologies, WC Docket Nos. 23-62, 12-375, at 4 (filed Aug. 7, 2026). While Securus does not take a position on NCIC's petition, it warns that the public interest advocates' arguments would "render the Waiver Process Illusory," because the Commission's rules on their face allow a provider to seek a waiver if the provider cannot recover its costs at a facility, yet the public interest advocates would deny relief despite that very showing. Securus Reply Comments at 2-3, WC Docket Nos. 23-62, 12-375 at 2-3 (filed Aug. 20, 2026).

Securus also documents the Commission's inconsistent treatment of the waiver process. In particular, the Commission has determined that it is "integral" to its just-and-reasonableness determination and that the caps and "revised waiver process" together "fully satisfy" the MWR Act, 2024 Order ¶¶ 219, 222 (JA___), but it also cites to the absence of successful waiver requests as evidence that its

caps are reasonable, 2021 ICS Order ¶ 105 (JA___). The Commission recognizes that the waiver process must be "practicably, not just theoretically, available." 2021 ICS Order ¶ 170 (JA___), but opponents to NCIC's waiver request insist that waiver requests must be denied because below-cost recovery is the predictable byproduct of industry-average ratemaking. Thus, the Commission cannot rely on the waiver process's mere existence to justify the caps that produce that below-cost recovery in the first place, while rejecting waiver requests that satisfy the waiver standard established by the Commission. A safety valve that must be closed whenever it is most needed is no safety valve at all. *See ALLTEL*, 838 F.2d at 561-62.

### C. The Commission Failed To Consider The Costs Of All IPCS Providers.

The MWR Act's implementation directive to the Commission was clear, it "shall consider costs associated with any safety and security measures necessary to provide" IPCS "and differences in the costs" of service "by small, medium, or large facilities or other characteristics." MWR Act § 3(b)(2)(2) (emphasis added). When Congress uses "shall," the consideration it directs is not optional, and the Commission may not effectively read the command out of the statute. *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 485 (2001) (an agency "may not

construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion").

The Commission did not perform the consideration Congress specified. Instead, it substituted a different test that filtered IPCS providers' reported costs through the "used and useful" doctrine, which was originally developed for two-party, monopoly utility ratemaking, in which a regulator polices a utility's investments on behalf of captive ratepayers. *See Verizon*, 535 U.S. at 484-85 (describing the doctrine's origins in traditional utility regulation).

The IPCS industry is significantly different, a fact that the FCC has recognized for more than 20 years. IPCS service contracts are competitively bid, where the correctional authority specifies the required security capabilities in its requests for proposals and disqualifies non-conforming bids. Consumers paying for the service are not parties to that negotiation. In that carceral setting, the security measures a facility requires as a condition of service are "necessary" by definition, *see Global Tel*Link*, 866 F.3d at 413 (costs incurred as a "condition of doing business" at correctional facilities are legitimate IPCS costs), and a screen that discards them because they also benefit other operations, or because cost-data reporting templates captured them imperfectly, does not "consider" them within any fair reading of the statute.

The history of the safety-and-security exclusions illustrates the defect. The 2024 Order rejected roughly 65 percent of reported safety-and-security costs not because the Commission found the underlying expenditures imprudent, but because responses to the Commission's own loosely specified reporting templates were anomalous or inconsistent. NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 5 (filed Mar. 6, 2025) (JA___). The 2025 Order's corrected that, yet the Commission retains the "used-and-useful" framework for the interim caps, the facility-cost analysis, and the forthcoming permanent caps. Order ¶¶ 28-36, 63, 68 (JA___). An agency may not build a defective methodology, penalize the industry for using that imperfect methodology, and then invoke "caution" to set every cap at the floor of the resulting understated ranges.

The Commission reliance on the used-and-useful screen is  misplaced. The doctrine originated as a limit on what property may be included in the rate base of a utility subject to rate-of-return regulation. *Verizon*, 535 U.S. at 484-85 (describing the doctrine as a fixture of traditional cost-of-service regulation disciplining "prudent-investment" inclusion in the rate base). The Commission itself has repeatedly recognized that the doctrine is a rate-base constraint. *Sandwich Isles Communications, Inc.*, Order, 34 FCC Rcd at 580 ¶ 7 (used-and-useful review governs whether *investment* is properly included in "the carrier's rate base"); *American Tel. & Tel. Co.*, Phase II Final Decision and Order, 64 F.C.C.2d

1, ¶ 111 (1977) (limiting used-and-useful analysis to whether *plant* is "used and useful in the provision of common carrier service").

However, the Order deploys the doctrine in a categorically different setting, namely by using "used and useful" to remove individual *operating expenses* (such as safety-and-security personnel and third-party monitoring services), *capital costs* (such as WACC inputs), and even entire categories of *facility costs* out of the cost basis before averaging. Such approach is demonstrably different from the past applications of the used-and-useful doctrine and represents a new cost-screening tool the Commission invented and applied only to IPCS.

Thus, the Commission's application of the used-and-useful doctrine represents both an unlawful expansion of Commission precedent and an arbitrary departure from it. To the extent the Commission means to invoke the traditional used-and-useful doctrine, *Sandwich Isles* and *AT&T Phase II* confine that doctrine to rate base and provide no support for excluding operating expenses, capital costs, or facility costs from a per-minute cost calculation.

Further, to the extent the Commission means to import a broader cost-screening tool of its own design for the IPCS market, it must acknowledge the departure from its precedents and provide a reasoned explanation - which it did not. *Fox Television*, 556 U.S. at 515-16; *Encino Motorcars*, 579 U.S. at 221-22.

Under either framing, the Commission's extension of the used-and-useful review beyond a provider's rate base clearly violates the Commission's statutory obligations. Section 276 does not employ the term at all, and the MWR Act directs the Commission to "consider" "safety and security measures *necessary to provide*" IPCS - a facially different inquiry. MWR Act § 3(b)(2)(2). A doctrine developed to police utility investment prudence cannot, without more, be repurposed as a screen to disallow the operating costs that IPCS providers must incur to deliver the very service Congress required them to be compensated for.

### D. The Commission's Unexplained Shift From Simple To Minute-Weighted Averages Compounds The Lower-Bound Error And Requires Reasoned Explanation.

An additional, self-contained defect in the Commission's methodology is its unexplained shift from *simple* averages in the 2021 ICS Order to *minute-weighted* averages in the 2024 Order, which the 2025 Order preserved without discussion. In 2021, the Commission calculated a simple average of provider costs plus one standard deviation and reported that the resulting caps covered the costs of 81 percent of prison contracts and 96 percent of large-jail contracts. 2021 ICS Order ¶ 99, 36 FCC Rcd 9519. In 2024, the Commission switched to minute-weighted averages, and its own tables reported that the resulting caps recovered costs at only about two-thirds of reporting contracts. 2024 Order, App. J Tabl. 3 (JA___);

Securus Sept. 29, 2025 Ex Parte at 3-4. The 2025 Order carried that methodology forward into the corrected cost distributions.

The consequences of shifting to minute-weighting are significant. Because per-minute IPCS costs are *inversely* correlated with facility size, i.e., small jails have materially higher per-minute costs than large jails, and jails have materially higher per-minute costs than prisons, weighting each provider's cost data by the *volume* of minutes served significantly shifts the industry-wide average toward large-facility economics, while understating the costs of the medium, small, very small, and extremely small jail tiers. Thus, the MWR Act's command to "consider . . . differences in the costs" of service "by small, medium, or large facilities" is eviscerated by the Commission's approach  to reduce those differences into a single volume-weighted average. MWR Act § 3(b)(2)(2). While Securus raised these concerns prior to the adoption of the 2025 Order, the Commission failed to meaningfully address these concerns. Securus Sept. 29, 2025 Ex Parte at 3-4.

Because the shift from simple to minute-weighted averaging represents a significant change in the Commissions IPCS rate-setting methodology, the Commission was required to "display awareness that it is changing position" and to "provide[] a reasoned explanation." *Fox Television*, 556 U.S. at 515-16; *Encino Motorcars*, 579 U.S. at 221-22. And under *Loper Bright*, the statutory question whether an industry-wide methodology that dissolves size-based cost variation can

satisfy the MWR Act's "shall consider" command is one this Court must now decide. 603 U.S. at 412-13.

## II. THE COMMISSION'S REFUSAL TO REINSTATE SEPARATE ANCILLARY SERVICE FEES WAS ARBITRARY AND UNLAWFUL.

The 2024 Order abolished separately billed ancillary service fees, and "incorporated" the IPCS providers' recovery of such costs into the new rate caps. 2024 Order ¶ 408 (JA___). NCIC's reconsideration petition attacked that premise directly, demonstrating that the caps could not recover ancillary costs that the Commission had never accurately measured. Instead, NCIC proposed calibrated, cost-based alternatives: a $3.00 cap for automated payment transactions, $5.95 for live-agent transactions, a $0.25 single-call fee, reasonable deposit limits, and the elimination of duplicative credit-card pass-through charges. Order ¶ 114 & n.300 (JA___). NCIC repeatedly highlighted the importance of the public to have access to live operators to assist in the establishment of IPCS accounts, and the additional costs associated with providing such service to the public.

The 2025 Order concedes that the 2024 cost model omitted hundreds of millions of dollars of costs and overstated billable minutes, but the Commission reset the rate caps at the lower bounds of the corrected ranges with no demonstrated recovery of ancillary costs or acknowledgment of the impact on IPCS providers. Instead of ruling on NCIC's request, the Commission "deferred" it

to the Further Notice, retaining the prohibition and exacerbating the problem of providing below cost IPCS services. Order ¶¶ 108-117 (JA___).

In defending the abolition of separate fees, the Commission asserted that providers "failed to reliably or consistently allocate" costs among ancillary services in their data submissions. FCC MCP 191 Br. at 93. But the agency cannot have it both ways. If the Commission found IPCS providers' ancillary fee cost data too unreliable to support service-by-service fee caps, the Commission cannot simultaneously argue that the ancillary fee cost data is reliable enough to satisfy the statutory requirement that those costs were fully "incorporated" into per-minute rate caps.

That disposition is clearly arbitrary and capricious. First, an agency must respond to the objections before it, and deferral to a future proceeding of indefinite duration, while the challenged rule remains in force, is not a response. *Lilliputian*, 741 F.3d at 1312. Second, the disposition is internally inconsistent because the Commission simultaneously (a) maintains the ancillary fee prohibition on the ground that ancillary costs live inside the caps, and (b) sets the caps at levels its own data show cannot house those costs. Order ¶¶ 87-89 (JA___). An agency decision that "is internally inconsistent" is "arbitrary and capricious." *ANR Storage*, 904 F.3d at 1028.

Finally, the Commission never addressed the consumer-protection evidence NCIC placed in the record clearly demonstrating that the ancillary fee prohibition has resulted in some IPCS providers charging unregulated fees, costing consumers far more than the actual cost of the underlying transactions. NCIC Pet. for Recon. at 18-19 (JA___). The refusal to reinstate cost-based ancillary fees should be vacated and remanded for a decision on the merits. NCIC's proposal would have banned the industry's worst practice outright and capped the remainder at demonstrated cost. Order ¶ 114 & n.300 (JA___). The Commission's response was to prohibit NCIC's cost-based fees, defer any substitute framework indefinitely, and leave the documented abuses to a future proceeding.

## III. THE COMMISSION'S RETENTION OF THE SITE COMMISSION PROHIBITION - WITHOUT ADDRESSING NCIC'S CHALLENGE - WAS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW.

### A. The Commission Failed To Address NCIC's Petition

NCIC's reconsideration petition squarely challenged the 2024 Order's categorical prohibition on site commission payments and its preemption of contrary state and local requirements. NCIC Pet. for Recon. at 16 (JA___). The 2025 Order never addresses that challenge and characterizes NCIC's petition as raising only two issues - the treatment of safety-and-security costs and unbilled minutes. Order ¶ 4 (JA___). Its ordering clause disposes of the petition as "GRANTED IN PART . . . as described herein." Order ¶ 131 (JA___). Nowhere in

between does the Commission acknowledge, describe, or address NCIC's site commission request.

That silence is dispositive. An agency acts arbitrarily when it fails to respond to "relevant" and "significant" public comments, *Lilliputian*, 741 F.3d at 1312, and a reconsideration petition filed under 47 C.F.R. § 1.429 is the appropriate vehicle for parties to raise such points. This Court "may uphold agency action only on the grounds that the agency invoked when it took the action." *State Farm*, 463 U.S. at 43. The Commission completely failed to address NCIC's request for reconsideration on this point.

### B. The Prohibition Departs From Decades Of Precedent Without Reasoned Explanation And Exceeds The Commission's Authority.

Section 276(b)(1)(A) directs the Commission to establish a "compensation plan" ensuring that providers are "fairly compensated" and that "all rates and charges are just and reasonable." Congress has granted the Commission authority over carrier practices in §201(b), which declares unlawful any unjust or unreasonable "charge, practice, classification, or regulation." 47 U.S.C. § 201(b). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *accord Hamdan v. Rumsfeld*, 548 U.S.

557, 578 (2006). A prohibition on payments flowing *from* providers *to* correctional facilities regulates a business practice, and the financial terms of the provider-facility relationship is not a "rate" or "charge" imposed on consumers of IPCS. The "compensation plan" contemplated by Section 276 runs in one direction, i.e., compensation to providers. Past decisions correctly describe Section 276 as "merely direct[ing] the Commission to 'ensure that all [ICS] providers are fairly compensated,'" in contrast to Section 201's ratemaking authority, *Global Tel*Link*, 866 F.3d at 409-10. The *GTL* court treated site payments as simply a cost of providing service at the locations providers serve. *Id.* at 412. Nothing in that structure authorizes the Commission to dictate to whom providers may make payments under their contracts.

For more than two decades, the Commission recognized that payments from communications providers to the owners of the locations they serve are a lawful feature of the payphone framework from which Section 276 springs. *See Implementation of the Pay Telephone Reclassification and Compensation Provisions*, Order on Reconsideration, 11 FCC Rcd 21233, ¶ 52 (1996); *See also Arsberry v. Illinois*, 244 F.3d 558, 561 (7th Cir. 2001). When an agency reverses a settled position, it must acknowledge the change and supply a reasoned explanation that accounts for the reliance interests built up under the prior regime. *Fox Television*, 556 U.S. at 515-16; *Encino Motorcars*, 579 U.S. at 221-22.

Correctional authorities and providers structured their multi-year contracts around lawful facility compensation. The 2024 Order reluctantly acknowledged those realities by creating a "safety valve" in a footnote that would permit reimbursement of facilities' reasonable, actually incurred costs, 2024 Order ¶¶ 181-82 & n.648 (JA___). Despite NCIC's arguments on reconsideration, the 2025 Order fails to address this reality.

The prohibition also exceeds the Commission's statutory authority. Nothing in the MWR Act addresses site commissions, and Congress expressly disclaimed any intent to "modify or affect any Federal, State, or local law" requiring communications services at correctional facilities or to "prohibit the implementation of any safety and security measures related to such services." MWR Act § 4. Yet the Commission construed a statute about just and reasonable communications *rates* to authorize a nationwide prohibition on the financial terms of contracts between providers and the state and local governments that operate correctional facilities, all the while preempting contrary state law in the process. Decisions of that "magnitude and consequence," reallocating authority over state correctional administration, require clear congressional authorization that is absent here. *West Virginia v. EPA*, 597 U.S. 697, 723-24, 735 (2022). Further, after *Loper Bright*, the Commission's assertion of that authority receives no deference. Instead, the Court must decide for itself whether Congress authorized the prohibition, 603

U.S. at 412-13. Congress legislated against the backdrop of the Commission's longstanding position that site commissions are a matter for correctional authorities and did not add language that would have eliminated site commissions. Seventeen State Attorneys General petitioned for review of the 2024 Order's preemption holding for precisely these reasons.

The preemption of state and local law fails for independent reasons. Section 152(b) "fences off from FCC reach or regulation intrastate matters," and operates as "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370, 373 (1986). An agency "literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it," and it "may not confer power upon itself." *Id.* at 374. It follows that where the Commission lacks authority to regulate, "it equally lacks the power to preempt state law." *Mozilla Corp. v. FCC*, 940 F.3d 1, 76 (D.C. Cir. 2019) (per curiam); *See id.* at 74 (vacating preemption directive that was not grounded "in a lawful source of statutory authority").

Moreover, the prohibition abrogates the financial terms of thousands of existing agreements between IPCS providers and state and local correctional authorities, totaling more than 3,500 contracts nationwide. Consol. Reply Br. of Provider Petitioners at 25, *In re: MCP No. 191*, No. 24-8028 (1st Cir.). *Fox*

*Television* and *Encino* require the agency to confront an industry's reliance interests on that scale, and the 2025 Order completely fails to do so. In fact, the Commission concedes in *MCP 191* that, absent preemption, providers required by state law to pay site commissions which they cannot recover "will not be fairly compensated." FCC MCP 191 Br. at 67. That concession cannot be reconciled with the Commission's simultaneous insistence that fair compensation demands no more than an opportunity to recover industry averages. The statute cannot mean one thing when it supports the Commission's rule and another when it condemns it.

### C. The Prohibition Is Irreconcilable With The Order's Facility Rate Additive.

Finally, the 2025 Order addresses site commissions inconsistently. The Order adopts a $0.02-per-minute facility rate additive precisely because correctional facilities incur compensable costs in facilitating IPCS, even though it insists that the additive "does not constitute a site commission." Order ¶¶ 46-51 (JA___). The Order further questions, in its accompanying Further Notice, whether payments to facilities "in excess of" the additive remain prohibited. Order n.278 (JA___). The Commission cannot coherently maintain that (a) compensating facilities for IPCS-related costs is unlawful revenue sharing when accomplished by contract, but (b) lawful and necessary when accomplished by regulation at a rate

established by the Commission. A decision that "is internally inconsistent" is "arbitrary and capricious." *ANR Storage*, 904 F.3d at 1028. The prohibition should be vacated.

## IV. THE UNIFORM $0.02-PER-MINUTE FACILITY RATE ADDITIVE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO THE MWR ACT.

The MWR Act commands the Commission to consider "differences in the costs" of service "by small, medium, or large facilities or other characteristics." MWR Act § 3(b)(2)(2). This consideration was of paramount importance to law enforcement agencies during the consideration of amendments to the MWR Act prior to its adoption. In fact, Senator Duckworth's staff asserted "it is unlikely that FCC would ever NOT consider costs associated with any safety and security measures necessary to provide intrastate prison phone services…unless FCC wants to be swiftly defeated in Federal litigation." Email Correspondence from Benjamin Rhodeside, Office of Senator Duckworth, dated March 17, 2022, Appendix A (JA___).

The Commission's own findings establish that facility costs differ dramatically by size, resulting in the creation of rate tiers, including an entirely new "extremely small" tier whose rate caps are roughly double those of large jails. Order, Table 1 (JA___). The record likewise establishes material cost differences

between audio and video services, with rate caps for video at two to three times audio in every tier. Order ¶¶ 10-18, 52 & Table 4 (JA___).

Against that backdrop, the Commission adopted a uniform $0.02 per minute facility additive that treats the costs of making IPCS available uniform, regardless of population size or services offered. Order ¶¶ 47-48 (JA___). NCIC proposed that the additive vary by facility size, consistent with the statute's enumerated considerations, but the Commission rejected the proposal on the ground that "[t]he lack of reliable correctional facility cost data in the record constrains our ability to justify adopting a different additive today, including one based on facility size." Order ¶ 47 (JA___). Meanwhile, the Commission gave "no weight" to the only contemporary facility cost survey in the record, submitted by Pay Tel, which reported facility costs averaging $0.08 per minute. Order, ¶ 107 & n.285 (JA___); see also Order, ¶¶ 103-107 (JA___).

The record supports the differences the Commission declined to consider. Using the Commission's own data, NCIC demonstrated that annual facility costs per incarcerated person rise from $134.61 in prisons to $592.24 in the smallest jails (0-49 ADP) for audio services, and from $32.65 to $272.24 for video services. NCIC Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 3 (filed Oct. 21, 2025) (JA___). Despite this showing, the Commission established a uniform additive that treated large prisons and the smallest jails alike, even though

Commission data demonstrated that facility costs vary greatly depending on facility size. This conclusion was further supported by the 2025 Facility Cost Study prepared by the National Sheriffs' Association, which validated the responses of 314 correctional facilities nationwide, and conclusively determined that the per-minute costs incurred by correctional facilities to make IPCS available are inversely dependent on the relative size of the facility. Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375, at 11 (filed Feb. 3, 2026).

The Commission's shifting characterizations of the additive underscore the arbitrariness. Defending the 2024 Order, the Commission described the $0.02 figure as an upper-bound allowance that did not affect the final caps, derived from data it conceded could not quantify facility costs with "any level of exactitude." FCC MCP 191 Br. at 20. The 2025 Order then adopted that same figure as an operative, uniform rate additive. Thus far, the Commission offers no rational explanation how the additive adequately compensates all facilities. The remedy is the one the statute prescribes, namely the adoption of a tiered-based additive calibrated to the facility size and service cost differences Congress directed the Commission to consider.

## V. THE COMMISSION'S REFUSAL TO ADOPT ENFORCEMENT AND DATA-COLLECTION PROCEDURES TO ADDRESS NONCOMPLIANT IPCS PROVIDERS WAS ARBITRARY AND CAPRICIOUS.

NCIC's fourth reconsideration ground asked the Commission to do two related things: (1) adopt procedures ensuring that *all* IPCS providers participate in the mandatory data collections on which the Commission's rates are built; and (2) investigate documented, ongoing violations of the IPCS rules. NCIC Pet. for Recon. at 18-20 (JA___). In support, NCIC identified approximately eight video-only IPCS providers operating without having registered with the Commission or filing the mandatory data collections required of all IPCS providers. NCIC also highlighted IPCS providers that impose (i) duplicative credit-card processing charges layered on top of costs already recovered in regulated rates across an estimated 85 percent of the industry, (ii) single-call fees of $3.00 or more against demonstrated costs near $0.25, (iii) per-minute video billing exceeding $0.35 in conflict with Commission  rules, and (iv) the pass-through of federal universal service charges on IPCS revenues not subject to those charges. *Id.* (JA___). NCIC showed that correcting these practices could reduce the ancillary charges consumers pay by as much as 90 percent.

The 2024 Order's only response was to modify the Commission's informal complaint form. 2024 Order ¶ 597 (JA___). The 2025 Order failed to address NCIC's arguments.

The omission is consequential as well as unexplained. The Order directs a new mandatory data collection and commits to adopting permanent rate caps by the end of the first quarter of 2027. However, the permanent caps will be calculated from IPCS data submissions even though the Commission has no procedures to compel submissions from unregistered IPCS providers. Order ¶ 81 (JA___). Rates built on a dataset that systematically omits non-compliant providers are not the product of reasoned decision-making, and will only perpetuate the failed rate methodology that undermined the 2024 Order. The integrity of the data underlying nationwide price regulation is an "important aspect of the problem," and the Commission "entirely failed to consider" it. *State Farm*, 463 U.S. at 43. This aspect of the Order, too, should be remanded with instructions to address NCIC's enforcement and data-integrity proposals on the merits.

## CONCLUSION

The Court should vacate the Order insofar as it (1) sets interim rate caps at the lowest bounds of the Commission's cost ranges; (2) refuses to reinstate cost-based ancillary service fees; (3) retains the prohibition on site commission payments and its preemption of state and local law; (4) adopts a uniform $0.02-per-minute facility rate additive; and (5) fails to adopt enforcement and data-collection procedures. The Court should remand for further proceedings in which the Commission faithfully implements the MWR Act's guarantee that all IPCS providers are fairly compensated, and all rates and charges are just and reasonable, while funding the safety and security measures on which correctional communications depend.

Respectfully submitted,

/s/ Lee G. Petro

Glenn S. Richards
Phillip J. DeRosier
Lee G. Petro
DICKINSON WRIGHT PLLC
1825 Eye Street, N.W., Suite 900
Washington, D.C. 20006
(202) 466-5961
GRichards@dickinson-wright.com
PDeRosier@dickinson-wright.com
LPetro@dickinson-wright.com

*Counsel for Petitioner Network Communications International Corp. d/b/a NCIC Correctional Services*

September 9, 2026

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and First Circuit Local Rule 32.0 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,046 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point type.

/s/ Lee G. Petro
Lee G. Petro

## CERTIFICATE OF SERVICE

I hereby certify that, on September 9, 2026, I caused this brief to be filed electronically with the Clerk of the Court through the Court's CM/ECF system, and that a copy of the same will be served on all counsel of record through the Court's CM/ECF system.

/s/ Lee G. Petro
Lee G. Petro

# APPENDIX A

**From:** Rhodeside, Benjamin (Duckworth) <Benjamin_Rhodeside@duckworth.senate.gov>
**Sent:** Thursday, March 17, 2022 10:40 AM
**Cc:** Hayes, Virginia (Duckworth) <Virginia_Hayes@duckworth.senate.gov>; Williams, Dion (Duckworth) <Dion_Williams@duckworth.senate.gov>; Bhat, Aneysha (Duckworth) <Aneysha_Bhat@duckworth.senate.gov>
**Subject:** FW: Duckworth ANS to S. 1541, Martha Wright-Reed Just and Reasonable Communications Act of 2021

I've attached:

- ANS language (MIR22062);
- Section-by-section summary;
- Redline showing how S. 1541, as amended by the ANS, would amend sections 152, 153 and 276 of title 46, United States Code;
- Final FCC TA feedback we received (we asked FCC to flag any additional drafting concerns, if any, and to provide comment on Section 3(b)(2) – FCC staff flagged no technical drafting concerns and offered feedback on how it views Section 3(b)(2)); and
- **March 14, 2022 letter from the National Sheriff's Association (NSA) to the CST Chair and Ranking Member requesting that CST favorably report S. 1541, as amended by ANS (MIR22062) and with no other amendments**.

The latter letter may be most critical in advancing this urgently needed legislative fix, because for years, NSA has opposed this bill. Now – not only does NSA **not** oppose the bill, but they are publicly on the record **supporting** committee passage of S. 1541, as amended by the Duckworth ANS.

**NOTE:**

My boss consulted with Cheryl Leanza on the language in MIR22062 and Cheryl is working to secure a letter of support from prison phone justice coalition – though that remains TBD.

- This is because there are certain activists who are deeply disappointed with Section 3(b)(2) of the ANS and strongly reject the notion that the FCC, in regulating intrastate prison communication rates and charges to ensure they are just and reasonable, should be statutorily required to "…consider costs associated with any safety and security measures necessary to provide [prison phone service]" and consider differences in such costs by small, medium or large facilities.
- Such concerns are why we specifically solicited additional FCC TA providing feedback on its interpretation of Section 3(b)(2) – which largely aligns with our view, namely that given the Administrative Procedures Act existing requirements – it is unlikely that FCC would ever NOT consider costs associated with any safety and security measures necessary to provide intrastate prison phone services, since orgs representing law enforcement officers and correctional facility personnel will definitely file material with FCC raising exactly those cost concerns – and unless FCC wants to be swiftly defeated in Federal litigation – one imagines it will definitely make sure to consider such cost concerns related to safety and security (which LEOs passionately assert do exist – with the same conviction that certain activists assert such costs do not exist).

Thank you,
Ben
202-344-9218

Benjamin Rhodeside
Legislative Director
Senator Tammy Duckworth
The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail. Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

**STATUTORY ADDENDUM**

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156

5 U.S.C. § 706(2)(A)

28 U.S.C. §§ 2112(a)(3), 2342, 2343, 2344

47 U.S.C. § 201

47 U.S.C. § 276

47 U.S.C. § 402(a)

**<u>The Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (01/05/2023)</u>**:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Martha Wright-Reed Just and Reasonable Communications Act of 2022".

SEC. 2. TECHNICAL AMENDMENTS.

(a) IN GENERAL.-Section 276 of the Communications Act of 1934 (47 U.S.C. 276) is amended- (1) in subsection (b)(1)(A)- (A) by striking "per call"; (B) by inserting ", and all rates and charges are just and reasonable," after "fairly compensated"; (C) by striking "each and every"; (D) by striking "call using" and inserting "communications using"; and (E) by inserting "or other calling device" after "payphone"; and (2) in subsection (d), by inserting "and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 3(1)" after "inmate telephone service".

(b) DEFINITION OF ADVANCED COMMUNICATIONS SERVICES.-Section 3(1) of the Communications Act of 1934 (47 U.S.C. 153(1)) is amended- (1) in subparagraph (C), by striking "and" at the end; (2) in subparagraph (D), by striking the period at the end and inserting "; and"; and (3) by adding at the end the following: "(E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.".

(c) APPLICATION OF THE ACT.-Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by inserting "section 276," after "sections 223 through 227, inclusive,".

SEC. 3. IMPLEMENTATION.

(a) RULEMAKING.-Not earlier than 18 months and not later than 24 months after the date of enactment of this Act, the Federal Communications Commission shall promulgate any regulations necessary to implement this Act and the amendments made by this Act.

(b) USE OF DATA.-In implementing this Act and the amendments made by this Act, including by promulgating regulations under subsection (a) and determining just and reasonable rates, the Federal Communications Commission- (1) may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider; and (2) shall consider costs associated with any safety and security measures necessary to provide a service described in paragraph (1) and

differences in the costs described in paragraph (1) by small, medium, or large facilities or other characteristics.

## SEC. 4. EFFECT ON OTHER LAWS.

Nothing in this Act shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities.

**5 U.S.C. § 706(2)(A)**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) contrary to constitutional right, power, privilege, or immunity;
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law;
> >
> > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> >
> > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**<u>Sections 28 U.S.C. §§ 2112(a)(3), 2342, 2343, 2344 provide</u>**:

**§ 2112(a)(3). Record on review and enforcement of agency orders**

(a)The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers. Such rules may authorize the agency, board, commission, or officer to file in the court a certified list of the materials comprising the record and retain and hold for the court all such materials and transmit the same or any part thereof to the court, when and as required by it, at any time prior to the final determination of the proceeding, and such filing of such certified list of the materials comprising the record and such subsequent transmittal of any such materials when and as required shall be deemed full compliance with any provision of law requiring the filing of the record in the court. The record in such proceedings shall be certified and filed in or held for and transmitted to the court of appeals by the agency, board, commission, or officer concerned within the time and in the manner prescribed by such rules. If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:

> (3)If an agency, board, commission, or officer receives two or more petitions for review of an order in accordance with the first sentence of paragraph (1) of this subsection, the agency, board, commission, or officer shall, promptly after the expiration of the ten-day period specified in that sentence, so notify the judicial panel on multidistrict litigation authorized by section 1407 of this title, in such form as that panel shall prescribe. The judicial panel on multidistrict litigation shall, by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified in the first sentence of paragraph (1), in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals. The judicial panel on multidistrict litigation shall, after providing notice to the public and an opportunity for the submission of comments, prescribe rules with respect to the consolidation of proceedings under this paragraph. The agency, board, commission, or officer concerned shall file the record in the court of appeals designated pursuant to this paragraph.

**§ 2342. Jurisdiction of court of appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of-

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47 . . . . Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

**§ 2343. Venue**

The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

**§ 2344. Review of orders; time; notice; contents of petition; service**

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of-

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

**Section 201 of the Communications Act of 1934, 47 U.S.C. § 201:**

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

**<u>Section 276 of the Communications Act of 1934, 47 U.S.C. § 276, provides in relevant part</u>:**

**§ 276. Provision of payphone service**

(a) Nondiscrimination safeguards

After the effective date of the rules prescribed pursuant to subsection (b), any Bell operating company that provides payphone service:

> (1) shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and
>
> (2) shall not prefer or discriminate in favor of its payphone service.

(b) Regulations

> (1) Contents of regulations - In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that-
>
> > (A) establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation;
> >
> > (B) discontinue the intrastate and interstate carrier access charge payphone service elements and payments in effect on February 8, 1996, and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A);
> >
> > (C) prescribe a set of nonstructural safeguards for Bell operating company payphone service to implement the provisions of paragraphs (1) and (2) of subsection (a), which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry-III (CC Docket No. 90-623) proceeding;
> >
> > (D) provide for Bell operating company payphone service providers to have the same right that independent payphone providers have to

negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry interLATA calls from their payphones, unless the Commission determines in the rulemaking pursuant to this section that it is not in the public interest; and

(E) provide for all payphone service providers to have the right to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry intraLATA calls from their payphones.

(2) Public interest telephones - In the rulemaking conducted pursuant to paragraph (1), the Commission shall determine whether public interest payphones, which are provided in the interest of public health, safety, and welfare, in locations where there would otherwise not be a payphone, should be maintained, and if so, ensure that such public interest payphones are supported fairly and equitably.

(3) Existing contracts - Nothing in this section shall affect any existing contracts between location providers and payphone service providers or interLATA or intraLATA carriers that are in force and effect as of February 8, 1996.

(c) State preemption - To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.

(d) "Payphone service" defined - As used in this section, the term "payphone service" means the provision of public or semi-public pay telephones, the provision of inmate telephone service and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 153(1) of this title in correctional institutions, and any ancillary services.

**Section 402 of the Communications Act of 1934, 47 U.S.C. § 402**:

**§ 402. Judicial review of Commission's orders and decisions**

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.