Nos. 26-8037 & 26-1449

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

No. 26-8037

IN RE: MCP 198

---

No. 26-1449

NETWORK COMMUNICATIONS INTERNATIONAL CORP.
D/B/A NCIC CORRECTIONAL SERVICES,

*Petitioner*,

SECURUS TECHNOLOGIES, LLC; GLOBAL TEL*LINK, D/B/A
VIAPATH TECHNOLOGIES; NATIONAL SHERRIFFS' ASSOCIATION,

*Intervenors*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents*,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.;
PENNSYLVANIA PRISON SOCIETY; UNITED CHURCH OF CHRIST
MEDIA JUSTICE MINISTRY, INC.; SECURUS TECHNOLOGIES, LLC,

*Intervenors*.

---

On Petitions for Review of an Order of the Federal Communications Commission

---

# BRIEF FOR SECURUS TECHNOLOGIES, LLC AS INTERVENOR IN SUPPORT OF NCIC CORRECTIONAL SERVICES

---


Michael H. Pryor
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

Scott H. Angstreich
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

*Counsel for Securus Technologies, LLC*


September 16, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor Securus Technologies, LLC ("Securus") submits the following corporate disclosure statement:

**Securus** is a privately held limited liability company and a wholly owned subsidiary of parent company Aventiv Technologies, LLC. Securus' ultimate parent entity is SCRS Intermediate Holding Corporation. Two entities own 10 percent or more of the stock of SCRS Intermediate Holding Corporation: Deutsche Bank Securities Inc. and Rubric Capital Master Fund LP. Deutsche Bank Securities Inc. is not itself publicly traded, but is a wholly owned subsidiary of Deutsche Bank AG, which is publicly traded. Rubric Capital Master Fund LP is not a publicly traded entity and is managed by Rubric Capital Management LP, a private registered investment adviser. Other than as set forth above, no other publicly held corporation owns 10 percent or more of its membership.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT .......................................................................1

STATEMENT OF THE ISSUE.........................................................................2

STATEMENT OF THE CASE..........................................................................3

ARGUMENT ..................................................................................................6

I. THE FCC'S CONTINUED PROHIBITION ON SEPARATE ANCILLARY SERVICE CHARGES IS ARBITRARY AND CAPRICIOUS.............................................................................7

II. THE FCC'S CALCULATION OF ANCILLARY SERVICE COSTS ON A PER-MINUTE BASIS IS ARBITRARY AND CAPRICIOUS...........................................................................10

CONCLUSION ...............................................................................................13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Ackerley Commc'ns of Massachusetts, Inc. v. City of Cambridge*, 135 F.3d 210 (1st Cir. 1998)....................7

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018)....................9

*Board of Cnty. Comm'rs v. EPA*, 72 F.4th 284 (D.C. Cir. 2023)....................7

*Boston Redevelopment Auth. v. National Park Serv.*, 838 F.3d 42 (1st Cir. 2016)....................7

*Cowels v. FBI*, 936 F.3d 62 (1st Cir. 2019)....................6

*Craker v. DEA*, 44 F.4th 48 (1st Cir. 2022)....................9

*Gulluni v. Levy*, 85 F.4th 76 (1st Cir. 2023)....................3

*Seavey v. Barnhart*, 276 F.3d 1 (1st Cir. 2001)....................7

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)....................9

### ADMINISTRATIVE DECISIONS

Memorandum Opinion and Order, *Investigation of Interstate Access Tariff Non-Recurring Charges*, 2 FCC Rcd 3498 (1987)....................8

Order, *Incarcerated People's Communications Services*, 40 FCC Rcd 4309 (2025)....................5

Report and Order and Order on Reconsideration, *Implementation of Section 224 of the Act*, 26 FCC Rcd 5240 (2011)....................8

Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services*, 40 FCC Rcd 9365 (2025)....................1, 2, 5, 6, 7, 8, 10, 11, 12, 13

Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services*, 39 FCC Rcd 7647 (2024).....3, 4, 5, 6, 7, 8, 9, 10, 11, 12

**STATUTES AND REGULATIONS**


Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ...........................................3

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) ........................................3

5 U.S.C. § 706(2)(A)..........................................................................................3, 6

47 C.F.R.:

§ 64.6000 ..........................................................................................2

§ 64.6100(a)........................................................................................12

## PRELIMINARY STATEMENT

Securus is one of the nation's largest providers of incarcerated people's communications services ("IPCS") and related software and equipment to correctional facilities across the country. Its services allow incarcerated individuals to communicate with friends and family outside the correctional facility and to access educational, vocational, and productivity content within the facility.

To provide those services, IPCS providers must perform a number of administrative tasks — account creation and setup, payment authorization and verification, payment processing (including fraud detection), and so on. While these tasks are ancillary, they are also necessary components to the provision of IPCS and come at a cost to providers of IPCS. Until recently, the Federal Communications Commission ("FCC") permitted IPCS providers to assess separate (but limited) fees for tasks such as automated payments, third-party financial transactions, live agent transactions, obtaining a paper bill, and single-call transactions.

But in 2024 — and continued in the 2025 decision[1] at issue here — the FCC eliminated the ability of IPCS providers to impose separate per-use charges for these ancillary services on the consumers that use them. Instead, the FCC decided

---

[1] Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services*, 40 FCC Rcd 9365 (2025) ("*2025 Order*") (JA___-___).

that IPCS providers should recover the costs of those ancillary services through the per-minute rates charged to all IPCS consumers. As Petitioner Network Communications International Corporation ("NCIC") explains, that was error.[2]

The FCC's 2025 decision to continue prohibiting providers from charging separate fees for ancillary services and instead to require them to recover those amounts in per-minute rates was arbitrary and capricious. The FCC disregarded record evidence showing that this approach prevents IPCS providers from recovering their legitimately incurred costs associated with providing these ancillary services to IPCS consumers. The Court should vacate the FCC's order insofar as it continues the prohibition on separate ancillary service charges (thus reviving the FCC's prior rule allowing, but limiting, such charges) and remand to the FCC for further proceedings.

## STATEMENT OF THE ISSUE

Whether the *2025 Order*'s continuing prohibition on the imposition of separate ancillary service charges[3] and failure to account for the costs incurred in the provision of such services is arbitrary, capricious, an abuse of discretion, or

---

[2] Securus does not address the other issues NCIC raises in its brief.

[3] The term "ancillary service charge" encompasses any charge that is associated with the provision or use of the service that is not (a) included in the per-minute charges or (b) an authorized fee, a mandatory fee, or a mandatory tax. *2025 Order* ¶ 108 n.286 (JA____); *see also* 47 C.F.R. § 64.6000 (defining "ancillary service charge").

otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023) ("An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded an important aspect of the problem, offered an explanation that runs counter to the evidence, or when a reasonable explanation for the agency's decision cannot be discerned.").

## STATEMENT OF THE CASE

In 2022, Congress adopted the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (the "MWR Act"),[4] which amended the federal Communications Act of 1934 to expand the FCC's authority over IPCS. In 2024, the FCC adopted "comprehensive reforms" to implement the MWR Act: (1) "Lower existing per-minute rate caps for audio IPCS and establish initial interim per-minute rate caps for video IPCS"; (2) "Lower the overall prices consumers pay for IPCS and simplify the pricing structure by incorporating the costs of ancillary services in the rate caps and prohibiting providers from imposing any separate ancillary service charges on IPCS consumers"; and (3) "Prohibit IPCS providers from making site commission payments for IPCS and preempt state and local laws and regulations requiring such commissions." *2024 Order*[5] ¶¶ 2-3 (JA____-____).

---

[4] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023).

[5] Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services*, 39 FCC Rcd 7647 (2024) ("*2024 Order*") (JA____-____). Appeals of the

The FCC adopted a staggered implementation period for its new rate caps and site commission ban based on the type of correctional facility at issue, the terms of existing contracts, and any required state legislative or administrative process. *Id.* ¶¶ 588-591 (JA____-____).

With respect to ancillary service charges, the FCC determined including the costs of providing ancillary services in the per-minute rate caps was the "best means" to ensure just and reasonable rates and fair compensation for providers. *Id.* ¶ 408 (JA____-____). The FCC therefore eliminated all separate ancillary service charges and included the "costs" associated with ancillary services in the per-minute rate caps. *Id.* ¶ 414 (JA____).[6] The FCC did not stagger implementation of its new ban on separate charges for ancillary services. *Id.* ¶ 587 (JA____-____).

Several parties filed petitions for reconsideration of the *2024 Order* asking the FCC to reinstate the previously permissible separate ancillary service charges,[7]

---

FCC's *2024 Order* currently are pending in this Court under *In re: MCP 191*, along with the question of which issues raised in those appeals are moot.

[6] The FCC determined $0.011 per minute should be included to account for ancillary service costs and reached that amount based on calculations using providers billed and unbilled audio and video IPCS minutes. *2024 Order* App. F ¶ 26 (JA____).

[7] *See* HomeWAV Recon Petition at 3-8 (JA____-____); NCIC Ex Parte at 6-7 (JA____-____) (providing its reconsideration proposal); *see also generally* NCIC Recon Petition (JA____-____).

which received significant support in the record.[8] These parties argued that the "costs" allocated for ancillary services in the per-minute rate caps did not provide "fair compensation" to providers as required under the FCC's statutory mandate. *2025 Order* ¶ 111 (JA____).

In the *2025 Order*, the FCC further revised the "IPCS regulatory framework" adopted in the *2024 Order* "to more accurately reflect the costs providers and correctional authorities incur in the provision of IPCS." *Id.* ¶ 2 (JA____).[9] The FCC recognized the mandates in the *2024 Order* created "unintended consequences," "implementation challenges," and "risks to safety and security." *Id.* ¶ 1 (JA____). The FCC found changes to the regulatory framework were necessary to balance its "dual statutory mandates — just and reasonable rates for consumers and providers and fair compensation for providers." *Id.* ¶ 2 (JA____).

Specifically, the *2025 Order* increased the per-minute rate caps applicable to audio and video IPCS, and adopted an additional rate additive to address the costs

---

[8] *See* Securus Recon Comments at 2-3 (JA____-____); Pay Tel Recon Comments at 2-3 (JA____-____); HomeWAV Ex Parte at 1-2 (JA____-____); Securus Ex Parte at 8-10 (JA____-____); Pay Tel Ex Parte at 1-3 (JA____-____); ViaPath Ex Parte at 5-7 (JA____-____); *see also generally* Pay Tel Waiver Petition (JA____-____).

[9] Before issuing the *2025 Order*, the FCC waived the implementation deadlines adopted in the *2024 Order* for the rate caps and site commission prohibition, but did not waive the implementation deadline with respect to the ancillary service charge prohibition. Order, *Incarcerated People's Communications Services*, 40 FCC Rcd 4309 (2025) (JA____-____).

incurred by correctional authorities to make IPCS available in facilities. *Id.* ¶ 8 (JA____). While the *2025 Order* addressed some of the issues raised in the reconsideration petitions, the FCC continued to prohibit providers from assessing separate ancillary service charges (reiterating its findings from the *2024 Order*), but sought further comment on the issue "to be thorough." *Id.* ¶¶ 108, 110 (JA____, JA____).

The *2025 Order*'s continuing prohibition on the imposition of separate ancillary service charges and failure to account for the costs incurred in the provision of ancillary services is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The FCC ignored the record evidence that such an approach prevents IPCS providers from recovering their legitimately incurred costs associated with ancillary services.

## ARGUMENT

The FCC's continued requirement in the *2025 Order* that providers recover the costs of ancillary services exclusively through per-minute rates is arbitrary and capricious, has not been sufficiently explained, and is contrary to record evidence. *See Cowels v. FBI*, 936 F.3d 62, 67 (1st Cir. 2019) ("An agency action is arbitrary and capricious if the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of

opinion or the application of agency expertise.' ") (quoting *Boston Redevelopment Auth. v. National Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016)); *Seavey v. Barnhart*, 276 F.3d 1, 12 (1st Cir. 2001) (finding remand is appropriate when an agency "has provided insufficient explanation for its action").

The Court should therefore vacate the *2025 Order* with respect to its treatment of ancillary service costs and remand to the FCC for further proceedings. *See Board of Cnty. Comm'rs v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) ("If parts of a regulation are invalid and other parts are not, we set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together."); *see also Ackerley Commc'ns of Massachusetts, Inc. v. City of Cambridge*, 135 F.3d 210, 215-16 (1st Cir. 1998) (similar, as to unconstitutional provisions within a statute). Pending review on remand, the FCC's prior rule allowing separate ancillary service charges (but limiting those charges) would apply.

## I. THE FCC'S CONTINUED PROHIBITION ON SEPARATE ANCILLARY SERVICE CHARGES IS ARBITRARY AND CAPRICIOUS

In the *2024 Order*, the FCC prohibited IPCS providers from imposing separate ancillary service charges and instead incorporated them into the per-minute rates. *2024 Order* ¶ 408 (JA____-____). The FCC continued this practice in the

*2025 Order* "for the same reasons the [FCC] articulated in the *2024 IPCS Order*." *2025 Order* ¶ 109 (JA____). This determination is arbitrary and capricious.

First, the FCC asserts that ancillary services "are inherent in the provision of IPCS." *2024 Order* ¶ 415 (JA____). But the FCC acknowledges that not all incarcerated persons (or their friends and family) will use all ancillary services or use them all equally. *Id.* ¶¶ 417, 425 (JA____, JA____-____). Continuing to include the costs of ancillary services in general IPCS rates thus inappropriately shifts those costs to non-cost-causers, which the FCC has long-advocated against.[10] Indeed, in the same order in which it banned separate ancillary service charges, the FCC stated its goal to ensure IPCS consumers "are charged no more than the cost of their calls." *Id.* App. E, ¶ 4 (JA____-____). But the FCC then unfairly burdened those consumers by including ancillary service costs within general rates, making *all* incarcerated persons (or their friends and family) bear those costs even if they do not use those ancillary services or do not use them to the same extent as others.[11] The FCC's inconsistent application of that goal renders the *2025 Order* arbitrary

---

[10] *See*, *e.g.*, Report and Order and Order on Reconsideration, *Implementation of Section 224 of the Act*, 26 FCC Rcd 5240, ¶ 143 (2011) ("Under cost causation principles, if a customer is causally responsible for the incurrence of a cost, then that customer — the cost causer — pays a rate that covers this cost."); Memorandum Opinion and Order, *Investigation of Interstate Access Tariff Non-Recurring Charges*, 2 FCC Rcd 3498, ¶ 34 (1987) ("[W]e believe the public interest is best served, and a competitive marketplace is best encouraged, by policies that promote the recovery of costs from the cost-causer.").

[11] *See* Pay Tel Recon Comments at 2-3 (JA____-____).

and capricious. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) ("Because FERC's decision is internally inconsistent, it is arbitrary and capricious.").

Second, the FCC asserts that eliminating separate ancillary charges will eliminate abuses. *2024 Order* ¶ 418 (JA____-____). But curbing abuses should be addressed through rules targeting that behavior, not spreading the costs of ancillary services across all IPCS consumers.[12] "When promulgating new regulations, an agency must consider alternatives within the ambit of existing policy . . . . The key question is whether the agency entirely failed to consider an important aspect of the problem." *Craker v. DEA*, 44 F.4th 48, 63 (1st Cir. 2022); *see also U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 571 (D.C. Cir. 2004) ("[A] rule is irrational . . . if . . . a narrower alternative . . . has all the same advantages and fewer disadvantages, and the agency has not articulated any reasonable explanation for the proposed alternative."). The FCC does not explain why it could not address any abusive practices directly through such rules.

Finally, the FCC claims prohibiting separate charges will "better align with similar services in the non-carceral communications context." *2024 Order* ¶ 423 (JA____). Yet the record demonstrates that imposing a separate fee in the IPCS context — such as a payment processing fee — is no different from similar charges

[12] *See* Securus Ex Parte at 9 (JA____).

incurred and recouped by other types of communications providers and businesses.[13] Indeed, it is hard to find a business today that does not impose some type of fee (or loss of discounts) for paying by credit card, including wireless providers, gas stations, restaurants, utilities, and even the federal government.[14] The FCC offers no reasoned explanation for treating IPCS providers differently.

## II. THE FCC'S CALCULATION OF ANCILLARY SERVICE COSTS ON A PER-MINUTE BASIS IS ARBITRARY AND CAPRICIOUS

The *2024 Order* concluded the total industry cost to provide ancillary services was approximately $0.011 per minute and incorporated that amount into the adopted rate caps. *2024 Order* App. F, Tbl. 11 (JA____).[15] To reach this determination, the FCC calculated the total costs for each of the permitted ancillary services and spread that amount across all audio and video calling minutes. *Id.* App. F, ¶ 26 (JA____). The *2025 Order* continued this practice by incorporating the same $0.011 figure for ancillary service costs in the newly adopted rate caps. *2025 Order* App. D, Tbl. 13 (JA____). The FCC erred in its calculation of the amount of costs attributable to ancillary services.

---

[13] *See* ViaPath Ex Parte at 5-6 (JA____-____).

[14] *See id.* at 6 (JA____).

[15] The FCC employed a "zone of reasonableness" approach in setting IPCS rates by establishing lower bounds and upper bounds, and then ultimately setting the rates at the lower bounds. *2024 Order* ¶¶ 189, 209 (JA____-____, JA____-____). The FCC continued this approach in the *2025 Order*. *2025 Order* ¶¶ 71, 76 (JA____, JA____).

It is not appropriate to calculate ancillary service costs based on calling minutes of use. IPCS providers incur ancillary service costs as those services are used (and each and every time they are used), not when consumers use minutes to make calls. For example, a provider incurs a cost for allowing a consumer to use a payment card to deposit money into an account. *2025 Order* ¶ 110 (JA____). The provider incurs that cost regardless of whether the account is ever used for calling or the number of calling minutes used, meaning the provider might never fully recover its costs associated with facilitating each deposit.

The FCC's $0.011 figure also ignores that eliminating per-use charges results in an increased number of transactions and smaller transaction amounts, which the record reflects occurred after the *2024 Order*. *Id.* ¶ 111 (JA____).[16] The FCC's prohibition on separate charges has led to a considerable increase in the number of deposits with a corresponding reduction in the amount of such deposits, both of which have significantly increased providers' costs beyond the costs incurred when per-use charges were permitted.[17] While the FCC recognized the potential that its approach would result in increased usage of ancillary services

---

[16] *See* Securus Ex Parte at 8-9 (JA____-____); Pay Tel Ex Parte at 2-3 (JA____-____).

[17] For example, Securus noted the average monthly number of funding transactions increased by 14% and the average deposit amount dropped by around $5.00. *See* Securus Ex Parte at 9 (JA____).

(*2024 Order* ¶ 423 (JA___)), it failed to account for the resulting cost increase when calculating the rate caps in the *2025 Order*.

The problem is also made worse by the FCC's decision to prohibit IPCS providers from setting a minimum deposit amount. *2025 Order* ¶ 117 (JA____-____); *see also* 47 C.F.R. § 64.6100(a). Minimum purchase amounts for use of a payment card are common in retail businesses, based on the recognition that businesses incur certain card processing fees that do not vary based on the amount charged to the card. The same is true for IPCS providers — each deposit made using a payment card, regardless of the size of the deposit, results in the provider incurring a fixed processing fee that the provider may not fully recover if the deposit amount is too small.[18]

Therefore, to the extent the FCC continues to incorporate ancillary service costs into per-minute rates, the amount to be included must accurately reflect record evidence of provider costs and consumer habits or other steps must be taken to ensure providers can recover their legitimately incurred costs.

[18] *See* Securus Recon Comments at 2-3 (JA____-____); Securus Ex Parte at 9-10 (JA____-____).

## CONCLUSION

The Court should vacate the portion of the *2025 Order* continuing the prohibition on separate ancillary service charges (thus reverting to the FCC's prior rule allowing but limiting such charges) and remand to the FCC for further proceedings.

Respectfully submitted,

*/s/ Scott H. Angstreich*

Michael H. Pryor
BROWNSTEIN HYATT FARBER SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

Scott H. Angstreich
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

*Counsel for Securus Technologies, LLC*

September 16, 2026

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit approved by the Court in its July 23, 2026 Order (3,000 words) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f):

☑ this document contains 2,887 words, or

□ this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point or

□ this document has been prepared in a monospaced typeface using _____ with ________.

/s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Securus Technologies, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 16, 2026, I caused a copy of the foregoing Intervenor Brief of Securus Technologies, LLC to be filed electronically with the Clerk of the Court through the Court's CM/ECF system and that a copy of the same will be served on all counsel of record through the Court's CM/ECF system.

/s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Securus Technologies, LLC*